**CV3 LEGAL**
CHARLES VLASIC III, ESQ.
Nevada Bar No. 11308
197 E. California Ave., Ste. 302
Las Vegas, Nevada 89104
Telephone: (702) 551-1178
Facsimile: (702) 551-1178
cvlasic@cv3legal.com

**REID RUBINSTEIN & BOGATZ**
I. SCOTT BOGATZ, ESQ.
Nevada Bar No. 3367
BRAD LIPMAN, ESQ.
Nevada Bar No. 14567
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
Telephone: (702) 776-7000
Facsimile: (702) 776-7900
sbogatz@rrblf.com
blipman@rrblf.com

*Attorneys for Defendant/*
*Counterclaimant/Third-Party Plaintiff,*
*Ka Tat Au-Yeung*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MAGMA HOLDING, INC., a Nevada corporation; and META LAB, INC. a Nevada corporation,<br><br>       Plaintiffs,<br><br>vs.<br><br>KA TAT "KARTER" AU-YEUNG, an individual,<br><br>       Defendant. | Case No.: 2:20-cv-00406-RFB-BNW<br><br><br><br>**ANSWER, COUNTERCLAIM AND THIRD-PARTY COMPLAINT** |
| KA TAT AU-YEUNG, an individual,<br><br>       Counterclaimant,<br><br>vs.<br><br>MAGMA HOLDING, INC., a Nevada corporation; and META LAB, INC. a Nevada corporation,<br><br>       Counterdefendants. | |

KA TAT AU-YEUNG, an individual,

                Third-Party Plaintiff,

vs.

YUXIANG GAO, an individual; QIAN XU, an individual; DOES I-X, inclusive; and ROE ENTITIES 1-10, inclusive,

                Third-Party Defendants.

Defendant, Ka Tat Au-Yeung ("Karter" or "Defendant"), by and through his attorneys, the law firms of CV3 Legal and Reid Rubinstein & Bogatz, for his Answer to the Complaint filed by Magma Holding, Inc. ("Magma") and Meta Lab, Inc. ("Meta") on or about February 26, 2020 ("Complaint"), hereby admits, denies and alleges as follows:

### PARTIES

1.     In answering the allegations contained in Paragraph 1 of the Complaint, Defendant admits that Magma is a Nevada corporation and that it is a wholly-owned subsidiary of MOTI Technology Co., LTD. ("MOTI"); however, Defendant denies the remaining allegations contained therein.

2.     In answering the allegations contained in Paragraph 2 of the Complaint, Defendant admits the allegations contained therein.

3.     In answering the allegations contained in Paragraph 3 of the Complaint, Defendant admits that Karter resides in Clark County, Nevada and that Karter was a corporate director and officer of both Magma and Meta; however, Defendant denies the remaining allegations contained therein.

### JURISDICTION AND VENUE

4.     In answering the allegations contained in Paragraph 4 of the Complaint, Defendant denies the allegations contained therein.

5.     In answering the allegations contained in Paragraph 5 of the Complaint, Defendant denies the allegations contained therein.

6.     In answering the allegations contained in Paragraph 6 of the Complaint, Defendant denies the allegations contained therein.

## GENERAL ALLEGATIONS

### BACKGROUND FACTS RE MAGMA, META, AND KARTER

7.     In answering the allegations contained in Paragraph 7 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore denies same.

8.     In answering the allegations contained in Paragraph 8 of the Complaint, Defendant admits that Magma was incorporated on or about July 2, 2018, that Karter served on Magma's Board of Directors, was named Magma's corporate secretary, and was Magma's primary sales representative; however, Defendant denies the remaining allegations contained therein.

9.      In answering the allegations contained in Paragraph 9 of the Complaint, Defendant denies the allegations contained therein.

10.     In answering the allegations contained in Paragraph 10 of the Complaint, Defendant admits the allegations contained therein.

11.     In answering the allegations contained in Paragraph 11 of the Complaint, Defendant denies the allegations contained therein.

### KARTER'S UNAUTHORIZED MONEY TRANSFERS

12.     In answering the allegations contained in Paragraph 12 of the Complaint, Defendant denies the allegations contained therein.

13.     In answering the allegations contained in Paragraph 13 of the Complaint, Defendant denies the allegations contained therein.

14.     In answering the allegations contained in Paragraph 14 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore denies same.

15.     In answering the allegations contained in Paragraph 15 of the Complaint,

Defendant denies the allegations contained therein.

16.     In answering the allegations contained in Paragraph 16 of the Complaint, Defendant denies the allegations contained therein.

### KARTER'S INTERFERENCE WITH MAGMA'S/META'S BUSINESS OPERATIONS

17.     In answering the allegations contained in Paragraph 17 of the Complaint, Defendant admits that Magma sells its products through a number of websites, including the Eightcig Website and Eightvape Website; however, Defendant denies the remaining allegations contained therein.

### GoDaddy

18.     In answering the allegations contained in Paragraph 18 of the Complaint, Defendant admits that Eightcig and Eightvape Websites are registered with GoDaddy; however, Defendant is without knowledge or information sufficient to form a belief as to the truth of the balance of the remaining allegations contained therein, and therefore denies same.

19.     In answering the allegations contained in Paragraph 19 of the Complaint, Defendant denies the allegations contained therein.

### Shopify

20.     In answering the allegations contained in Paragraph 20 of the Complaint, Defendant admits that Shopify is an eCommerce platform through which Magma operates the Eightvape Website; however, Defendant denies the remaining allegations contained therein.

21.     In answering the allegations contained in Paragraph 21 of the Complaint, Defendant denies the allegations contained therein.

22.     In answering the allegations contained in Paragraph 22 of the Complaint, Defendant denies the allegations contained therein.

23.     In answering the allegations contained in Paragraph 23 of the Complaint, Defendant denies the allegations contained therein.

### BigCommerce

24.     In answering the allegations contained in Paragraph 24 of the Complaint,

Defendant admits that BigCommerce is an eCommerce platform through which Magma operates the Eightcig Website; however, Defendant denies the remaining allegations contained therein.

25.     In answering the allegations contained in Paragraph 25 of the Complaint, Defendant denies the allegations contained therein.

26.     In answering the allegations contained in Paragraph 26 of the Complaint, Defendant denies the allegations contained therein.

27.     In answering the allegations contained in Paragraph 27 of the Complaint, Defendant denies the allegations contained therein.

28.     In answering the allegations contained in Paragraph 28 of the Complaint, Defendant denies the allegations contained therein.

**Google G Suite**

29.     In answering the allegations contained in Paragraph 29 of the Complaint, Defendant denies the allegations contained therein.

30.     In answering the allegations contained in Paragraph 30 of the Complaint, Defendant denies the allegations contained therein.

31.     In answering the allegations contained in Paragraph 31 of the Complaint, Defendant denies the allegations contained therein.

32.     In answering the allegations contained in Paragraph 32 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore denies same.

**BankCard USA**

33.     In answering the allegations contained in Paragraph 33 of the Complaint, Defendant admits that BankCard USA acts as the Merchant Service Provider for the Eightvape and Eightcig Website and that Karter is a signer and personal guarantor of the BankCard USA Accounts; however, Defendant denies the remaining allegations contained therein.

34.     In answering the allegations contained in Paragraph 34 of the Complaint,

Defendant denies the allegations contained therein.

35.    In answering the allegations contained in Paragraph 35 of the Complaint, Defendant denies the allegations contained therein.

36.    In answering the allegations contained in Paragraph 36 of the Complaint, Defendant denies the allegations contained therein.

**KARTER'S UNAUTHORIZED ACCESS OF MAGMA'S/META'S COMPUTER SYSTEMS AND MISAPPROPRIATION OF TRADE SECRETS**

37.    In answering the allegations contained in Paragraph 37 of the Complaint, Defendant denies the allegations contained therein.

38.    In answering the allegations contained in Paragraph 38 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore denies same.

39.    In answering the allegations contained in Paragraph 39 of the Complaint, Defendant denies the allegations contained therein.

40.    In answering the allegations contained in Paragraph 40 of the Complaint, Defendant denies the allegations contained therein.

41.    In answering the allegations contained in Paragraph 41 of the Complaint, Defendant denies the allegations contained therein.

42.    In answering the allegations contained in Paragraph 42 of the Complaint, Defendant denies the allegations contained therein.

43.    In answering the allegations contained in Paragraph 43 of the Complaint, Defendant denies the allegations contained therein.

44.    In answering the allegations contained in Paragraph 44 of the Complaint, Defendant denies the allegations contained therein.

45.    In answering the allegations contained in Paragraph 45 of the Complaint, Defendant denies the allegations contained therein.

**FIRST CAUSE OF ACTION**
**(Conversion)**

46.     In answering the allegations contained in Paragraph 46 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

47.     In answering the allegations contained in Paragraph 47 of the Complaint, Defendant denies the allegations contained therein.

48.     In answering the allegations contained in Paragraph 48 of the Complaint, Defendant denies the allegations contained therein.

49.     In answering the allegations contained in Paragraph 49 of the Complaint, Defendant denies the allegations contained therein.

50.     In answering the allegations contained in Paragraph 50 of the Complaint, Defendant denies the allegations contained therein.

**SECOND CAUSE OF ACTION**
**(Embezzlement)**

51.     In answering the allegations contained in Paragraph 51 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

52.     In answering the allegations contained in Paragraph 52 of the Complaint, Defendant denies the allegations contained therein.

53.     In answering the allegations contained in Paragraph 53 of the Complaint, Defendant denies the allegations contained therein.

54.     In answering the allegations contained in Paragraph 54 of the Complaint, Defendant denies the allegations contained therein.

55.     In answering the allegations contained in Paragraph 55 of the Complaint, Defendant denies the allegations contained therein.

56.     In answering the allegations contained in Paragraph 56 of the Complaint, Defendant denies the allegations contained therein.

**THIRD CAUSE OF ACTION**
**(Claim and Delivery)**

57.     In answering the allegations contained in Paragraph 57 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

58.     In answering the allegations contained in Paragraph 58 of the Complaint, Defendant denies the allegations contained therein.

59.     In answering the allegations contained in Paragraph 59 of the Complaint, Defendant denies the allegations contained therein.

60.     In answering the allegations contained in Paragraph 60 of the Complaint, Defendant denies the allegations contained therein.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

61.     In answering the allegations contained in Paragraph 61 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

62.     In answering the allegations contained in Paragraph 62 of the Complaint, Defendant denies the allegations contained therein.

63.     In answering the allegations contained in Paragraph 63 of the Complaint, Defendant denies the allegations contained therein.

64.     In answering the allegations contained in Paragraph 64 of the Complaint, Defendant denies the allegations contained therein.

65.     In answering the allegations contained in Paragraph 65 of the Complaint, Defendant denies the allegations contained therein.

66.     In answering the allegations contained in Paragraph 66 of the Complaint, Defendant denies the allegations contained therein.

67.     In answering the allegations contained in Paragraph 67 of the Complaint, Defendant denies the allegations contained therein.

68.     In answering the allegations contained in Paragraph 68 of the Complaint,

Defendant denies the allegations contained therein.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

69.     In answering the allegations contained in Paragraph 69 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

70.     In answering the allegations contained in Paragraph 70 of the Complaint, Defendant admits the allegations contained therein.

71.     In answering the allegations contained in Paragraph 71 of the Complaint, Defendant denies the allegations contained therein.

72.     In answering the allegations contained in Paragraph 72 of the Complaint, Defendant denies the allegations contained therein.

73.     In answering the allegations contained in Paragraph 73 of the Complaint, Defendant denies the allegations contained therein.

74.     In answering the allegations contained in Paragraph 74 of the Complaint, Defendant denies the allegations contained therein.

## SIXTH CAUSE OF ACTION
### (Breach of Contract – Confidential Information and Invention Assignment Agreement)

75.     In answering the allegations contained in Paragraph 75 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

76.     In answering the allegations contained in Paragraph 76 of the Complaint, Defendant denies the allegations contained therein.

77.     In answering the allegations contained in Paragraph 77 of the Complaint, Defendant denies the allegations contained therein.

78.     In answering the allegations contained in Paragraph 78 of the Complaint, Defendant denies the allegations contained therein.

79.     In answering the allegations contained in Paragraph 79 of the Complaint,

Defendant denies the allegations contained therein.

80. In answering the allegations contained in Paragraph 80 of the Complaint, Defendant denies the allegations contained therein.

## SEVENTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Confidential Information and Invention Assignment Agreement)**

81. In answering the allegations contained in Paragraph 81 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

82. In answering the allegations contained in Paragraph 82 of the Complaint, Defendant denies the allegations contained therein.

83. In answering the allegations contained in Paragraph 83 of the Complaint, Defendant denies the allegations contained therein.

84. In answering the allegations contained in Paragraph 84 of the Complaint, Defendant denies the allegations contained therein.

85. In answering the allegations contained in Paragraph 85 of the Complaint, Defendant denies the allegations contained therein.

86. In answering the allegations contained in Paragraph 86 of the Complaint, Defendant denies the allegations contained therein.

87. In answering the allegations contained in Paragraph 87 of the Complaint, Defendant denies the allegations contained therein.

88. In answering the allegations contained in Paragraph 88 of the Complaint, Defendant denies the allegations contained therein.

## EIGHTH CAUSE OF ACTION
**(Breach of Contract – Confirmation Letter)**

89. In answering the allegations contained in Paragraph 89 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

90. In answering the allegations contained in Paragraph 90 of the Complaint,

Defendant denies the allegations contained therein.

91.     In answering the allegations contained in Paragraph 91 of the Complaint, Defendant denies the allegations contained therein.

92.     In answering the allegations contained in Paragraph 92 of the Complaint, Defendant denies the allegations contained therein.

93.     In answering the allegations contained in Paragraph 93 of the Complaint, Defendant denies the allegations contained therein.

94.     In answering the allegations contained in Paragraph 94 of the Complaint, Defendant denies the allegations contained therein.

## NINTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Confirmation Letter)**

95.     In answering the allegations contained in Paragraph 95 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

96.     In answering the allegations contained in Paragraph 96 of the Complaint, Defendant denies the allegations contained therein.

97.     In answering the allegations contained in Paragraph 97 of the Complaint, Defendant denies the allegations contained therein.

98.     In answering the allegations contained in Paragraph 98 of the Complaint, Defendant denies the allegations contained therein.

99.     In answering the allegations contained in Paragraph 99 of the Complaint, Defendant denies the allegations contained therein.

100.    In answering the allegations contained in Paragraph 100 of the Complaint, Defendant denies the allegations contained therein.

101.    In answering the allegations contained in Paragraph 101 of the Complaint, Defendant denies the allegations contained therein.

102.    In answering the allegations contained in Paragraph 102 of the Complaint,

Defendant denies the allegations contained therein.

## TENTH CAUSE OF ACTION
### (Violation of Lanham Act by Use of False Designation 15 U.S.C. § 1125 (a)(1)(A))

103.    In answering the allegations contained in Paragraph 103 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

104.    In answering the allegations contained in Paragraph 104 of the Complaint, Defendant denies the allegations contained therein.

105.    In answering the allegations contained in Paragraph 105 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained therein, and therefore denies same.

106.    In answering the allegations contained in Paragraph 106 of the Complaint, Defendant denies the allegations contained therein.

107.    In answering the allegations contained in Paragraph 107 of the Complaint, Defendant denies the allegations contained therein.

108.    In answering the allegations contained in Paragraph 108 of the Complaint, Defendant denies the allegations contained therein.

109.    In answering the allegations contained in Paragraph 109 of the Complaint, Defendant denies the allegations contained therein.

110.    In answering the allegations contained in Paragraph 110 of the Complaint, Defendant denies the allegations contained therein.

## ELEVENTH CAUSE OF ACTION
### (Violation of the Computer Fraud and Abuse Act 18 U.S.C. §1030(a)(2))

111.    In answering the allegations contained in Paragraph 111 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

112.    In answering the allegations contained in Paragraph 112 of the Complaint, Defendant denies the allegations contained therein.

113.    In answering the allegations contained in Paragraph 113 of the Complaint, Defendant denies the allegations contained therein.

114.    In answering the allegations contained in Paragraph 114 of the Complaint, Defendant denies the allegations contained therein.

## TWELFTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations)

115.    In answering the allegations contained in Paragraph 115 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

116.    In answering the allegations contained in Paragraph 116 of the Complaint, Defendant denies the allegations contained therein.

117.    In answering the allegations contained in Paragraph 117 of the Complaint, Defendant denies the allegations contained therein.

118.    In answering the allegations contained in Paragraph 118 of the Complaint, Defendant denies the allegations contained therein.

119.    In answering the allegations contained in Paragraph 119 of the Complaint, Defendant denies the allegations contained therein.

120.    In answering the allegations contained in Paragraph 120 of the Complaint, Defendant denies the allegations contained therein.

121.    In answering the allegations contained in Paragraph 121 of the Complaint, Defendant denies the allegations contained therein.

122.    In answering the allegations contained in Paragraph 122 of the Complaint, Defendant denies the allegations contained therein.

## THIRTEENTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836)

123.    In answering the allegations contained in Paragraph 123 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

124.    In answering the allegations contained in Paragraph 124 of the Complaint, Defendant denies the allegations contained therein.

125.    In answering the allegations contained in Paragraph 125 of the Complaint, Defendant denies the allegations contained therein.

126.    In answering the allegations contained in Paragraph 126 of the Complaint, Defendant denies the allegations contained therein.

127.    In answering the allegations contained in Paragraph 127 of the Complaint, Defendant denies the allegations contained therein.

## FOURTEENTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets – NRS 600A))

128.    In answering the allegations contained in Paragraph 128 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

129.    In answering the allegations contained in Paragraph 129 of the Complaint, Defendant denies the allegations contained therein.

130.    In answering the allegations contained in Paragraph 130 of the Complaint, Defendant denies the allegations contained therein.

131.    In answering the allegations contained in Paragraph 131 of the Complaint, Defendant denies the allegations contained therein.

132.    In answering the allegations contained in Paragraph 132 of the Complaint, Defendant denies the allegations contained therein.

133.    In answering the allegations contained in Paragraph 133 of the Complaint, Defendant denies the allegations contained therein.

## FIFTEENTH CAUSE OF ACTION
### (Injunctive Relief)

134.    In answering the allegations contained in Paragraph 134 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

135.   In answering the allegations contained in Paragraph 135 of the Complaint, Defendant denies the allegations contained therein.

136.   In answering the allegations contained in Paragraph 136 of the Complaint, Defendant denies the allegations contained therein.

137.   In answering the allegations contained in Paragraph 137 of the Complaint, Defendant denies the allegations contained therein.

138.   In answering the allegations contained in Paragraph 138 of the Complaint, Defendant denies the allegations contained therein.

### SIXTEENTH CAUSE OF ACTION
**(Declaratory Relief)**

139.   In answering the allegations contained in Paragraph 139 of the Complaint, Defendant repeats and realleges its answers to all previous paragraphs in the Complaint as though fully set forth herein.

140.   In answering the allegations contained in Paragraph 140 of the Complaint, Defendant denies the allegations contained therein.

141.   In answering the allegations contained in Paragraph 141 of the Complaint, Defendant denies the allegations contained therein.

142.   In answering the allegations contained in Paragraph 142 of the Complaint, Defendant denies the allegations contained therein.

143.   In answering the allegations contained in Paragraph 143 of the Complaint, Defendant denies the allegations contained therein.

144.   In answering the allegations contained in Paragraph 144 of the Complaint, Defendant denies the allegations contained therein.

### AFFIRMATIVE DEFENSES

1.   Plaintiffs fail to state any claim against Defendant upon which relief may be granted.

2.   Plaintiffs' claims are barred in whole or in part for a lack of subject matter jurisdiction.

3.      Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

4.      Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

5.      Plaintiffs' claims are barred as a result of unconscionability.

6.      Plaintiffs have failed to do equity towards Defendant, and therefore, are not entitled to any relief from Defendant.

7.      To the extent Plaintiffs lack standing with respect to any claim, that claim should be dismissed.

8.      Defendant has not breached any contracts with Plaintiffs.

9.      Plaintiffs' claims for breach of contract are barred as a result of their failure to satisfy conditions precedent.

10.     Plaintiffs' claims for breach of contract are barred as a result of their failure to satisfy conditions subsequent.

11.     Plaintiffs' claims are barred as a result of a lack of adequate consideration.

12.     Plaintiffs' claims are barred as a result of fraud upon the Defendant.

13.     Plaintiffs' claims are barred by the first to breach rule.

14.     Defendant's conduct was not the cause of Plaintiffs' alleged losses or damages, the existence of which is denied, relieving Defendant from any liability.

15.     Plaintiffs' damages, if any, are the result of actions and/or inactions of parties other than Defendant.

16.     Insufficient notice was given to Defendant of Plaintiffs' claims and causes of action.

17.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of mistake, excuse and/or nonperformance.

18.     Plaintiffs have not conferred any benefit to Defendant.

19.     Defendant has not retained any benefit which in equity and good conscience belongs to Plaintiffs.

20.     To the extent Defendant has received any benefit from Plaintiffs, Defendant has not been unjustly enriched.

21.     Plaintiffs are not equitably entitled to obtain any money from Defendant.

22.     Plaintiffs are not entitled to the reasonable value of any services from Defendant.

23.     Defendant was justified in his failure to perform, if any.

24.     Plaintiffs, by their own acts and conduct, waived any right to assert any claims against Defendant.

25.     Defendant acted in conformity with the law and with reasonableness in discharging his duties from any agreement(s) with Plaintiffs.

26.     Defendant at all times herein acted reasonably and in good faith in discharging his obligations and duties owed to Plaintiffs, if any.

27.     Defendant has committed no deceptive acts.

28.     Defendant's conduct was not oppressive nor made or committed with malice, oppression, or fraud.

29.     Plaintiffs have failed to mitigate their damages.

30.     Plaintiffs received everything they was entitled to receive from any agreement(s) with Defendant.

31.     Plaintiffs' claims are barred or limited as a result of their wrongful conduct, including but not limited to their prior breach of the implied covenant of good faith and fair dealing.

32.     Plaintiffs' bad faith bars its claims against Defendant.

33.     Defendant has committed no intentional acts meant to disrupt or harm Plaintiffs.

34.     Plaintiffs have not suffered any damages as a result of any act or failure to act by Defendant.

35.     Damages and injuries, if any, suffered by Plaintiffs are not attributable to any act, conduct, or omission on the part of Defendant.

36.     Defendants' liability, if any, must be reduced by the percentage of fault of others, including Plaintiffs, Third-Party Defendants, and possibly others.

37.     Any damages allegedly incurred by Plaintiffs are subject to set-off against those damages incurred by Defendant as a result of Plaintiffs' wrongful actions.

38.     Any damages allegedly incurred by Plaintiffs are subject to off-set against those damages incurred by Defendant as a result of Plaintiffs' wrongful actions.

Any and all actions complained of by Plaintiffs were approved or ratified by Plaintiffs.

39.     Defendant hereby incorporates by reference those affirmative defenses enumerated in Fed. R. Civ. P. 8 as though fully set forth herein.  Such defenses are herein incorporated by reference for the specific purpose of not waiving the same.

40.     Pursuant to the provisions of the Fed. R. Civ. P. 11, at the time of the filing of this Answer to the Complaint, all possible affirmative defenses may not have been alleged inasmuch as insufficient facts and relevant information may not have been available after reasonable inquiry, and therefore, Defendant reserves the right to amend this Answer to allege additional affirmative defenses if subsequent investigation so warrants.

WHEREFORE, Defendant prays for judgment on the Complaint as follows:

1.     That Plaintiffs take nothing by reason of the Complaint on file herein;

2.     That the Complaint be dismissed with prejudice;

3.     That Defendant recovers his costs and attorneys' fees incurred herein; and

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

4.    For such and further relief as the Court may deem just and proper under the circumstances.

Dated this 20th day of March, 2020.

CV3 LEGAL

By: ___/s/ Charles Vlasic, Esq.___
     Charles Vlasic III, Esq.
     Nevada Bar No. 11308
     197 E. California Ave., Ste. 302
     Las Vegas, Nevada 89104
     *Attorneys for Defendant/*
     *Counterclaimant/Third-Party Plaintiff,*
     *Ka Tat Au-Yeung*

REID RUBINSTEIN & BOGATZ

By: ___/s/ I. Scott Bogatz, Esq.___
     I. Scott Bogatz, Esq.
     Nevada Bar No. 3367
     Brad Lipman, Esq.
     Nevada Bar No. 14567
     300 South Fourth St., Ste. 830
     Las Vegas, Nevada 89101
     *Attorneys for Defendant/*
     *Counterclaimant/Third-Party Plaintiff,*
     *Ka Tat Au-Yeung*

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Counterclaimant/Third-Party Plaintiff, Ka Tat Au-Yeung ("Karter" or "Counterclaimant" or "Third-Party Plaintiff"), by and through his attorneys, the law firms of CV3 Legal and Reid Rubinstein & Bogatz, for his Counterclaim against Magma and Meta, and his Third-Party Complaint against Yuxiang Gao ("Michael") and Qian Xu ("Daniel"), hereby alleges and complains as follows:

## INTRODUCTION

1.    This dispute arose when Karter learned that his business partners – Michael and Daniel – had not only defrauded him out of a multi-million dollar business, but were also stealing millions of dollars from their new businesses – Magma and Meta, and were using these companies to illegally funnel millions of dollars to a shady network of Chinese and Cayman entities they secretly owned and controlled.

## PARTIES

2.    Karter is a dual citizen of both the United States and Hong Kong, although he was raised in Clark County, Nevada.

3. Karter resides and does business in Clark County, Nevada.

5. Magma is a Nevada corporation doing business in Clark County, Nevada.

6. Meta is a Nevada corporation doing business in Clark County, Nevada.

4. Michael is a Chinese National, doing business in Clark County, Nevada.

5. Daniel is a Chinese National, doing business in Clark County, Nevada.

6. Michael and Daniel are sometimes collectively referred to herein as "Third-Party Defendants".

7. The true names or capacities, whether individual, corporate, associate or otherwise, of the Third-Party Defendants named herein as DOES I through X, inclusive, and ROE ENTITIES 1 through 10, inclusive, are presently unknown to Third-Party Plaintiff who, therefore, sues said Third-Party Defendants by such fictitious names. Third-Party Plaintiff alleges that each Third-Party Defendant designated herein as a DOE or ROE ENTITY is negligently, willfully, contractually, intentionally, or otherwise legally responsible for the events and happenings herein referred to and proximately caused injury and damage thereby to Third-Party Plaintiff as herein alleged. Third-Party Plaintiff shall ask leave of this Court to amend the Third-Party Complaint to insert the true names and capacities of each Third-Party Defendant named as DOE and/or ROE ENTITY, when the same has been ascertained, and will further seek leave to join said Third-Party Defendants in these proceedings.

## GENERAL ALLEGATIONS

### A. BACKGROUND OF THE PARTIES AND THE E-CIGARETTE BUSINESS

8. Karter first met Daniel in or around April 2015 when they were both working at OutletPC.com in Henderson, Nevada.

9. Karter and Daniel eventually began discussing the possibility of starting an e-cigarette business together.

10. As part of their proposed business plan, Karter and Daniel agreed that they would share duties related to sales, marketing, and accounting for their new e-cigarette venture.

11.     Karter and Daniel further agreed that Daniel would focus on leveraging his supply chain connections in China, whereas Karter would focus on e-commerce, operations, warehousing, purchasing and accounts payable.

12.     Karter would later come to learn that Daniel's "supply chain connections in China" primarily referred to Michael – Daniel's long-time friend from college.

13.     In or around May 2015, Karter and Daniel began selling e-cigarettes online, mainly through the eBay online marketplace.

14.     Around this time, Daniel introduced a man named Daxin Chan to Karter.

15.     Mr. Chan initially assisted Karter and Daniel with affiliate marketing and purchasing for their e-cigarette business.

**B.     EIGHTCIG**

16.     On or about October 8, 2015, an Operating Agreement for Eightcig was drafted utilizing the Nevada Secretary of State Website (the "Eightcig Operating Agreement").

17.     The Eightcig Operating Agreement listed the original members of Eightcig – Karter, Daniel and Mr. Chan, in addition to two new members – Michael and his friend and business associate from China, Xiangwei Wang.

18.     Michael and Mr. Wang provided supply chain and logistics support for Eightcig products from Shenzhen, China through a company they owned together – Troogle Technology LTD ("Troogle").

19.     The Eightcig Operating Agreement listed the Membership Interest percentages in Eightcig as:

a.  Daniel – 21.67%

b.  Karter – 21.66%

c.  Mr. Chan – 21.66%

d.  Michael – 17.5%

e.  Mr. Wang – 17.5%

20.     With respect to "Interested Transactions" the Eightcig Operating Agreement states that "[a]ny transaction between a member or members and the LLC is prohibited unless a decision is approved by **all** of the disinterested Members after full disclosure of all material facts."

21.     With respect to the "Withdrawal and Transfer of [Membership] Interests", the Eightcig Operating Agreement states in relevant part that "[a] [M]ember may withdraw from the LLC **only** with the unanimous approval of the other [M]embers."

22.     With respect to a "Voluntary Withdrawal" of Membership Interests, the Eightcig Operating Agreement states in relevant part that "[a]n existing [M]ember may propose a voluntary withdrawal from the LLC, which requires the approval of **all** of the other existing [M]embers to be effective.

23.     A Voluntary Withdrawal will constitute a surrender of the [Membership I]nterest **back to the LLC**."

24.     With respect to the Transfer of Membership Interests through Sale, the Eightcig Operating Agreement states in relevant part that "[t]ransfer of the [Membership I]nterest can also be made by a sale of the [Membership I]nterest, either to a current [M]ember or to a potential new [M]ember.  Information about that proposed transfer will be provided to all of the [M]embers by the proposer, along with the terms of the transfer. The share of the transferring [M]ember will be allocated to the person(s) acquiring the [M]embership [I]nterest. Once the proposed terms are set out, the decision whether or not to approve the transfer will be circulated for comment and decision."

25.     In early 2016, Mr. Chan's visa expired, so he returned to China and voluntarily withdrew from Eightcig.

26.     As part of his voluntary withdrawal from Eightcig, Mr. Chan's sold his Membership Interests back to the company, and Michael insisted the Members redistribute equally, rather than in proportion to their respective ownership percentages.

27.     At some point thereafter, although the circumstances and timing remain unclear, Michael claims to have acquired his friend and business partner – Mr. Wang's Membership Interests in Eightcig.

28.     A purported transfer of Mr. Wang's Membership Interests in Eightcig to Michael would have been a breach of the Eightcig Operating Agreement.

29.     Karter disputes Michael's claims that he validly acquired Mr. Wang's Membership Interests in Eightcig.

C.      **THE SUCCESS OF EIGHTCIG**

30.     Almost immediately after its formation in 2015, Eightcig became extremely successful.

31.     In 2018 alone, Eightcig reported gross revenue of $44,946,905.00, and gross profit of $4,731,632.00.

32.     Karter and the sales and marketing team he ran were responsible for virtually all of these sales.

33.     In addition, at all times relevant, Karter was in charge of sales and virtually all of the day-to-day operations at Eightcig.

D.      **THE THIRD-PARTY DEFENDANTS' SCHEME TO DEFRAUD KARTER AND FLEECE EIGHTCIG BY ROLLING IT INTO A NETWORK OF SHADOW ENTITIES PRIMARILY OWNED AND CONTROLLED BY THE THIRD-PARTY DEFENDANTS.**

34.     In or around mid-2018, Daniel and Michael worked together to devise a scheme to defraud Karter and fleece Eightcig by rolling it into a network of shadow companies which were secretly owned and controlled primarily by Michael and Daniel.

35.     In order to accomplish their fraudulent scheme, Daniel and Michael decided to pressure Karter into believing things that were not true – that Eightcig was on the verge of failure and that as a result, Karter had no choice but to agree to roll Eightcig into a new network of companies which would purportedly be utilized to attract new investors.

1    **1.    Michael's Misrepresentations to Karter**

2        36.    More specifically, on or about July 16, 2018, Michael flew to Las Vegas from

3    China, and asked Karter to pick him up at the airport.

4        37.    Karter picked up Michael as requested, and took Michael to the Eightcig offices

5    located at 6175 S. Sandhill Rd. Ste. 100, Las Vegas, Nevada 89120 (the "Eightcig Sandhill

6    Office").

7        38.    It was that day – on or about July 16, 2018 at the Eightcig Sandhill Office –

8    where Michael first began making the following false and misleading verbal representations to

9    Karter:

10       a.    The e-cigarette industry was facing imminent collapse because of
11            purported new e-cigarette regulations working their way through the
             Food and Drug Administration of the United States Government;

12       b.    Eightcig was no longer viable as it was currently capitalized and
13            positioned in the e-cigarette market;

14       c.    Unless Eightcig obtained a quick infusion of capital and was rolled
             into a new network of companies as Michael was demanding,
15            Eightcig would not make it another year;

16       d.    Michael already had investors from China lined up who were ready,
             willing and able to invest tens of millions of dollars into this new
             multi-company structure;
17

18       e.    If Karter agreed to roll Eightcig into this new network of companies,
             the new companies would immediately be worth approximately
19            $100,000,000.00;

20       f.    If Karter agreed to roll Eightcig into this new network of companies,
             Karter's effective membership interest in the new companies would
21            be somewhere between 15% - 20%, but not less than 15%; and

22       g.    If Karter did not agree to roll Eightcig into this new network of
             companies, Karter would have to immediately buy-out Michael and
             Daniel from Eightcig.
23

24       39.    The foregoing false and misleading representations are not exhaustive, they are

25    just representative examples of the false and misleading statements made by Michael to Karter

26    in or around July 2018.

27       40.    Upon information and belief, none of the foregoing statements from Michael to

28    Karter were true.

Page 24 of 53

41.     Upon information and belief, Michael knew none of the foregoing statements he made to Karter were true.

42.     Karter did not know the foregoing (mis)representations made by Michael were false.

43.     Karter reasonably trusted and believed the foregoing (mis)representations made by Michael – his business partner of approximately three years.

## 2.     Michael's Misrepresentations to Karter

44.     During the week of July 16, 2018, Daniel echoed Michael's false and misleading representations to Karter at an around the Eightcig Sandhill Office by making the following verbal representations:

a.     The e-cigarette industry was facing imminent collapse because of purported new e-cigarette regulations working their way through the Food and Drug Administration of the United States Government;

b.     Eightcig was no longer viable as it was currently capitalized and positioned in the e-cigarette market;

c.     Unless Eightcig obtained a quick infusion of capital and was rolled into a new network of companies as Michael was demanding, Eightcig would not make it another year;

d.     Michael already had investors from China lined up who were ready, willing and able to invest tens of millions of dollars into this new multi-company structure;

e.     If Karter agreed to roll Eightcig into this new network of companies, the new companies would immediately be worth approximately $100,000,000.00; a

f.     If Karter agreed to roll Eightcig into this new network of companies, Karter's effective membership interest in the new companies would be somewhere between 15% - 20%, but not less than 15%; and

g.     If Karter did not agree to roll Eightcig into this new network of companies, Karter would have to immediately buy-out Michael and Daniel from Eightcig.

45.     The foregoing false and misleading representations are not exhaustive, they are just representative examples of the false and misleading statements made by Daniel to Karter in or around July 2018.

46.     Upon information and belief, none of the foregoing statements from Daniel to Karter were true.

47.     Upon information and belief, Daniel knew none of the foregoing statements he made to Karter were true.

48.     Karter did not know the foregoing (mis)representations made by Daniel were false.

49.     Karter reasonably trusted and believed the foregoing (mis)representations made by Daniel – his business partner of approximately three years.

50.     In or around July 2018, the value of Eightcig was at least tens of millions of dollars.

51.     However, neither Eightcig nor Karter had the capital to immediately buy-out Michael and Daniel as they were demanding as an alternative to rolling up Eightcig into a new network of companies.

52.     Michael and Daniel knew this fact.

53.     Given that a buy-out of Michael and Daniel was not possible, and because together Michael and Daniel represented the majority ownership of Eightcig, and because Michael and Daniel told Karter in no uncertain terms that Karter did not have a choice but to agree to roll Eightcig into a new network of companies, Karter reasonably felt he had no option but to comply with Michael and Daniel's demands.

**E.     THE ONE-SIDED ROLL-UP PROCESS**

54.     Although Karter did not know it when Michael and Daniel were pressuring him during the week of July 16, 2018, Michael and Daniel had already set their fraudulent scheme in motion.

55.     For example, Karter would later learn that Daniel had secretly incorporated Magma - the entity the Third-Party Defendants intended to roll Eightcig into several weeks prior on July 2, 2018 and secretly made himself the president of Magma.

56.     Over the next several months, Michael and Daniel began bombarding Karter with stacks of documents.

57.     Michael and Daniel falsely represented to Karter that the documents they were bombarding him with were necessary to accomplish the roll-up of Eightcig in accordance with the representations and promises they made to Karter previously.

58.     Michael and Daniel expected Karter to sign every single document he was provided immediately, without question or negotiation.

59.     Often, the documents Karter was expected to sign were written in traditional Chinese, which Karter only understands in bits and pieces.

60.     Often, the documents Karter was expected to sign only contained a signature page.

61.     On a number of occasions, the documents Karter was expected to sign were sent from China in the middle of the night in Las Vegas when Karter was sleeping, and Michael and Daniel would call, text-message and email Karter and Karter's co-workers repeatedly until Karter woke up and signed some of the documents.

62.     When Karter began to express concern regarding his lack of inclusion in the Eightcig roll-up process and the sudden authoritarian tone Michael and Daniel began to take with Karter regarding the roll-up process, Michael and Daniel began questioning Karter's loyalty.

63.     Karter would later learn that Michael and Daniel eventually began having Daniel and other individuals, for example, Eva Wei, sign documents on Karter's behalf without his knowledge or approval.

64.     Upon information and belief, a number of documents the Third-Party Defendants and Counterdefendants are relying upon in this dispute, were not actually signed by Karter.

65.     One document the Counterdefendants and Third-Party Defendants have attempted to use against Karter in this dispute is a so-called Confidential Information and

Invention Assignment Agreement; however, Karter disputes the validity and enforceability of this document, and there was no consideration for this alleged agreement.

66.     Another document the Counterdefendants and Third-Party Defendants have attempted to use against Karter in this dispute is a so-called Confirmation Letter; however, Karter disputes the validity and enforceability of this document, and there was no consideration for this alleged agreement either.

**F.     THE DISCOVERY OF THE FRAUD AND THE FUNNELING OF MONEY TO AND FROM THE NETWORK OF SHADOW CAYMAN AND CHINESE ENTITIES**

67.     When the proverbial dust from the purported Eightcig roll-up began to settle over the next several months, Karter began to understand that Michael and Daniel had lied to him about the necessity, purpose and ownership of the Eightcig roll-up.

68.     For example, Karter learned that Michael and Daniel had essentially plugged Eightcig into a network of shadow offshore Cayman and Chinese entities owned and controlled primarily by Michael and Daniel, so they could improperly and illegally funnel money to and from these entities (the funneling of money will be discussed in more detail below).

69.     Karter would also learn that Michael and Daniel were representing that Eightcig essentially became Magma – a Nevada entity which purportedly was wholly owned by a Cayman entity called MOTI Technology Co., LTD ("MOTI").

70.     Karter would also learn that MOTI, in turn, was wholly owned by several Cayman entities, one of which was set up for Karter, one of which was set up for Michael, one of which was set up for Daniel, and several other entities which were set up for so-called "investors".

71.     As Karter continued to try and put all the pieces of the fraud-puzzle together, he also continued to run the day-to-day operations, and was responsible for virtually all of the administrative functions for Magma, and its wholly owned subsidiary, Meta.

72.     Given Karter's position as sole founder, shareholder, corporate officer and director permanently residing in the United States, Michael and Daniel expected Karter to perform as the CEO of Magma and Meta.

73.     In fact, Karter was listed as the President, Treasurer, Secretary, Officer and Director for both Magma and Meta on the Nevada Secretary of State website.

74.     As part of his functions, Karter was a signatory on both the Magma and Meta bank accounts, and he was responsible for overseeing Magma and Meta payroll and accounts payable.

75.     In fact, Karter believes that he was asked to sign, and in fact did sign a number of personal guarantees on various obligations of the entities.

76.     Despite repeated requests, Magma, Meta, Michael and Daniel refuse to provide information or documentation or Karter regarding the possible personal guaranties that he may have signed, or that may have been signed for him without his knowledge or approval.

77.     Almost immediately, Karter began noticing suspicious transfers of large sums of money being wired between Magma, Meta and the various network of Cayman and Chinese entities owned and controlled by Michael and Daniel.

78.     For example, the following is a non-exhaustive list of suspicious transactions, for which proper documentation or explanation has never been provided to Karter:

a.    **January 15, 2019 –** Daniel instructed Karter to wire $1,000,000.00 from Magma to Troogle (the company owned by Michael and his friend, Mr. Wang), as a "loan", although the Troogle "loan" was never repaid

b.    **February 1, 2019** – Zhen Fund COII LLC (one of the "investors" who owns an interest in MOTI) wired $1,000,000.00 to Magma for the benefit of MOTI

c.    **February 12, 2019** – Zhen Fund wired an additional $1,000,000.00 to Magma for the benefit of MOTI

d.    **March 25, 2019** – Daniel instructed Karter to wire $1,000,000.00 from Magma to Flamingo Technology, LTD (a company owned and controlled by the Third-Party Defendants), with no explanation provided

e.   **February 14, 2019 –** Daniel instructed Karter to wire $1,000,000.00 in three separate transactions from Magma to Leiyan Technology, LTD (a company owned in part and fully controlled by Michael), for the alleged "prepayment of goods", with no explanation or goods ever provided

f.   **March 4, 2019 –** MSA China Fund II, LP wired $4,000,000.00 to Magma as part of a "convertible loan"

g.   **March 29, 2019 –** Daniel instructed Karter to wire $4,000,000.00 from Magma to Flamingo Technology LTD (a company owned and controlled by the Third-Party Defendants), with no explanation provided

h.   **June 6, 2019 –** Daniel instructed Karter to wire $1,000,000.00 from Magma to Troogle (the company owned by Michael and his friend, Mr. Wang), with no explanation provided

79.   Also, on or about September 3, 2019, a check in the amount of $64,000.00 was issued from Magma to Daniel for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place.

80.   In or around October 2019 when Karter began requesting information from Michael about the foregoing, and other suspicious transactions to and from Magma and Meta's bank account(s), Michael and Daniel sent Qin Gong, a financial controller from Leiyan Technology, LTD (a company owned in part and fully controlled by Michael) to oversee Magma and Meta's accounting department.

81.   Around this time, Karter was told by Michael and others that Magma is a "cash cow", and Karter learned that Magma is the only company in the entire network of Cayman and Chinese companies set up by Michael and Daniel which is profitable.

82.   Karter further learned that Michael and Daniel plan to continue fleecing Magma at will, for their own personal gain and to the detriment of Karter.

83.   In December 2019, Michael and Daniel ordered the following additional suspicious transactions, for which proper documentation or explanation has never been provided to Karter:

a.   **December 12, 2019** – Ms. Qin (the financial controller from Leiyan Technology, LTD - a company owned in part and fully controlled by Michael), instructed Karter to wire $1,000,000.00 as a "loan" to its subsidiary Meta, so Meta can pay Troogle (the company owned by Michael and his friend, Mr. Wang), with no explanation provided

b.   **December 23, 2019** – Ms. Qin (the financial controller from Leiyan Technology, LTD - a company owned in part and fully controlled by Michael), instructed an officer of Meta to wire $1,099,364.86 from Meta to Troogle (the company owned by Michael and his friend, Mr. Wang), with no explanation provided

c.   **December 31, 2019** – a check in the amount of $54,000.00 was issued from Magma to Daniel for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place

d.   **December 31, 2019** – a check in the amount of $15,000.00 was issued from Magma to Michael for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place

e.   **January 12, 2020**, Michael instructed Karter to wire approximately $2,074,829.00 from Magma to various of the Cayman and Chinese entities owned and controlled by the Third-Party Defendants, with insufficient/suspicious explanation and documentation provided

84.   Karter recently learned that Troogle (the company owned by Michael and his friend, Mr. Wang) has been dissolved, so that the millions of dollars in loans and advance payments Magma made to Troogle at Michael's direction are not, and were likely never going to be repaid or fulfilled.

85.   Karter also learned that Michael is involved in a lawsuit in California (Superior Court Case No. 30-2019-01093094-CU-FR-CJC) for allegedly defrauding other business partners in a separate e-cigarette business.

**G.   THE BONUSES**

86.   On or about December 31, 2019, Magma booked an unprecedented $65,000,000.00 in gross revenues (over $17,000,000.00 in sales for which Karter was personally responsible).

87.   As a result of Magma's overwhelming success in 2019, and consistent with his job duties, Karter instructed Magma to pay bonuses in equal amounts of $150,000.00 each (the "Bonuses"), to its general manager Hui Sun ("Sindy"), to Karter (Magma's CEO and VP of Sales), to Michael and to Daniel.

88.     Magma sent two Bonus checks of $150,000.00 each via UPS (Tracking No. 1Z8732R2DA25281071), to Michael (Check No. 1240), and to Daniel (Check No. 1241), and wired both Sindy and Karter $150,000 each.

## H.     THE WHISTLEBLOWING, DISCOVERY OF THE SECRET, UNAUTHORIZED EIGHTCIG ASSET PURCHASE AGREEMENT AND THE SAFEGUARDING OF FUNDS

89.     By the beginning of 2020, Karter had seen enough suspicious activity with respect to the Magma and Meta finances that he started to become worried that the shady "business practices" and "accounting" being conducted at the direction of Michael and Daniel could be running afoul of United States tax and criminal laws.

90.     Karter was also concerned that Michael and Daniel were continuing to fleece the Magma bank accounts in favor of Chinese companies that they owned and controlled without Karter.

91.     Given these concerns, on or about January 6, 2020, Karter caused Magma to wire approximately $6,000,000.00 from the Magma bank account to the Meta bank account for safekeeping with the memo "Fraud Mitigation".

92.     At that time, Karter believed that he and another trusted Magma/Meta employee/officer were the only individuals with access to the Meta bank account so the approximately $6,000,000.00 would be safe there.

93.      Several days later on or about January 15, 2020, Karter met with a licensed CPA from the well-respected accounting firm Eide Bailly for advice.

94.     The accountant Karter met with almost immediately confirmed Karter's concerns with respect Michael and Daniel's shady "business practices" and "accounting" and explained that the funneling of such large amounts of money through Magma and Meta, especially without proper documentation and reporting was indeed very likely running afoul of United States tax, and possibly even criminal laws.

95.     Karter promptly informed Michael and Daniel of his discussions with the CPA and of his concerns regarding potential United States tax and criminal law violations.

96.     In response to Karter's concerns, Michael only wanted to discuss the Bonuses, and demanded the return of the Bonuses from Karter and Sindy.

97.     Soon after, on or about January 21, 2020, Karter was surprised to learn that Daniel had secretly executed an Asset Purchase Agreement sometime in 2019, but which was back-dated to December 28, 2018 and which purported to sell certain of Eightcig's assets to Magma (the "Eightcig Asset Purchase Agreement").

98.     Karter was surprised because when Karter had previously asked Daniel about the potential sale of Eightcig's assets to Magma, Daniel had provided Karter only with an incomplete draft of a purchase agreement, which contained no details regarding timing, amounts, or assets to be bought/sold.

99.     Pursuant to the Eightcig Asset Purchase Agreement, Eightcig purportedly agreed to transfer the following assets to Magma in exchange for a promise from Magma to pay Eightcig approximately $6,619,468.79 within two years:

        a.   Inventory:                     $10,481,191.20

        b.   Deposits:                      $70,310.54

        c.   Account Payable:          $3,936,186.98

        d.   Account Receivable:     $4,154.03

100.    The Eightcig Asset Purchase Agreement does not purport to transfer any intellectual or intangible property from Eightcig to Magma.

101.    The Eightcig Asset Purchase Agreement does not purport to transfer any website domains or e-commerce accounts from Eightcig to Magma.

102.    The Eightcig Asset Purchase Agreement was secretly executed by Daniel on behalf of both Eightcig and Magma.

103.    Karter never knew of, or approved the Eightcig Asset Purchase Agreement or its terms.

104.    The secret purported sale of Eightcig's assets to Magma via the Eightcig Asset Purchase Agreement was a breach of the Eightcig Operating Agreement.

105. When Karter questioned Daniel about the Eightcig Asset Purchase Agreement and whether/when Magma was going to pay the purchase price to Eightcig, Daniel ignored Karter.

106. When Karter questioned Michael about the Eightcig Asset Purchase Agreement and whether/when Magma was going to pay the purchase price to Eightcig, Michael told Karter that Magma was never going to pay Eightcig.

107. Evidence that neither the Third-Party Defendants nor Magma ever intend to pay Eightcig for the purchase of its assets is evidenced by the fact that Magma's obligation to pay Eightcig has never been reflected on Magma's books or records.

108. Upon information and belief, the Third-Party Defendants never intended to cause Magma to pay Eightcig for its purported acquisition of the Eightcig Assets.

109. In fact, the Third-Party Defendants caused Eightcig to be dissolved with the Nevada Secretary of State on or about December 31, 2018, and Daniel just recently attempted to unilaterally disburse funds remaining in the Eightcig bank account in order to close that account.

110. In late January 2020 as Karter continued to work with the CPA at Eide Bailly in an attempt to sort out Magma and Meta's shady finances and accounting, Karter learned that Daniel instructed the employees not to provide any financial information to Karter.

111. Several days later on or about February 5, 2020, Karter learned that he had secretly been replaced as the President, Treasurer, Secretary, Officer and Director on the Nevada Secretary of State website for Magma and Meta.

112. No notice was provided to Karter, nor was a Directors or Shareholders meeting held where the Officers, Directors or Shareholders could vote on the actions taken by Third-Party Defendants to purportedly remove Karter as the President, Treasurer, Secretary, Officer and Director for Magma and/or Meta.

113.    Given Karter's sudden and secret removal as an officer and director on the Nevada Secretary of State website for Magma and Meta, Karter was reasonably concerned that the $6,000,000.00 in the Meta bank account may no longer be safe.

114.    As a result of these concerns, on or about February 6, 2020, Karter caused Meta to wire approximately $6,000,000.00 from the Meta bank account to his personal savings account for safekeeping (the "Savings Account").

115.    Immediately after the approximately $6,000,000.00 was deposited into the Savings Account, the bank froze the funds.

## I.    THIS STATE COURT ACTION, THE RETALIATION, THE ILLEGAL AND GROSS MISMANAGEMENT OF MAGMA AND META BY THE THIRD-PARTY DEFENDANTS, AND THE FORUM SHOPPING

116.    On or about February 12, 2020 Karter filed a lawsuit in the Eighth Judicial District of Nevada State Court, Case No. A-20-810395-B ("State Court Action"), against the Counterdefendants and Third-Party Defendants alleging claims for: (1) fraudulent and/or intentional misrepresentation; (2) negligent misrepresentation; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing – contract; (5) breach of the implied covenant of good faith and fair dealing – tort; (6) breach of fiduciary duty; (7) constructive fraud; (8) civil conspiracy; (9) unjust enrichment; and (10) declaratory relief.

117.    By way of the State Court Action, Karter sought to rescind the Eightcig roll-up, to recover monetary damages, to have the court appoint a receiver over Magma and Meta, and for court direction with respect to the frozen $6,000,000.00, among other relief.

118.    In response to Karter filing the State Court Action, counsel for Counterdefendants and Third-Party Defendants reached out to counsel for Karter and requested that Karter not proceed with serving a copy of the State Court Action, ostensibly so the parties could allegedly focus in good faith on settlement negotiations.

119.    Contrary to their representations, however, Third-Party Defendants did not intend to focus in good faith on settlement negotiations – they intended to, and did improperly

forum shop this dispute, by filing the underlying action several weeks after the State Court Action was filed, and a day after it was served.

120.   Third-Party Defendants also continued to engage an illegal campaign of retaliation against Karter while also illegally and grossly mismanaging Magma and Meta, recklessly placing these companies, along with their shareholders, creditors and employees at unnecessary risk, and while continuing to funnel large sums of money to their network of shadow entities – likely in violation of United States tax and criminal laws.

121.   For example, for almost three weeks after he transferred the $6,000,000.00 to the Savings Account for safe keeping, Karter continued to function as Magma and Meta's CEO and was the sole founder, shareholder, corporate officer and director of Magma and Meta who resided in the United States.

122.   The Third-Party Defendants only finally terminated Karter on February 25, 2020 when it became apparent to them that Karter was not going to dismiss the State Court Action and allow them to continue fleecing Magma and illegally funnel millions of dollars through Magma's and Meta's bank accounts.

123.   The stability and continuity in Magma and Meta's management and operations all evaporated when Karter was suddenly and illegally terminated on February 25, 2020.

124.   After repeated requests, counsel for Magma and Meta have refused to identify any competent officers, directors or executive level management legally on site at Magma or Meta.

125.   Over the past several weeks, Magma's sales website has inexplicably gone offline, gross sales and profits have sharply declined, and not only is employee moral extremely low, employees are legitimately concerned for their safety.

126.   For example, since January 2020, Third-Party Defendants traveled from China to the United States several times **by way of other countries** in order to avoid heightened COVID-19 (Coronavirus) screening and travel bans imposed by the United States government.

127.    Prior to his termination when employees of Magma and Meta approached Karter with health and safety concerns given Third-Party Defendants' clandestine travel and deliberate lack of screening, Karter brought them up to Third-Party Defendants who promptly ignored and dismissed these concerns.

128.    Karter is informed and believes that since his termination on February 25, 2020, Magma and Meta employees have also raised these same concerns directly to Third-Party Defendants, and have similarly been ignored and/or rebuffed.

129.    Third-Party Defendants are also improperly attempting to manage Magma and Meta on their periodic visits to the United States (but mostly from China), and are improperly paying themselves thousands of dollars regularly from Magma and/or Meta as "Consulting Fees".

130.    Upon information and belief, this is illegal, as Third-Party Defendants are both Chinese nationals, and neither one of them hold proper visas which would permit this activity and these payments.

131.    Upon information and belief, Third-Party Defendants are also continuing to fleece Magma by, among other schemes, having Magma purchase dead-stock from companies owned and/or controlled by Third-Party Defendants, by having Magma purchase products at prices above market rates from companies owned and/or controlled by Third-Party Defendants, and by forcing Magma to contribute bogus financing and other operating costs to companies owned and/or controlled by Third-Party Defendants.

132.    Upon information and belief, Third-Party Defendants are continuing to funnel millions of dollars through Magma and Meta in violation of United States tax and possibly even criminal laws.

133.    On more than one occasion in the past, Third-Party Defendants informed Karter that if they ever became parties to a lawsuit in the United States, they would abscond to China where they cannot be served or forced to pay a judgment.

134.     Third-Party Defendants are currently holding true to their word – they are hiding in China and are refusing to accept service or otherwise participate in the Nevada State Court Action.

135.     Upon information and belief, Third-Party Defendants intend to continue playing this bad faith procedural game of hide and seek in this case, even while simultaneously managing the Counterdefendants which are located here in Nevada, directing this litigation for the Counterdefendants, and submitting declarations on behalf of Counterdefendants such as Daniel's 18 page Declaration in Support of Counterdefendants' Motion for Temporary Restraining Order against Karter [Doc. No. 10], filed in this case on March 12, 2020.

<u>**FIRST CLAIM FOR RELIEF**</u>
**(Fraudulent and/or Intentional Misrepresentation – Against Third-Party Defendants)**

136.     Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

137.     The Third-Party Defendants made many, repeated material misrepresentations to Karter.

138.     The Third-Party Defendants made these misrepresentations with the intent to deceive and with the intent to induce action by Karter through reliance on these misrepresentations.

139.     At the time the Third-Party Defendants made these misrepresentations to Karter, they knew these statements were false.

140.     At the time the Third-Party Defendants' made these misrepresentations to Karter, Karter did not know these statements were false.

141.     Karter justifiably relied on the Third-Party Defendants' fraudulent and intentional misrepresentations.

142.     As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

143.   The Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

144.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation – Against Third-Party Defendants)

145.   Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

146.   The Third-Party Defendants supplied false and/or misleading information to Karter.

147.   The Third-Party Defendants failed to exercise reasonable care in supplying false and/or misleading information to Karter.

148.   Karter reasonably and justifiably relied upon the Third-Party Defendants' misrepresentations.

149.   As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

150.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Against Third-Party Defendants)

151.   Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

152.   Karter and Third-Party Defendants are parties to a valid, existing, and binding contract, namely the Eightcig Operating Agreement.

153.   Karter has performed his duties under the Eightcig Operating Agreement.

154.   The Third-Party Defendants have repeatedly breached their respective obligations under the Eightcig Operating Agreement.

155.   As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

156.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.
. . .

### FOURTH CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing (Contract) – Against Third-Party Defendants**

157.   Karter repeats and realleges all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

158.   Karter and Third-Party Defendants are parties to a valid, existing, and binding contract, namely the Eightcig Operating Agreement.

159.   Under the Eightcig Operating Agreement, the Third-Party Defendants owed a duty of good faith and fair dealing to Karter.

160.   Karter has performed his duties under the Eightcig Operating Agreement.

161.   The Third-Party Defendants have repeatedly breached their respective obligations under the Eightcig Operating Agreement, by performing in a manner that is unfaithful to the spirit and intent of the Eightcig Operating Agreement and by generally failing to act in good faith.

162.   Karter's justified expectations under the Eightcig Operating Agreement were denied due to the Third-Party Defendants' wrongful conduct.

163.   As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

164.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

**FIFTH CLAIM FOR RELIEF**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing (Tort) –**
**Against Third-Party Defendants)**

165.   Karter repeats and realleges all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

166.   Karter and Third-Party Defendants are parties to a valid, existing, and binding contract, namely the Eightcig Operating Agreement.

167.   A special element of reliance and/or fiduciary duty existed between Karter as minority Member and Third-Party Defendants as the majority Members of Eightcig due to the Third-Party Defendants superior, entrusted position as the majority Members of Eightcig.

168.   The Third-Party Defendants have repeatedly breached their respective obligations under the Eightcig Operating Agreement by performing in a manner that is unfaithful to the spirit and intent of the Eightcig Operating Agreement and by generally failing to act in good faith.

169.   Karter's justified expectations under the Eightcig Operating Agreement were denied due to the Third-Party Defendants' wrongful conduct.

170.   As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

171.   The Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

172.    It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty – Against Third-Party Defendants)**

173.    Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

174.    A special element of reliance and/or fiduciary duty existed between Karter as minority Member and Third-Party Defendants as the majority Members of Eightcig due to the Third-Party Defendants' superior, entrusted position as the majority Members of Eightcig.

175.    By virtue and existence of their fiduciary relationship with Karter, the Third-Party Defendants were under a duty to act for the benefit of Karter with respect to matters within the scope of that relationship.

176.    The Third-Party Defendants had a duty to act with the utmost good faith, trust, confidence, and candor towards Karter.

177.    The Third-Party Defendants had a duty to use their respective abilities to control Eightcig in a fair, just, and equitable manner.

178.    The Third-Party Defendants were not permitted to use their respective powers to control Eightcig and its activities to benefit themselves alone or in a manner detrimental to Karter, as the minority member in Eightcig.

179.    As set forth in more detail herein, the Third-Party Defendants' conduct breached their respective fiduciary duties owed to Karter.

180.    As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

181.    The Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

182.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

### SEVENTH CLAIM FOR RELIEF
#### (Constructive Fraud – Against Third-Party Defendants)

183.   Karter repeats and realleges all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

184.   A special element of reliance and/or fiduciary duty existed between Karter as minority Member and Third-Party Defendants as the majority Members of Eightcig due to the Third-Party Defendants superior, entrusted position as the majority Members of Eightcig.

185.   As a result of the Third-Party Defendants' superior, entrusted position, the Third-Party Defendants owed Karter a legal and/or equitable duty.

186.   The Third-Party Defendants have repeatedly breached their respective legal and/or equitable duty to Karter by concealing material facts from Karter, by acting without the knowledge and/or consent of Karter, and by generally failing to act in good faith.

187.   As a direct and proximate cause of the Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

188.   The Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

189.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

### EIGHTH CLAIM FOR RELIEF
#### (Civil Conspiracy – Against Counterdefendants and Third-Party Defendants)

190.   Karter repeats and realleges all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

191.  Counterdefendants and Third-Party Defendants, by acting together in concert, intended to accomplish an unlawful objective for the purpose of harming Karter.

192.  Counterdefendants and Third-Party Defendants, by acting together in concert did accomplish an unlawful objective which harmed Karter.

193.  As a direct and proximate cause of Counterdefendants and Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

194.  Counterdefendants and Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

195.  It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## NINTH CLAIM FOR RELIEF
### (Unjust Enrichment – Against Counterdefendants and Third-Party Defendants)

196.  Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

197.  Should this Court determine and/or declare that the Eightcig Asset Purchase Agreement, the so-called Confidential Information and Invention Assignment Agreement, and/or the so-called Confirmation Letter are invalid or otherwise unenforceable, it follows that benefits have been conferred upon the Counterdefendants and Third-Party Defendants by Karter.

198.  Counterdefendants and Third-Party Defendants have appreciated those benefits.

199.  Counterdefendants and Third-Party Defendants have accepted and retained benefits from Karter under circumstances where it would be inequitable for Counterdefendants and Third-Party Defendants to retain those benefits without the payment of value for the same.

200.    As a direct and proximate cause of the Counterdefendants and Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

201.    It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## TENTH CLAIM FOR RELIEF
### (Declaratory Relief – Against Counterdefendants and Third-Party Defendants)

202.    Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

203.    A justiciable controversy exists between Karter on the one hand, and Counterdefendants and Third-Party Defendants on the other hand.

204.    Karter on the one hand, and Counterdefendants and Third-Party Defendants on the other hand, have asserted competing interests and claims of right with respect to the subject matter of this litigation.

205.    Karter's interests are clearly adverse to Counterdefendants and Third-Party Defendants' interests in this dispute.

206.    This controversy is ripe for judicial determination.

207.    Karter is entitled to a declaratory judgment from this Court that:

    a.   a receiver shall be appointed over Counterdefendants;

    b.   the Third-Party Defendants and Counterdefendants must immediately work with a reputable CPA and accounting firm to address and correct the financials, accounting and reporting for Counterdefendants, and to ensure these entities are in full compliance with all applicable laws and regulations;

    c.   the Third-Party Defendants and Counterdefendants must indemnify, defend and hold Karter harmless from any and all claims and/or damages as a result of their wrongful actions which were not taken in compliance with the Eightcig Operating Agreement, and/or with all applicable laws and regulations;

d.   the various documents and agreements related to the Eightcig roll-up and establishment of all the entities involved in the Eightcig roll-up, including but not limited to the Counterdefendants (and all documents and agreements created or entered into thereafter, including but not limited to any personal guarantees, the purported Eightcig Asset Purchase Agreement, the so-called Confidential Information and Invention Assignment Agreement and the so-called Confirmation Letter), all be rescinded and the Eightcig roll-up shall be unwound in its entirety;

e.   the various actions undertaken by the Third-Party Defendants which resulted in the wrongful oppression and freeze-out of Karter are illegal, and therefore are invalid and void;

f.   the various actions undertaken by the Third-Party Defendants which were in violation of the Eightcig Operating Agreement are illegal, and therefore are invalid and void;

g.   the $6,000,000.00 presently held in the Savings Account should be interpled with the Court for safekeeping during the pendency of this action so Third-Party Defendants cannot abscond with these funds to China or other places outside the jurisdiction of the Court;

h.   the eightvape.com domain and Shopify webstore shall be returned to Karter individually; and

i.   such further declaration(s) which may become necessary through the course of the litigation.

208.   As a direct and proximate cause of Counterdefendants and Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

209.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## ELEVENTH CLAIM FOR RELIEF
### (Constructive Trust – Against Counterdefendants and Third-Party Defendants)

210.   Karter repeats and realleges all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

211.    Third-Party Defendants and Counterdefendants obtained money and/or property that were acquired in such a fashion making it inequitable that Third-Party Defendants and Counterdefendants should retain the same.

212.    The raising of a constructive trust is necessary to prevent the failure of justice, especially given the unity of interest between the Third-Party Defendants and Counterdefendants.

213.    The constructive trust should include Karter's tangible and intangible rights and property such as his membership interests in Eightcig and its assets, and other gain wrongfully obtained by Third-Party Defendants and Counterdefendants and any and all property purchased with the same.

214.    Alternatively, Karter is entitled to an equitable lien against any and all property obtained by Counterdefendants and Third-Party Defendants as a result of their actions complained of herein.

215.    As a direct and proximate cause of Counterdefendants and Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

216.    It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

## TWELFTH CLAIM FOR RELIEF
### (Alter Ego – Against Counterdefendants and Third-Party Defendants)

217.    Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

218.    Counterdefendants Magma and Meta are influenced, governed and controlled by Third-Party Defendants Michael and Daniel.

219.    At all times relevant to this Counterclaim and Third-Party Complaint, Counterdefendants Magma and Meta have been inadequately capitalized.

220.   At all times relevant to this Counterclaim and Third-Party Complaint, Counterdefendants Magma and Meta and Third-Party Defendants Michael and Daniel all failed to follow required corporate formalities.

221.   Third-Party Defendants Michael and Daniel have wrongfully used Counterdefendants Magma's and Meta's funds as their own.

222.   Third-Party Defendants Michael and Daniel have caused Counterdefendants Magma's and Meta's funds to be wrongfully and improperly comingled with those of other entities and/or individuals.

223.   Upon information and belief, there is such a unity of interest between Third-Party Defendants Michael and Daniel on the one hand, and Counterdefendants Magma and Meta on the other hand, that they are essentially inseparable from each other.

224.   Adhering to Counterdefendants Magma's and Meta's respective corporate fictions would sanction a fraud or promote an injustice against and upon Karter.

225.   Third-Party Defendants Michael and Daniel should be held liable for the actions and obligations of Counterdefendants Magma and Meta, and vice-versa.

226.   As a direct and proximate cause of Counterdefendants and Third-Party Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of $75,000.00, the exact amount to be proven at trial.

227.   Counterdefendants and Third-Party Defendants' actions were committed with malice and oppression, entitling Karter to punitive damages in an amount in excess of $75,000.00, the exact amount of which will be determined at the time of trial.

228.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

### THIRTEENTH CLAIM FOR RELIEF
**(Appointment of a Receiver – Against Counterdefendants)**

229.   Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

230.     Third-Party Defendants Daniel and Michael have been and continue to improperly, illegally and grossly mismanage Magma and Meta, recklessly placing these companies, along with their shareholders, creditors and employees at unnecessary risk.

231.     Third-Party Defendants Daniel and Michael have been and continue to funnel large sums of money to their network of shadow entities – likely in violation of United States tax and criminal laws.

232.     The conduct and omissions of Counterdefendants Magma and Meta at the direction of Third-Party Defendants Daniel and Michael as described herein, is incompatible with Karter's rights and interests.

233.     The conduct and omissions of Counterdefendants Magma and Meta at the direction of Third-Party Defendants Daniel and Michael, as described herein, if allowed to continue, will result in immediate and irreparable harm to Karter and to Magma and Meta.

234.     The conduct and omissions undertaken by Counterdefendants Magma and Meta at the direction of Third-Party Defendants Daniel and Michael are ongoing and there is no adequate remedy at law to compensate Karter or to preclude Counterdefendants or Third-Party Defendants from their continuing course of actions to the detriment of Karter.

235.     Third-Party Defendants structured Magma and Meta not for the purpose of allowing these entities to participate in the normal and usual manner of corporations, but for the specific purpose of allowing these and other entities to control each other such that they are mere instrumentalities of each other.

236.     Adhering to Magma's and Meta's respective corporate fictions would sanction a fraud or promote an injustice against and upon Karter.

237.     When Third-Party Defendants fraudulently induced Karter to roll Eightcig into their network of shadow companies and when one of those companies – Magma purportedly acquired all of Eightcig's assets pursuant to the Eightcig Asset Purchase Agreement – Karter owned at least 1/3 of Eightcig.

238.   Karter never received any monetary consideration for his at least 1/3 interest in Eightcig.

239.   Accordingly Karter holds or should hold *at least* ten percent (10%) of the issued and outstanding stock in Magma and its wholly-owned subsidiary, Meta.

240.   Based on, and as a result of the foregoing conduct and omissions of the Counterdefendants and Third-Party Defendants, a receiver should be appointed over Counterdefendants Magma and Meta pursuant to NRS 32.101 *et seq.* and NRS 78.650.

241.   The appointment of a receiver is necessary to protect the interests of Karter, Counterdefendants Magma and Meta and among other things, to preserve the status quo and to prevent the loss of assets during the pendency of this litigation.

242.   Without the appointment of a receiver, Third-Party Defendants will deplete all of Magma and Meta's funds and abscond to China.

243.   It has become necessary for Karter to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

### FOURTEENTH CLAIM FOR RELIEF
### (Accounting – Against Counterdefendants and Third-Party Defendants)

244.   Karter repeats and reallege all of the allegations contained in the preceding paragraphs of this Counterclaim and Third-Party Complaint as though fully set forth herein.

245.   Third-Party Defendants have intentionally set up a global network of shadow entities to obfuscate the relationship between the parties and facilitate the improper and potentially illegal flow of money between them.

246.   Third-Party Defendants have repeatedly refused to explain and provide acceptable documentation to Karter sufficiently explaining the relationship between the global network entities they have set up and the flow of money between them.

247.   Third-Party Defendants have repeatedly refused to explain and provide acceptable information or documentation to Karter regarding the possible personal guaranties

1   that he may have signed, or that may have been signed for him without his knowledge or

2   approval.

3         248.   The relationship between Karter, the Counterdefendants, the Third-Party

4   Defendants and their global network of shadow entities they set up is so complex that the Court,

5   through an equitable master, must be appointed to sort out the various dealings between these

6   individuals and entities.

7         249.   As a direct and proximate cause of Counterdefendants and Third-Party

8   Defendants' wrongful conduct, Karter has suffered damages in an amount in excess of

9   $75,000.00, the exact amount to be proven at trial.

10        250.   It has become necessary for Karter to engage the services of an attorney in these

11  proceedings as a direct and proximate result of the conduct alleged above and, therefore, Karter

12  is entitled to recover fees and costs incurred herein as general, specific and/or special damages.

13        WHEREFORE, Karter requests that judgment be entered against Third-Party

14  Defendants and Counterdefendants, and each of them, as follows:

15        1.     For general and special damages in excess of $75,000.00;

16        2.     For an award of punitive damages as set forth herein;

17        3.     For rescission;

18        4.     For a declaration as set forth herein;

19        5.     For an accounting;

20        6.     For a special award of attorneys' fees and costs of suit incurred herein;

21        7.     For pre-judgment interest;

22        8.     For post-judgment interest; and

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28

9.     For such other and further relief as the Court deems just and proper.

Dated this 20th day of March, 2020.

CV3 LEGAL                                    REID RUBINSTEIN & BOGATZ

By:____/s/ Charles Vlasic, Esq.____          By:____/s/ I. Scott Bogatz, Esq.____
      Charles Vlasic III, Esq.                     I. Scott Bogatz, Esq.
      Nevada Bar No. 11308                         Nevada Bar No. 3367
      197 E. California Ave., Ste. 302             Brad Lipman, Esq.
      Las Vegas, Nevada 89104                      Nevada Bar No. 14567
      *Attorneys for Defendant/*                   300 South Fourth St., Ste. 830
      *Counterclaimant/Third-Party Plaintiff,*     Las Vegas, Nevada 89101
      *Ka Tat Au-Yeung*                            *Attorneys for Defendant/*
                                                   *Counterclaimant/Third-Party Plaintiff,*
                                                   *Ka Tat Au-Yeung*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of March, 2020, our office served a copy of the foregoing **ANSWER, COUNTERCLAIM AND THIRD-PARTY COMPLAINT** upon each of the following parties via CM/ECF electronic service:

SheppardMullin
Rena Andoh, Esq.
Jeff Kern, Esq.
30 Rockefeller Plaza
New York, New York, 10112-0015
JKern@sheppardmullin.com
RAndoh@sheppardmullin.com

Morris Law Group
Ryan M. Lower, Esq.
Raleigh C. Thompson, Esq.
411 E. Bonneville Ave., Ste. 360
Las Vegas, Nevada 89101
Rml@morrislawgroup.com
Rct@morrislawgroup.com

and that there is a regular communication by mail between the place of mailing and the place(s) so addressed.

_____/s/ Charles Vlasic _____
An employee of CV3 Legal