**CV3 LEGAL**
CHARLES VLASIC III, ESQ.
Nevada Bar No. 11308
197 E. California Ave., Ste. 302
Las Vegas, Nevada 89104
Telephone: (702) 551-1178
Facsimile: (702) 551-1178
cvlasic@cv3legal.com

**REID RUBINSTEIN & BOGATZ**
I. SCOTT BOGATZ, ESQ.
Nevada Bar No. 3367
BRAD LIPMAN, ESQ.
Nevada Bar No. 14567
300 South 4th Street, Suite 830
Las Vegas, Nevada 89101
Telephone: (702) 776-7000
Facsimile: (702) 776-7900
sbogatz@rrblf.com
blipman@rrblf.com

*Attorneys for Defendant/*
*Counterclaimant/Third-Party Plaintiff,*
*Ka Tat Au-Yeung*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MAGMA HOLDING, INC., a Nevada corporation; and META LAB, INC. a Nevada corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> KA TAT "KARTER" AU-YEUNG, an individual, <br><br> Defendant. <br><br> AND ALL RELATED ACTIONS. | Case No.: 2:20-cv-00406-RFB-BNW <br><br> **OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION AND COUNTERMOTION FOR APPOINTMENT OF A RECEIVER** |

## TABLE OF CONTENTS

I.     INTRODUCTION ..........................................................................................5

II.    RELEVANT FACTS ....................................................................................9

III.   LEGAL ARGUMENT..................................................................................26

     A.    THERE IS NO BASIS FOR A PRELIMINARY INJUNCTION ..................26

          1.   There Is No Probability Of Success On The Merits Of Plaintiffs' Claims ..........................................................................................26

          2.   There Is No Real Threat of Irreparable Harm To Plaintiffs.................31

          3.   The Balance Of Equities Weighs Strongly In Karter' Favor, And An Injunction Is Not In The Public Interest. ...............................................31

     B.    THIS COURT MUST APPOINT A RECEIVER OVER PLAINTIFFS.........32

          1.   The Corporate Fictions Of Magma And Meta Should Be Disregarded ..........................................................................................32

          2.   A Receiver Is Warranted And Appropriate Pursuant To NRS 32.101(1) ..........................................................................................34

          3.   A Receiver Is Also Warranted And Appropriate Pursuant To NRS 32.101(5)...........................................................................................34

          4.   A Receiver Is Also Warranted And Appropriate Pursuant To NRS 32.101(6)...........................................................................................35

          5.   A Receiver Is Also Warranted And Appropriate Pursuant To NRS 78.650..............................................................................................36

          6.   The Power And Duties Of The Receiver ......................................38

IV.    CONCLUSION..........................................................................................38

1

## **TABLE OF AUTHORITIES**

### **CASES**

<u>A Woman's Friend Pregnancy Res. Clinic v. Becerra</u>, 901 F.3d 1166, 1167 (9th Cir. 2018) . 25

<u>Bowler v. Leonard</u>, 70 Nev. 370, 382–83, 269 P.2d 833, 839 (1954) ..................................... 37

<u>Bowler v. Leonard</u>, 70 Nev. 370, 383, 269 P.2d 833, 839 (1954) ........................................... 31

<u>Brown v. Pennsylvania R Co</u>, 250 F. 513, 518 (3d Cir. 1918) ................................................. 32

<u>Cent. Republic Bank & Tr. Co. v. Caldwell</u>, 58 F.2d 721, 728 (8th Cir. 1932) ...................... 32

<u>Chamaria v. Diab</u>, No. 217CV02023JADCWH, 2017 WL 3271716, at *1 (D. Nev. Aug. 1, 2017) ...................................................................................................................................... 25

<u>Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n</u>, 247 U.S. 490, 501, 38 S. Ct. 553, 557 (1918) ........................................................................................................... 31

<u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976) .......... 22

<u>Costello v. Casler</u>, 127 Nev., 436, n. 4, 254 P.3d 631 (2011) ................................................ 34

<u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 474, 123 S.Ct. 1655 (2003) ............................... 32

<u>Gratitude Group, LLC v Hospitality Intern. Group</u>, No. 15A720090, 2016 WL 8648852, at *3 (2016) ................................................................................................................................... 34

<u>In re Ledstrom</u>, No. 2:15-CV-01145-APG, 2017 WL 1239144, at *11 (D. Nev. Jan. 27, 2017) ............................................................................................................................................... 35

<u>In re Rieger, Kapner & Altmark</u>, 157 F. 609, 613 (S.D. Ohio 1907) ...................................... 31

<u>Liu v. Sun City Spas, Inc.</u>, No. A-478621, 2006 WL 4075784 (D. Nev. Dec. 27, 2006) ........ 35

<u>Lynn v. Ingalls</u>, 100 Nev. 115, 120, 676 P.2d 797, 800–01 (1984) ........................................ 34

<u>Medical Device Alliance, Inc. v. Ahr</u>, 116 Nev. 851, 862, 8 P.3d 135, 142 (2000) ................ 34

<u>Nishon's, Inc. v. Kendigian</u>, 91 Nev. 504, 505, 538 P.2d 580, 581 (1975) ............................ 31

<u>Pennsylvania Canal Co v. Brown</u>, 235 F. 669, 680 (3d Cir. 1916) ......................................... 31

<u>Polaris Indus. Corp. v. Kaplan</u>, 103 Nev. 598, 601, 747 P.2d 884, 886 (1987) ...................... 32

<u>Publicker Indus., Inc. v. Roman Ceramics Corp.</u>, 603 F.2d 1065, 1069 (3d Cir. 1979) .......... 32

<u>State ex rel. Nenzel v. Second Jud. Dist. Ct.</u>, 49 Nev. 145, 155, 241 P. 317 (1925) ............... 31

<u>Trustees Sys. of Co. of Pennsylvania v. Payne</u>, 65 F.2d 103, 107 (3d Cir. 1933) ............. 31, 32

Viega GmbH v. Eighth Jud. Dist. Ct., 130 Nev. 368, 383, 328 P.3d 1152, 1162 (2014) ........32

Washington St. Corp. v. Lusardi, 976 F.2d 587, 588 (9th Cir. 1992)....................................22

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365 (2008) ........................25

## STATUTES

NRS 32.010(1) ....................................................................................................................33

NRS 32.010(5) ....................................................................................................................33

NRS 32.010(6) ....................................................................................................................34

NRS 32.101(1) ....................................................................................................................33

NRS 32.101(5) ....................................................................................................................34

NRS 32.101(6) ....................................................................................................................35

NRS 635 et seq. ..................................................................................................................37

NRS 78.650 ........................................................................................................................36

NRS  32.010 ........................................................................................................................33

NRS  78.650 ........................................................................................................................35

Defendant/Counterclaimant/Third-Party Plaintiff, Ka Tat Au-Yeung ("Karter"), by and through his attorneys, the law firms of CV3 Legal and Reid Rubinstein & Bogatz, hereby respectfully files this Opposition ("Opposition") to Plaintiffs/Counterdefendants Magma Holding, Inc. ("Magma") and Meta Lab, Inc. ("Meta")'s Application for Preliminary Injunction ("Application"), and Countermotion for Appointment of Receiver ("Countermotion"). This Opposition and Countermotion is made and based upon all the papers, pleadings and records on file herein, together with the following points and authorities, the Declarations and Exhibits attached hereto, and any oral argument entertained by the Court at the time of the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

As fully detailed in the First Amended Counterclaim and Third-Party Complaint and below, in 2015 at 19 years old, Karter and his then friend third-party Defendant Qian Xu ("Daniel") started an e-cigarette on-line business together, mainly by selling on eBay. As the business quickly grew, Karter purchased the eightvape.com domain name from GoDaddy and soon thereafter Eightcig, LLC was created. Given that the product was primarily sourced from China, Daniel introduced Karter to a friend from China, who later brought in third-party Defendant Yuxiang Gao ("Michael"). Karter, Daniel and Michael ultimately became the three members in Eightcig, each owning about a third of the company.

As the only US citizen in the group, and the person with the direct operational and sales responsibilities, Karter established most of the business relationships for Eightcig. Specifically, the other two members told Karter that they did not want to be directly responsible for any obligation in the United States and left that to Karter, including the signing of various personal guarantees. By 2018 the business had become quite successful, reporting gross revenue of $44,946,905.00, and gross profit of $4,731,632.00.

As the business started to succeed, Daniel and Michael devised a scheme to defraud Karter and fleece Eightcig of its value and transfer it off-shore. To that end, Daniel and Michael convinced Karter that the industry was facing imminent collapse, that Eightcig would fail

without substantial additional capital, but that if Eightcig was "rolled-up" into a network of Cayman Island and Chinese companies, the new companies would immediately be worth approximately $100,000,000, and that Karter's membership would be about 15%-20% of the new roll-up.

In fact, none of this was true. To date, no legitimate funding has come into the United States by the supposed "investors" in the Cayman Islands or China. To the contrary, through a series of barely concealed actions and by placing a compatriot of theirs as "controller" of the new companies – Magma and Meta – Daniel and Michael commenced to strip the United States operations of all of its profits and most of its operating capital. At the same time, Daniel and Michael began bombarding Karter with stacks of documents saying that it was necessary to immediately sign documents without review, and, of course, without counsel. Often, the documents Karter was expected to sign were written in Chinese, which Karter only understands in bits and pieces and some documents were presented as only a signature page. Daniel and Michael had some of the documents signed by other individuals on behalf of Michael without Karter's knowledge or approval.

Around this same time, Daniel and Michael coordinated over 20 off-shore wire transfers which amounted to nearly twenty million dollars, without proper documentation or a legitimate business purpose. When Karter asked Michael and Daniel about these suspicious transactions, Karter was either ignored, or was told that questioning Michael and Daniel showed "disloyalty". As a result of Karter's growing concerns about Michael, Daniel and their use of Magma and Meta as conduit for what could be illicit purposes, Karter sought the assistance of an outside CPA who quickly advised Karter that the transactions were indeed suspicious, raising legitimate concerns of improper and illegal transfers, as well as potential money laundering and tax evasion. These transactions are detailed below and the mechanisms used for these illicit activities are discussed and explained by an expert engaged for this case, whose Declaration is attached hereto as **Exhibit LL**.

By way of example and as more fully detailed below, in early January 2020, Michael instructed Karter to wire approximately $2,074,829.00 from Magma to a Chinese-based

affiliate called Thunderstone. When Karter inquired about the basis of the wire, Michael told Karter that the $2,074,829.00 was Magma's allocation of Thunderstone's "HR Cost" and "Financing Cost" for 2019 (for which there was no corresponding loan or any benefit conferred to the United States company). Karter also asked about millions of dollars in wires to Troogle – a Chinese-based non-affiliated company owned by Michael and his friend, Mr. Wang. Michael and Daniel informed Karter that the funds had been for advance payments for product or loans, but that the goods would never be delivered and the loans would never be repaid since Troogle was being dissolved. As Karter's expert discusses in Declaration, these are classic schemes for money laundering and other forms of fraud.

To protect Magma and Meta, Karter had approximately $6 million transferred from Magma's bank account to Meta's bank account which had more limited access. Immediately, Daniel and Michael came to the United States (through improper channels and avoiding the COVID-19 travel ban imposed by the United States Government), and began attempting to access the $6 million that Karter had safeguarded so they could continue wiring these funds off-shore. At that point the funds were transferred to Karter's account to safeguard them again and immediately, without any use of the funds by Karter, the accounts were frozen by Wells Fargo. Those funds have remained frozen in the account until March 24, 2020 when they were paid into this Court as directed by this Court's Order [Dkt. No. 13].[1]

What Plaintiffs failed to inform this Court when they filed their *Ex Parte* Application claiming that a TRO had to be entered to safeguard the $6 million with no notice to Karter or his counsel, is that Karter had already acted to put the funds in the control of the Nevada State District Court. In fact, on February 12, 2020, approximately two weeks before Plaintiffs commenced an action in this Court on February 26, 2020, Karter filed a Complaint in Nevada

---

[1] In the most recent example of this, just this week as Wells Fargo acted to release the $6 million fund to the Court pursuant to the Order, Karter believes that the action resulted in Wells Fargo unfreezing an additional approximately $2.5 million in funds. Given Danial and Michael's ongoing scheme, Karter's counsel immediately notified Magma's litigation counsel of the direct concern that Daniel and Michael would take advantage of the two day lapse between the unfreezing of the $2.5 million in funds and the hearing with this Court on Thursday to transfer the funds off-shore. Counsel for Magma has not responded to the demand that these funds not be transferred off-shore until this Court could be consulted at the hearing on Thursday and has refused to confirm that the $2.5 million fund will be protected until this Court can act.

State District Court, specifically identified the $6 million, noted it was in a frozen account, and stated: "To further safeguard the $6 million during the pendency of this action, Karter seeks an Order requiring the $6 million to be interpled with the Court, or an Order restricting anyone from accessing the $6 million until this dispute is resolved."[2]  In fact, prior to Plaintiff obtaining a TRO from this Court, Karter had already filed a Motion for Appointment of a Receiver in the Nevada State Court Action to, among other things, take possession of the $6 million and to safeguard the operations of Magma and Meta from the illicit activities of Daniel and Michael during the pendency of the action.[3]

In short, and as fully detailed herein, there is simply no basis for a Preliminary Injunction against Karter.  Plaintiff/Counterdefendant and the Third-Party Defendants having engaged in a scheme to defraud Karter, and illicitly and illegally transfer funds to the Cayman Islands and China, have no basis to claim that they will succeed on the merits of this dispute.  Karter's safeguarding of the $6 million and almost immediate presentation to the State Court to assume jurisdiction of these funds cannot possibly support their position.  Indeed, Karter's actions in the form of whistleblowing cannot possibly be deemed to strip him of all rights in the business that he created and for which he has not been paid anything for its acquisition.

---

[2] The other amount identified in this Court's Order and paid into the Court pursuant to that Order, is the $150,000 bonus that was paid to Karter for last year's operating successes of Magma.  In obtaining the *Ex Parte* Order from this Court on that topic, Plaintiff did not explain to the Court that the payment (which was authorized by Karter as acting CEO) was based on this performance, and made along with other bonuses paid by the company.  As set forth below, Karter does not claim ownership of the $6 million which was being safeguarded and which Karter had attempted to put in the State Court's jurisdiction.  Therefore, having the funds held by this Court during the litigation seems appropriate at this time.  There is no basis, however, for the Plaintiffs to argue that they will suffer irreparable injury if this Court does not retain Karter's 2019 bonus.  Even if that bonus is disputed, a disputed bonus is simply not a legitimate basis for a Preliminary Injunction requiring the payment of the bonus into the Court.

[3] Plaintiffs and its counsel had been fully advised of these actions.  As set forth below, Plaintiffs' counsel immediately requested that Karter not serve the Complaint while efforts to resolve the matter were discussed.  Again, this turned out to be a ploy.  Instead of seeking a resolution, Plaintiffs filed this action and the Application on an *Ex Parte* basis without fully informing this Court of the status of the State Court litigation, in an attempt to forum shop and buy time to continue transferring funds off-shore for the illicit purposes of Daniel and Michael.  At the same time, Daniel and Michael fled the jurisdiction and to this day Plaintiffs' counsel claims to not represent Danial and Michael, who are named Defendants in the State Court action and named Third-Party Defendants in this case, and refuse to identify any counsel for Daniel and Michael who intend to remain outside the jurisdiction of this Court and the State Court.

Further, Karter has not interfered with any business of the Plaintiff, nor has he misappropriated any of Plaintiffs' trade secrets.

Instead, this Court should either abstain from this action and allow the earlier filed case to go forward in State Court where the Application for Appointment of a Receiver has already been heard and is under advisement, or immediately appoint a Receiver to safeguard the assets of the business and ensure that Daniel and Michael's illicit and illegal schemes come to an immediate stop.

## II.   RELEVANT FACTS[4]

### A.   BACKGROUND OF THE PARTIES AND THE E-CIGARETTE BUSINESS

Karter first met Third-Party Defendant Qian Xu ("Daniel") in or around April 2015 when they were both working at OutletPC.com in Henderson, Nevada.  Karter and Daniel eventually began discussing the possibility of starting an e-cigarette business together.  As part of their proposed business plan, Karter and Daniel agreed that they would share duties related to sales, marketing, and accounting for their new e-cigarette venture.  Karter and Daniel further agreed that Daniel would focus on leveraging his supply chain connections in China, whereas Karter would focus on e-Commerce, operations, warehousing, purchasing and accounts payable.  Karter would later learn that Daniel's "supply chain connections in China" primarily referred to Third-Party Defendant Yuxiang Gao ("Michael") – Daniel's long-time friend from college.

In or around May 2015, Karter and Daniel began selling e-cigarettes online, mainly through the eBay online marketplace.  On or about May 23, 2015, Karter purchased the eightvape.com domain from GoDaddy.com.[5]  Around this time, Daniel introduced a man named Daxin Chan to Karter.  Mr. Chan initially assisted Karter and Daniel with affiliate marketing and purchasing for their e-cigarette business.

---

[4] Unless otherwise cited, the facts set forth in this Opposition and Countermotion are attested to in the Au-Yeung Declaration, attached hereto as **Exhibit A**.

[5] See May 23, 2015 Receipt from GoDaddy.com for the domain Eightvape.com, attached hereto as **Exhibit B**.

**B.     EIGHTCIG**

On or about October 11, 2015, an Operating Agreement for Eightcig was drafted utilizing the Nevada Secretary of State Website (the "Eightcig Operating Agreement").[6]  The Eightcig Operating Agreement listed the original members of Eightcig – Karter, Daniel and Mr. Chan, in addition to two new members – Michael and his friend and business associate from China, Xiangwei Wang.[7]  Michael and Mr. Wang provided supply chain and logistics support for Eightcig products from Shenzhen, China through a company they owned together – Troogle Technology, LTD, formerly known as Shenzhen Troogle Technology LTD, until October 3rd, 2016.   The Eightcig Operating Agreement listed the Membership Interest percentages in Eightcig as: (1) Daniel – 21.67%; (2) Karter – 21.66%; (3) Mr. Chan – 21.66%; (4) Michael – 17.5%; and (5) Mr. Wang – 17.5%.[8]

With respect to "Interested Transactions" the Eightcig Operating Agreement states that **"[a]ny transaction between a member or members and the LLC is prohibited unless a decision is approved by <u>all</u> of the disinterested Members after full disclosure of <u>all</u> material facts."**[9]  With respect to the "Withdrawal and Transfer of [Membership] Interests", the Eightcig Operating Agreement states in relevant part that **"[a] [M]ember may withdraw from the LLC <u>only</u> with the unanimous approval of the other [M]embers."**[10]  With respect to a "Voluntary Withdrawal" of Membership Interests, the Eightcig Operating Agreement states in relevant part that **"[a]n existing [M]ember may propose a voluntary withdrawal from the LLC, which requires the approval of <u>all</u> of the other existing [M]embers to be**

---

[6] <u>See</u> October 11, 2015 Eightcig Operating Agreement, attached hereto as **Exhibit C.**

[7] <u>See</u> **Exhibit C**.

[8] <u>See</u> **Exhibit C**.

[9] <u>See</u> **Exhibit C** (emphasis added).

[10] <u>See</u> **Exhibit C** (emphasis added).

effective."[11]  **"A Voluntary Withdrawal will constitute a surrender of the [Membership I]nterest <u>back to the LLC</u>."**[12]

In early 2016, Mr. Chan's visa expired, so he returned to China and voluntarily withdrew from Eightcig.  As part of his voluntary withdrawal from Eightcig, Mr. Chan's sold his Membership Interests back to the company, and Michael insisted the Members redistribute equally, rather than in proportion to their respective ownership percentages.  At some point thereafter, although the circumstances and timing remain unclear, Michael claims to have acquired his friend and business partner – Mr. Wang's Membership Interests in Eightcig.  A purported transfer of Mr. Wang's Membership Interests in Eightcig to Michael would have been a breach of the Eightcig Operating Agreement, as set forth above.[13]  Accordingly, Karter disputes Michael's claims that he validly acquired Mr. Wang's Membership Interests in Eightcig.

### C.   THE SUCCESS OF EIGHTCIG

Almost immediately after its formation in 2015, Eightcig became extremely successful.  In 2018 alone, Eightcig reported gross revenue of $44,946,905.00, and gross profit of $4,731,632.00.[14]  Karter and the sales and marketing team he ran were responsible for virtually all of these sales.  In addition, at all times relevant, Karter was in charge of sales and virtually all of the day-to-day operations at Eightcig.

### D.   THE SCHEME TO DEFRAUD KARTER AND FLEECE EIGHTCIG BY ROLLING IT INTO A NETWORK OF SHADOW ENTITIES PRIMARILY OWNED AND CONTROLLED BY THE THIRD-PARTY DEFENDANTS.

In or around mid-2018, Daniel and Michael worked together to devise a scheme to defraud Karter and fleece Eightcig by rolling it into a network of shadow companies which

---

[11] <u>See</u> **Exhibit C** (emphasis added).

[12] <u>See</u> **Exhibit C** (emphasis added).

[13] <u>See</u> **Exhibit C**.

[14] <u>See</u> 2018 Eightcig Federal Tax Return, attached hereto as **Exhibit D**.  Note, the 2018 Eightcig Federal Tax Return lists Karter's ownership percentage in Eightcig as 27.10%, although Karter believes it should actually be over 33%, had Mr. Wang not attempted to improperly attempt to transfer his Membership Interests to Michael in violation of the Eightcig Operating Agreement.

were secretly owned and controlled primarily by Michael and Daniel.  In order to accomplish their fraudulent scheme, Daniel and Michael decided to pressure Karter into believing things that were not true – that Eightcig was on the verge of failure and that as a result, Karter had no choice but to agree to roll Eightcig into a new network of companies which would purportedly be utilized to attract new investors.

More specifically, on or about July 16, 2018, Michael flew to Las Vegas from China, and asked Karter to pick him up at the airport.  Karter picked up Michael as requested, and took Michael to the Eightcig offices located at 6175 S. Sandhill Rd. Ste. 100, Las Vegas, Nevada 89120 (the "Eightcig Sandhill Office").  It was that day – on or about July 16, 2018 at the Eightcig Sandhill Office – where Michael first began making the following false and misleading verbal representations to Karter:

a.   The e-cigarette industry was facing imminent collapse because of purported new e-cigarette regulations working their way through the Food and Drug Administration of the United States Government;

b.   Eightcig was no longer viable as it was currently capitalized and positioned in the e-cigarette market;

c.   Unless Eightcig obtained a quick infusion of capital and was rolled into a new network of companies as Michael was demanding, Eightcig would not make it another year;

d.   Michael already had investors from China lined up who were ready, willing and able to invest tens of millions of dollars into this new multi-company structure;

e.   If Karter agreed to roll Eightcig into this new network of companies, the new companies would immediately be worth approximately $100,000,000.00;

f.   Karter's effective membership interest in the new companies would be somewhere between 15% - 20%, but not less than 15%; and

g.   If Karter did not agree to roll Eightcig into this new network of companies, Karter would have to immediately buy-out Michael and Daniel from Eightcig.

During the week of July 16, 2018, Daniel echoed Michael's false and misleading representations to Karter at an around the Eightcig Sandhill Office.  Michael and Daniel knew the representations they were making to Karter were untrue; however, Karter did not know they were untrue at that time.   Karter reasonably trusted and believed the foregoing

(mis)representations made by Michael and Daniel – his business partners of approximately three years.

In or around July 2018, the value of Eightcig was at least tens of millions of dollars. However, neither Eightcig nor Karter had the capital to immediately buy-out Michael and Daniel as they were demanding as an alternative to rolling up Eightcig into a new network of companies. Michael and Daniel knew this fact. Given that a buy-out of Michael and Daniel was not possible, and because together Michael and Daniel represented the majority ownership of Eightcig, and because Michael and Daniel told Karter in no uncertain terms that Karter did not have a choice but to agree to roll Eightcig into a new network of companies, Karter reasonably felt he had no option but to comply with Michael and Daniel's demands.

**E.    THE ONE-SIDED ROLL-UP PROCESS**

Although Karter did not know it when Michael and Daniel were pressuring him during the week of July 16, 2018, Michael and Daniel had already set their fraudulent scheme in motion. For example, Karter would later learn that Daniel had secretly incorporated Magma - the entity the Third-Party Defendants intended to roll Eightcig into several weeks prior on July 2, 2018 and secretly made himself the president of Magma.[15]

Over the next several months, Michael and Daniel began bombarding Karter and other Magma employees with stacks of documents. Michael and Daniel falsely represented to Karter that the documents they were bombarding him with were necessary to accomplish the roll-up of Eightcig in accordance with the representations and promises they made to Karter previously. Michael and Daniel expected Karter to sign every single document he was provided immediately, without question or negotiation. Often, the documents Karter was expected to sign were written in traditional Chinese, which Karter only understands in bits and pieces. Often, the documents Karter was expected to sign only contained a signature page. On a number of occasions, the documents Karter was expected to sign were sent from China in the middle of the night in Las Vegas when Karter was sleeping, and Michael and Daniel would

---

[15] See July 2, 2018 Articles of Incorporation and Initial List of Officers and Directors for Magma, attached hereto as **Exhibit E**.

call, text-message and email Karter and Karter's co-workers repeatedly demanding that Karter immediately sign their documents.  Karter would later learn that Michael and Daniel eventually began having Daniel and other individuals, for example, Eva Wei, sign documents on Karter's behalf without his knowledge or approval.

### F.    THE DISCOVERY OF THE FRAUD AND THE FUNNELING OF MONEY TO AND FROM THE NETWORK OF SHADOW CAYMAN AND CHINESE ENTITIES

When the proverbial dust from the purported Eightcig roll-up began to settle over the next several months, Karter began to understand that Michael and Daniel had lied to him about the necessity, purpose and ownership of the Eightcig roll-up.  Michael and Daniel's scheme involved essentially turning Eightcig into Magma – a Nevada entity wholly owned by Third-Party Defendant MOTI Technology Co., LTD ("MOTI").  Karter would learn that MOTI is a Cayman entity which in turn, was wholly owned by several Cayman entities, one of which was set up for Karter, one of which was set up for Michael, one of which was set up for Daniel, and several other entities which were set up for so-called "investors".  As Karter continued to try and put all the pieces of the fraud-puzzle together, he also continued to run the day-to-day operations, and was responsible for virtually all of the administrative functions for Magma, and its wholly owned subsidiary, Meta, just as he had done for Eightcig previously.

Given Karter's position as sole founder, shareholder, corporate officer and director permanently residing in the United States, Michael and Daniel expected Karter to perform as the CEO of Magma and Meta.  In fact, Karter was listed as the President, Treasurer, Secretary, Officer and Director for both Magma and Meta with the Nevada Secretary of State.[16]   As part of his functions, Karter was a signatory on both the Magma and Meta bank accounts, and he was responsible for overseeing Magma and Meta payroll and accounts payable.  Karter also believes that he was named as a personal guarantor for various obligations of Magma and Meta; however, despite repeated requests, the Third-Party Defendants and the Counterdefendants refuse to provide information or documentation to Karter regarding the possible personal

---

[16] See **Exhibit E**; see January 31, 2019 Articles of Incorporation and Initial List of Officers and Directors for Meta, attached hereto as **Exhibit F**.

guaranties that he may have signed, or that may have been signed for him without his knowledge or approval.

Almost immediately after the roll-up, Karter began noticing suspicious transfers of large sums of money being wired to, from and between Magma, Meta and the shadow network of Chinese and Cayman entities with seemingly no legitimate business purpose. For example, the following is a non-exhaustive list of suspicious transactions, for which proper documentation or explanation has never been provided to Karter:

a. **January 16, 2019 -** $1,000,000.00 wire from Magma to Troogle Technology, LTD ("Troogle") (the Chinese-based company owned by Michael and his friend, Mr. Wang)[17]

b. **January 31, 2019 -** $500,000.00 wire from Magma to Troogle[18]

c. **February 1, 2019 -** $1,000,000.00 wire from Zhen Fund Coii, LLC ("Zhen Fund") (an alleged "investor" in MOTI), to Magma[19]

d. **February 12, 2019 -** $1,000,000.00 wire from Zhen Fund to Magma[20]

e. **February 12, 2019 -** $1,000,000.00 wire from Magma to Zhen Advisors, LTD (an affiliate of the alleged investor Zhen Fund)[21]

f. **February 14, 2019 -** $1,000,000.00 wire in three separate transactions ($700,000.00, $150,000.00 and $150,000.00) from Magma to Shenzhen Thunderstone Technology, LTD ("Thunderstone") (a Chinese-based sister company of Magma)[22]

g. **February 20, 2019 -** $1,000,000.00 wire in two separate transactions ($700,000.00 and $300,000.00) from Magma to Troogle[23]

---

[17] See January 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit G**.

[18] See **Exhibit G**.

[19] See February 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit H**.

[20] See **Exhibit H**.

[21] See **Exhibit H**.

[22] See **Exhibit H**.

[23] See **Exhibit H**.

h.     **March 4, 2019 -** $4,000,000.00 wire from MSA China Fund II, LP to Magma[24]

i.     **March 25, 2019 -** $1,000,000.00 wire from Magma to Troogle[25]

j.     **March 25, 2019 -** $1,000,000.00 wire from Magma to Flamingo Technology, LTD ("Flamingo") (a Hong-Kong-based sister company of Magma)[26]

k.     **March 29, 2019 -** $4,000,000.00 wire from Magma to Flamingo[27]

l.     **May 8, 2019 -** $500,000.00 wire from Magma to Troogle[28]

m.     **May 14, 2019 -** $600,000.00 wire from Magma to Troogle[29]

n.     **May 17, 2019 -** $300,000.00 wire from Magma to Troogle[30]

o.     **May 21, 2019 -** $500,000.00 wire from Magma to Troogle[31]

p.     **May 28, 2019 -** $400,000.00 wire from Magma to Troogle[32]

q.     **May 30, 2019 -** $300,000.00 wire from Magma to Troogle[33]

r.     **June 6, 2019 -** $300,000.00 wire from Magma to Troogle[34]

s.     **June 12, 2019 -** $400,000.00 wire from Magma to Troogle[35]

t.     **June 28, 2019 -** $250,000.00 wire from Meta to Troogle[36]

---

[24] See March 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit I**.

[25] See **Exhibit I**.

[26] See **Exhibit I**.

[27] See **Exhibit I**.

[28] See May 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit J**.

[29] See **Exhibit J**.

[30] See **Exhibit J**.

[31] See **Exhibit J**.

[32] See **Exhibit J**.

[33] See **Exhibit J**.

[34] See June 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit K**.

[35] See **Exhibit K**.

[36] See June 2019 Wells Fargo Bank Statements for Meta, attached hereto collectively as **Exhibit L**.

u.   **August 16, 2019** - $900,000.00 wire from Magma to Troogle[37]

v.   **August 28, 2019** - $600,000.00 wire from Magma to Flamingo[38]

w.   **September 3, 2019** - $64,000.00 a check issued from Magma to Daniel for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place.[39]

In or around October 2019 after Karter began requesting information from Michael and Daniel about the foregoing, and other suspicious transactions to and from Magma and Meta's bank account(s), Michael and Daniel sent Qin Gong, a financial controller from Thunderstone to oversee Magma and Meta's accounting department.

In December 2019, Michael and Daniel ordered the following additional suspicious transactions, for which proper documentation or explanation has never been provided to Karter:

a.   **December 12, 2019** – $1,000,000.00 wire from Magma to Meta[40]

b.   **December 23, 2019** – $1,099,364.86 wire from Meta to Troogle[41]

c.   **December 31, 2019** – a check in the amount of $54,000.00 was issued from Magma to Daniel for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place[42]

d.   **December 31, 2019** – $15,000.00 a check issued from Magma to Michael for "Consulting fees", although no consulting agreement or arrangement between Daniel and Magma is in place[43]

In early January 2020, Michael instructed Karter to wire approximately $2,074,829.00 from Magma to Thunderstone.  When Karter inquired about the basis of the wire, Michael told Karter that the $2,074,829.00 was Magma's allocation of Thunderstone's "HR Cost" and

[37] See August 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit M**.

[38] See **Exhibit M**.

[39] See September 3, 2019 Check to Daniel for "Consulting Fees", attached hereto as **Exhibit N**.

[40] See December 2019 Wells Fargo Bank Statements for Magma, attached hereto collectively as **Exhibit O**.

[41] See December 2019 Wells Fargo Bank Statements for Meta, attached hereto collectively as **Exhibit P**.

[42] See December 31, 2019 Check to Daniel for "Consulting Fees", attached hereto as **Exhibit Q**.

[43] See December 31, 2019 Check to Michael for "Consulting Fees", attached hereto as **Exhibit R**.

"Financing Cost" for 2019.  Karter also asked about the various wires to Troogle – the Chinese-based company owned by Michael and his friend, Mr. Wang.  Michael and Daniel informed Karter and others at Magma that Troogle was virtually insolvent and was going to be dissolved in the near future so any loans made to Troogle would not be repaid, and any pre-payments for goods would not be fulfilled by Troogle.

### G.    THE BONUSES

Meanwhile, Magma closed its 2019 books with an unprecedented $65,148,315.78 in gross revenues (over $17,000,000.00 in sales for which Karter was personally responsible).[44] As a result of Magma's overwhelming success in 2019, and consistent with his job duties, Karter instructed Magma to pay bonuses in equal amounts of $150,000.00 each (the "Bonuses"), to its general manager Hui Sun ("Sindy"), to Karter (Magma's CEO and VP of Sales), to Michael and to Daniel.  Magma sent two Bonus checks of $150,000.00 each via UPS (Tracking No. 1Z8732R2DA25281071), to Michael (Check No. 1240)[45], and to Daniel (Check No. 1241)[46], and wired both Sindy and Karter $150,000.00 each.

### H.    THE WHISTLEBLOWING, DISCOVERY OF THE SECRET, UNAUTHORIZED EIGHTCIG ASSET PURCHASE AGREEMENT AND THE SAFEGUARDING OF FUNDS

#### 1.    <u>The Meetings With Mr. Wilcox</u>

By the beginning of 2020, Karter had begun to have serious concerns that Magma's and Meta's shady "business practices" and "accounting" being conducted at the direction of Michael and Daniel could be running afoul of United States tax and criminal laws.[47]  Karter was also concerned that Michael and Daniel were continuing to fleece the Magma and Meta bank accounts.  Karter was also aware that Michael was involved in a lawsuit in California

---

[44] <u>See</u> 2019 Profit and Loss Statement for Magma, attached hereto as **Exhibit S**.

[45] <u>See</u> December 31, 2019 Check to Michael, attached hereto as **Exhibit T**.

[46] <u>See</u> December 31, 2019 Check to Daniel, attached hereto as **Exhibit U**.

[47] <u>See</u> March 24, 2020 Declaration of Craig L. Greene, CPA/CFF, CFE, MAFF confirming "there is significant indicia of potential money laundering using Magma/Meta as a conduit," attached hereto as **Exhibit LL**.

(Superior Court Case No. 30-2019-01093094-CU-FR-CJC) for allegedly defrauding other business partners out of millions of dollars in a separate e-cigarette venture.[48]

Given these concerns, on or about January 6, 2020, Karter caused Magma to wire approximately $6,000,000.00 from its bank account to the Meta bank account for safekeeping with the memo "Fraud Mitigation".[49]  At that time, Karter believed that he and another trusted Magma/Meta employee/officer were the only individuals with access to the Meta bank account so the approximately $6,000,000.00 would be safe there.

On or about January 7, 2020, Karter arranged a phone call with Chris Wilcox, a CPA from the well-respected accounting firm Eide Bailly for advice.  On or about January 14, 2020, Karter met with Mr. Wilcox in person to further discuss the troubling accounting situation for Magma and Meta.  Mr. Wilcox drafted a memorandum and confirmed Karter's concerns with respect to Magma and Meta's shady "business practices" and "accounting" being conducted at the direction of Michael and Daniel, and explained that the funneling of such large amounts of money through Magma and Meta, especially without proper documentation and reporting was indeed very likely running afoul of United States tax, and possibly even criminal laws.[50]  The following day on January 15, 2020, Karter detailed the pointed discussion he had with Mr. Wilcox in an email to Magma's/Meta's general counsel, which stated in relevant part:

> I did have a private discussion with Chris at the end of the meeting to let him know that I may be dismissed for my refusal to wire further funds due to suspicious and unreasonable allocation of business funds. He expressed to me that he would [not] be comfortable accepting our works if I was no longer a part of this company long due to the nature of our company's previous transactions.

---

[48] See August 26, 2019 California Complaint for: (1) Breach of Contract (Investors Agreement); (2) Breach of Implied Covenant of Good Faith and Fair Dealing (Investors Agreement); (3) Breach of Implied Covenant of Good Faith and Fair Dealing (Operating Agreement); (4) Fraud and Deceit (Cal. Civ. Code §§ 1709, 1710); (5) Fraud Based on Intentional Misrepresentation; (6) False Promise/Promissory Fraud; (7) Unfair Competition (Cal. Bus. and Prof. Code §§ 17200 et seq.); and (8) Judicial Order of Expulsion, attached hereto as **Exhibit V**.

[49] See January 31, 2020 Wells Fargo Bank Statements for Meta, attached hereto as **Exhibit W**.

[50] See January 14, 2020 Email and Memorandum from Mr. Wilcox, attached collectively hereto as **Exhibit X**.

> I asked him what the 6 million funnelled [sic] through Magma looks like and he paused, and said, it's not good at all. He really did not want to utter the words money laundering but I put it out there first to which there was no disagreement.[51]

Among other things, Mr. Wilcox advised Karter not to authorize the $2,074,829.00 wire for Thunderstone's "HR Cost" and "Financing Cost" until a transfer-pricing analysis was performed to make sure this payment was compliant with United States tax laws.[52]  Karter agreed to follow Mr. Wilcox' advice, but (correctly) predicted to Mr. Wilcox that he would be terminated for whistleblowing if he failed to blindly follow Michael and Daniel's orders.[53]

Karter promptly forwarded Mr. Wilcox' memorandum and informed Michael and Daniel of his discussions with Mr. Wilcox and of his concerns regarding potential United States tax and criminal law violations.  Michael and Daniel ignored Mr. Wilcox' memorandum and Karter's concerns.

## 2.  **The Secret, Unauthorized Eightcig Asset Purchase Agreement**

Soon after, on or about January 21, 2020, Karter was surprised to learn that Daniel had secretly executed, on behalf of **both** Eightcig and Magma, an Asset Purchase Agreement dated December 28, 2018, which purported to sell certain of Eightcig's assets to Magma (the "Eightcig Asset Purchase Agreement").[54]  Karter was surprised because when Karter had previously asked Daniel about the potential sale of Eightcig's assets to Magma, Daniel had provided Karter only with an incomplete draft of a purchase agreement, which contained no details regarding timing, amounts, or assets to be bought/sold.[55]  Pursuant to the Eightcig Asset Purchase Agreement, Eightcig purportedly agreed to transfer "Inventory, Deposits, Accounts Payable and Accounts Receivable" to Magma in exchange for a promise from Magma to pay

---

[51] See January 15, 2020 Email from Karter to Magma's/Meta's general counsel, attached hereto as **Exhibit Y**.

[52] See **Exhibit X**.

[53] See **Exhibit Y**.

[54] See December 28, 2018 Eightcig Asset Purchase Agreement, attached hereto as **Exhibit Z**.

[55] See December 18, 2018 Email and Draft Eightcig Asset Purchase Agreement, attached collectively hereto as **Exhibit AA**.

Eightcig approximately $6,619,468.79 within two years.[56]  Importantly, the Eightcig Asset Purchase Agreement does not purport to transfer any website domains, or e-Commerce accounts, intellectual or intangible property from Eightcig to Magma.[57]  As set forth above, Karter neither knew of, or approved the Eightcig Asset Purchase Agreement or its terms.  The secret purported sale of Eightcig's assets to Magma via the Eightcig Asset Purchase Agreement was a breach of the Eightcig Operating Agreement.[58]

### 3.   Neither The Third-Party Defendants Nor The Counterdefendants Ever Intended To Pay Eightcig For The "Purchase" Of Its Assets

After learning of the secret, unauthorized Eightcig Asset Purchase Agreement, Karter confronted Daniel and asked whether/when Magma was going to pay the purchase price to Eightcig, Daniel ignored Karter.[59]  When Karter questioned Michael about the Eightcig Asset Purchase Agreement and whether/when Magma was going to pay the purchase price to Eightcig, Michael told Karter that Magma was **never** going to pay Eightcig.

Magma's financials confirm that neither Michael, Daniel, nor Magma have any intention to pay the purchase price to Eightcig pursuant to the Eightcig Asset Purchase Agreement.  For example, the purchase price owed to Eightcig under the Eightcig Asset Purchase Agreement is not listed as a liability for Magma on its balance sheet.[60]  Instead, the same approximate amount as the Eightcig asset purchase price is listed as "Owner's investment".[61]  As further evidence that neither Michael, Daniel nor Magma ever had any intention to pay the purchase price to Eightcig pursuant to the Eightcig Asset Purchase Agreement, the Third-Party Defendants dissolved Eightcig on on December 28, 2018, **the same**

---

[56] See **Exhibit AA**.

[57] See **Exhibit AA**.

[58] See **Exhibit AA**.

[59] See January 21, 2020 Email from Karter to Daniel, attached hereto as **Exhibit BB**.

[60] See December 31, 2019 Magma Balance Sheet, attached hereto as **Exhibit CC**.

[61] See **Exhibit CC**.

**day** the Eightcig Asset Purchase Agreement was purportedly executed.[62]  Notably, on February 13, 2020 - the day after Karter filed the State Court Action in an effort to unwind the Eightcig roll-up (described below) – Daniel unilaterally disbursed all the funds remaining in two Eightcig bank accounts ($40,628.28 in the Eightcig Chase Account and $52,378.00 in the Eightcig Wells Fargo Account), so he could close those accounts.

In late January 2020 as Karter continued to work with Mr. Wilcox in an attempt to sort out Magma and Meta's shady finances and accounting, Karter learned that Daniel instructed the employees not to cooperate or provide any financial information to Karter.  The following day on or about February 5, 2020, Karter learned that he had secretly been replaced as the President, Treasurer, Secretary, Officer and Director on the Nevada Secretary of State website for Magma and Meta.  No notice was provided to Karter, nor was a Directors or Shareholders meeting held where the Officers, Directors or Shareholders could vote on the actions taken by Third-Party Defendants to purportedly remove Karter as the President, Treasurer, Secretary, Officer and Director for Magma and/or Meta.  Karter had not, however, been removed as the acting CEO of Magma or Meta.  Given Karter's sudden and secret removal as an officer and director on the Nevada Secretary of State website for Magma and Meta, Karter was reasonably concerned that the $6,000,000.00 in the Meta bank account may no longer be safe.  Immediately after, the approximately $6,000,000.00 was deposited into a "Savings Account", the bank froze the funds, and Karter notified Sindy – Magma's general manager – about the safekeeping of the funds.  The funds remained in the frozen account until they were deposited with this Court on or about March 24, 2020.[63]

**I.**   **THE STATE COURT ACTION, THE FORUM SHOPPING, THE RETALIATION, AND THE ILLEGAL AND GROSS MISMANAGEMENT OF MAGMA AND META BY THE THIRD-PARTY DEFENDANTS**

On or about February 12, 2020 Karter filed a lawsuit in the Eighth Judicial District of Nevada State Court, Case No. A-20-810395-B ("State Court Action"), against Michael, Daniel,

---

[62] See Nevada Secretary of State Website printout for Eightcig, attached hereto as **Exhibit DD**.

[63] See February 7, 2020 Email from Wells Fargo Bank confirming frozen account, attached hereto as **Exhibit EE**.

Magma and Meta alleging claims for: (1) fraudulent and/or intentional misrepresentation; (2) negligent misrepresentation; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing – contract; (5) breach of the implied covenant of good faith and fair dealing – tort; (6) breach of fiduciary duty; (7) constructive fraud; (8) civil conspiracy; (9) unjust enrichment; and (10) declaratory relief.[64]   Karter also sought to interplead the $6,000,000.00 and a receiver over Magma and Meta.[65]

In response to Karter filing the State Court Action, counsel for Michael and Daniel reached out to counsel for Karter and requested that Karter not proceed with serving a copy of the State Court Action, ostensibly so the parties could allegedly focus in good faith on settlement negotiations.  Contrary to their representations, however, Michael and Daniel did not intend to focus in good faith on settlement negotiations – they intended to, and did improperly forum shop this dispute, **by filing the underlying action several weeks <u>after</u> the State Court Action was filed**.

For almost three weeks after he transferred the $6,000,000.00 to the Savings Account for safe keeping, Karter continued to function as Magma and Meta's CEO and was the sole

---

[64] <u>See</u> February 12, 2020 State Court Complaint, attached hereto as **Exhibit FF**.

The Colorado River doctrine requires a federal court to abstain in favor of a concurrent state court proceeding where necessary to promote "wise judicial administration, conservation of judicial resources, and comprehensive disposition of litigation." <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976).  In <u>Colorado River</u>, the United States Supreme Court described four factors federal courts should consider in determining whether abstention is appropriate: (1) whether the state or federal court has exercised jurisdiction over the res, (2) the order in which the forums obtained jurisdiction, (3) the desirability of avoiding piecemeal litigation, and (4) the inconvenience of the federal forum. <u>Colorado River</u>, 424 U.S. at 800.  Subsequent decisions have added three more factors: (5) whether federal or state law controls the decision on the merits, (6) whether the state court can adequately protect the rights of the parties, and (7) whether the exercise of federal jurisdiction will promote forum shopping.  See <u>Washington St. Corp. v. Lusardi</u>, 976 F.2d 587, 588 (9th Cir. 1992).

As set forth in more detail herein, this case presents the Court with one of those rare instances where nearly all actors for a Colorado River stay are satisfied: the Nevada State Court was filed first, the Nevada State Court has heard Karter's Motion for the Appointment of a Receiver (and has taken it under advisement given this Court's TRO), the issues in both cases are identical, the (legitimate) claims at issue are all state-law based, and abstention will not allow Plaintiff to forum shop.

Accordingly, abstention would be proper, should this Court decide to abstain in favor of the earlier-filed State Court Action.

[65] <u>See</u> **Exhibit FF**.

founder, shareholder, corporate officer and director of Magma and Meta who resided in the United States. Michael and Daniel only finally terminated Karter on February 25, 2020 when it became apparent to them that Karter was not going to dismiss the State Court Action and look the other way as they continued to fleece Magma and illegally funnel millions of dollars through Magma's and Meta's bank accounts.[66]

Daniel also claimed in the Termination Letter that MOTI, as Magma's parent company, decided to repurchase all of Karter's membership interests in MOTI for nothing.[67] Michael's and Daniel's attempts to expel Karter from MOTI by paying him nothing and leaving him on the hook for secret guarantees, confirms what Karter alleged in the State Court Action and in this action – that the Eightcig roll-up, and all the documents related thereto, was nothing but an illusory, fraudulent scheme to steal Karter's interest in Eightcig. These actions also confirm that none of the documents related to the Eightcig roll-up were supported by actual consideration.

The stability and continuity in Magma and Meta's management and operations all evaporated when Karter was suddenly and illegally terminated on February 25, 2020. For example, after repeated requests, counsel for Magma and Meta have refused to identify any competent officers, directors or executive level management legally on site at Magma or Meta.[68] Upon information and belief, Michael and Daniel have installed Magma's former Information Technology officer David Lin as a puppet manager for Magma and Meta, although Mr. Lin has neither the experience or qualifications to properly manage Magma and Meta.[69] In reality, the Michael and Daniel are improperly *attempting* to manage Magma and Meta partly from China and partly during their periodic visits to the United States. Upon information and belief, Michael and Daniel are not permitted to manage Magma and Meta from the United

---

[66] See February 25, 2020 Termination Letter, attached hereto as **Exhibit GG**.

[67] See **Exhibit GG**.

[68] See Email exchanges between counsel for Karter and counsel for Counterdefendants and Third-Party Defendants, attached hereto as **Exhibit HH**.

[69] See David Lin's LinkedIn Profile, attached hereto as **Exhibit II**.

States as alleged B1/B2 Visa holders, nor are they allowed to pay themselves for these services as they have been.

Further, over the past several weeks, Magma's sales website has inexplicably gone offline, gross sales and profits have continued to sharply decline,[70] and employees are legitimately concerned for their safety.  For example, since January 2020, Michael and Daniel traveled from China to the United States several times **by way of other countries** in order to avoid heightened COVID-19 (Coronavirus) screening and travel bans imposed by the United States government.

Upon information and belief, Michael and Daniel are also continuing to to funnel millions of dollars through Magma and Meta in violation of United States tax and criminal laws.  Upon information and belief, Third-Party Defendants are also continuing to fleece Magma and Meta by, among other schemes, having them purchase dead-stock and regular restocks from companies owned and/or controlled by Michael and Daniel, having Magma and Meta purchase products at prices above market rates, and by forcing Magma and Meta to contribute bogus and illegitimate payments to off-shore companies controlled by Michael and Daniel.

On more than one occasion in the past, Michael and Daniel informed Karter that if they ever became parties to a lawsuit in the United States, they would abscond to China where they cannot be served or forced to pay a judgment.  Michael and Daniel are currently holding true to their word – they are hiding in China and are refusing to accept service or otherwise participate in the Nevada State Court Action or this action despite managing the Magma and Meta which are located here in Nevada, directing this litigation for Magma and Meta, and submitting declarations on behalf of Magma and Meta.[71]

---

[70] See July 2019 Profit and Loss Statement for Magma showing Gross Profit at **16.82%** and December 2019 Profit and Loss Statement for Magma showing Gross Profit at just **3.32%**, attached collectively hereto as **Exhibit JJ**.  Upon information and belief, since terminating Karter, Gross Sales and Gross Profit for Magma have both both dropped even further.

[71] See Email Exchange between counsel for Karter and Counsel for Plaintiffs, attached hereto collectively as **Exhibit KK**.

### III.    LEGAL ARGUMENT

### A.    THERE IS NO BASIS FOR A PRELIMINARY INJUNCTION

A "preliminary injunction is an extraordinary remedy never awarded as of right." Chamaria v. Diab, No. 217CV02023JADCWH, 2017 WL 3271716, at *1 (D. Nev. Aug. 1, 2017) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365 (2008)).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in his favor, and [4] that an injunction is in the public interest."  A Woman's Friend Pregnancy Res. Clinic v. Becerra, 901 F.3d 1166, 1167 (9th Cir. 2018) (citing Winter, 555 U.S. at 20, 129 S.Ct. at 172).  Here, a preliminary injunction would be improper because none of the foregoing factors even remotely exist.

### 1.    There Is No Probability Of Success On The Merits Of Plaintiffs' Claims

### a.    Karter Made No Wrongful Transfers Of Money

The first group of Plaintiffs' claims in this case are predicated upon the allegation that Karter made two wrongful transfers of money from Magma/Meta to himself.  Application at pp. 20 – 21.  These allegations are not only demonstrably untrue, it should be noted that money "damages are not traditionally considered irreparable because the injury can later be remedied by a monetary award."  See Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 952 (1974).

### (1)    The Bonus

With respect to the $150,000.00 Bonus, as set forth above, Karter was the acting CEO, President, Treasurer, Secretary, Officer and Director for both Magma and Meta.[72]  Karter was also the VP of sales, was a signatory on both the Magma and Meta bank accounts, and he was responsible for overseeing Magma and Meta payroll and accounts payable.  Magma closed its 2019 books with an unprecedented $65,148,315.78 in gross revenues - over $17,000,000.00 in sales for which Karter was personally responsible.  As a result of Magma's overwhelming success in 2019, and consistent with his job duties, Karter instructed Magma to pay

---

[72] See **Exhibit E**; **Exhibit F**; **Exhibit S**.

$150,000.00 Bonuses each to Magma's/Meta's general manager Sindy, to Michael[73], to Daniel[74], and to himself.  Plaintiffs have identified no rule, policy or procedure of Magma/Meta which the payment of these Bonuses allegedly violated, and Karter continued to perform his job duties for Magma/Meta for several months following the distribution of these Bonuses.[75] These facts clearly demonstrate that the payment of the $150,000.00 Bonus to Karter was not wrongful, nor is it something that Magma/Meta felt was a legitimate concern.  Put simply – Karter's $150,000.00 Bonus was not a wrongful transfer of money, and it cannot support a request for injunctive relief.

Moreover, Karter respectfully requests an Order returning the $150,000.00 Bonus that Karter was improperly forced to deposit with the Court on March 24, 2020 as a result of the *Ex Parte* TRO improperly obtained by Plaintiffs.

### (2)    The $6,000,000.00

With respect to the $6,000,000.00, again, Karter was the acting CEO, President, Treasurer, Secretary, Officer and Director for both Magma and Meta.[76]  As such, Karter owed fiduciary duties to Magma and Meta.  Among those duties was the obligation to protect Magma's and Meta's assets, and to prevent Magma and Meta from breaking laws, or being used to break laws.  This was especially true given Karter's knowledge that Michael had previously defrauded not only Karter with respect to Eightcig, but also potentially other partners in a California-based business venture.[77]

After observing Michael and Daniel wire over ten million dollars through Magma and Meta without proper documentation and without legitimate business purposes, Karter took reasonable steps to uphold his fiduciary duties.  For example, Karter sought professional accounting advice from Mr. Wilcox, who confirmed that by fleecing Magma and Meta and by

---

[73] See **Exhibit T**.

[74] See **Exhibit U**.

[75] See **Exhibit GG**.

[76] See **Exhibit E**; **Exhibit F**; **Exhibit S**.

[77] See **Exhibit V**.

funneling millions of dollars through Magma's/Meta's bank accounts, Michael and Daniel were almost certainly violating United States tax and criminal laws.[78]   Karter also informed the general counsel for Magma/Meta of his concerns and his discussions with Mr. Wilcox.[79]

Ultimately, Karter did the only reasonable thing he could think to do given his grave concerns – safeguard the $6,000,000.00 sitting in Magma's bank account.  Karter accomplished this objective by first transferring the the $6,000,000.00 from Magma's bank account into Meta's bank account with the notion "Fraud Mitigation"[80] and when it became apparent that this protective measure might not be sufficient, he placed the funds into the Savings Account, informed Magma's/Meta's general manager Sindy, and filed the State Court Action seeking court intervention and a receivership over Magma and Meta.[81]   The $6,000,000.00 was immediately frozen by Wells Fargo[82], and at no time has Karter attempted to move or utilize these funds.

During the pendency of this action, Karter engaged Craig L. Greene of Greene Forensic Accounting Solutions LLP.  Mr. Greene is a licensed CPA, who is also Certified in Financial Forensics by the American Institute of Certified Public Accountants, Certified in Fraud Examination by the Association of Certified Fraud Examiners, and certified as a Master Analyst in Financial Forensics.  Mr. Greene has reviewed the wire transactions in question and was able to confirm what Karter and Mr. Wilcox had suspected - that "there is significant indicia of potential money laundering using Magma/Meta as a conduit."[83]

Put simply – Karter did not "wrongfully" transfer the $6,000,000.00 in question – **he did exactly the opposite** – he took steps to safeguarded these funds so Michael and Daniel could not wire them offshore in violation of United States tax and criminal laws like they did

---

[78] See **Exhibit X**.

[79] See **Exhibit Y**.

[80] See **Exhibit W**.

[81] See **Exhibit CC**.

[82] See **Exhibit EE**.

[83] See **Exhibit LL**.

with tens of millions of Mama's and Meta's cash previously.

Accordingly, not only is there no probability for success on the merits of Plaintiffs' claims related to alleged wrongful transfers of money, there is no basis for the issuance of a Preliminary Injunction.

### b. Karter Did Not Interfere With Plaintiffs' E-Commerce Platforms

The second group of Plaintiffs' claims against Karter are predicated upon allegations that Karter took steps to wrongfully interfere with "Plaintiffs'" e-Commerce platforms. Application at pp. 18 – 19, 22 – 23. For example, Plaintiffs falsely accuse Karter for their trouble with Shopify by arguing that "[o]n or about February 13, 2020, Karter contacted Shopify and instructed Shopify to remove the eightvape.com domain from Magma's Shopify store, falsely claiming that Karter owned the eightvape.com domain." Application at p. 9 ¶¶ 18 – 20.

First, while it is true that Magma and Meta utilize the Eightcig and Eightvape-related e-Commerce platforms to sell products, it is not true that Magma or Meta ever validly acquired **ownership** rights to these e-Commerce platforms. As set forth in above, Karter purchased the the Karter purchased the eightvape.com domain from GoDaddy.com.[84] Eightcig never acquired the eightvape.com domain from Karter. Further, the Eightcig Asset Purchase Agreement does not purport to transfer any website domains, e-Commerce accounts such as Shopify or BigCommerce, intellectual, or intangible property from Eightcig to Magma.[85] Finally, even if the Eightcig Asset Purchase Agreement did, no consideration was provided by Magma for this purported transfer or acquisition, as set forth in more detail herein. The same is true for the so-called Confirmation Letter relied upon by the Plaintiffs in their Application.

Furthermore, it was Daniel, **not Karter**, who brought about the trouble Plaintiff's e-Commerce vendors when he suddenly began attempting to transfer ownership of these platforms after this dispute arose. Emails with Shopify confirm that contrary to Plaintiffs'

---

[84] See **Exhibit B**.

[85] See **Exhibit Z**.

representations to this Court, Karter did not reach out to Shopify on February 13, 2020, nor did he request that Shopify "remove the eightvape.com domain from Magma's Shopify store."[86] These emails clearly demonstrate that it was Daniel who contacted Shopify on February 2, 2020 in an attempt to suddenly transfer ownership of the Eightcig Shopify store from Karter's name into Daniel's name, and Karter only sought to maintain the status quo during the pendency of this dispute.[87]  The same is true for BigCommerce.

In sum, Karter could have shut down Magma's and Meta's e-Commerce platforms at any time prior to this Court's issuance of the *Ex Parte* TRO, but he clearly chose not to do so because he was content to let the Court resolve this dispute, as evidenced by the filing of the Nevada State Court Action weeks prior to the filing of this case.[88]  The same holds true today.

Accordingly, not only is there no probability for success on the merits of Plaintiffs' claims related to his alleged interference with "Plaintiffs" e-Commerce accounts, there is no basis for the issuance of a Preliminary Injunction.

### a.  Karter Did Not Misappropriate Plaintiffs' Trade Secrets

The third and final category of Plaintiffs' claims against Karter relate to allegations that Karter allegedly misappropriated Plaintiffs' trade secrets.  Application at pp. 16 – 19.  The gist of Plaintiffs' allegations are that Karter allegedly "directed and/or induced his cousin [Siyun "Crystal" Lu] to download vast amounts of Magma's Shopify product information" and now Plaintiffs suspect that Karter is in the process of setting up a competing business.  Plaintiffs' allege that on or about February 12, 2020, Karter directed or induced this activity from his Cousin after his removal from his Magma and Meta positions as an officer and director. Application at p. 12 : ¶¶ 17 – 23; p. 17 : ¶¶ 27 – 28; p. 18 : ¶¶ 1 – 2.

What Plaintiffs failed to tell this Court, however, is that Karter was employed as (at least) the VP of sales for Magma and Meta until February 25, 2020.[89]  Plaintiffs also failed to

---

[86] See Email exchange between Karter and Shopify, attached hereto collectively as **Exhibit MM**.

[87] See **Exhibit FF**.

[88] See **Exhibit AA**.

[89] See **Exhibit GG**.

tell this Court that the data in question were product CSV files for Magma and Meta which are routinely downloaded by sales staff (including by Karter, Ms. Lu, and many others at Magma and Meta), and are freely provided to vendors and clients of Magma and Meta. Put simply: (1) Plaintiffs have not alleged that **Karter** downloaded anything improperly (and they did not sue Ms. Lu for allegedly doing so); (2) the data in question have been downloaded by countless employees of Magma and Meta in the past; and (3) the data in question have been provided to countless vendors and clients of Magma and Meta in the past. Moreover, Plaintiffs have provided this Court with no evidence that Karter has received, or is otherwise wrongfully utilizing any of this alleged data.

Accordingly, not only is there no probability for success on the merits of Plaintiffs' claims related to Karter's alleged misappropriation of trade secrets, there is no basis for the issuance of a Preliminary Injunction.

### 2.    There Is No Real Threat of Irreparable Harm To Plaintiffs

As set forth above, money "damages are not traditionally considered irreparable because the injury can later be remedied by a monetary award." <u>Sampson</u>, 415 U.S. at 90, 94 S. Ct. at 952. Here, aside from Plaintiffs' allegations related to money damages (which cannot form the basis for injunctive relief), Plaintiffs' have identified no real threat of irreparable harm from Karter. For example, it was Plaintiffs, not Karter who interfered with the e-Commerce vendors at issue. Moreover, Plaintiffs have provided this Court with no evidence that Karter has misappropriated, has received, or is otherwise wrongfully utilizing any of their alleged trade secrets. Accordingly, this factor also tips in Karter's favor.

### 3.    The Balance Of Equities Weighs Strongly In Karter' Favor, And An Injunction Is Not In The Public Interest

As set forth in detail above, there no legitimate basis for the Court to issue a Preliminary Injunction against Karter. Accordingly, it follows that the balance of equities and the public interest both lean heavily in favor of this Court denying Plaintiffs' Application for a Preliminary Injunction against Karter. The exact opposite is true, which is why Karter is seeking the appointment of a receiver over Magma and Meta by way of his Countermotion. The balance of equities and the public interest related to Magma and Meta are discussed in more detail

below.

### B. THIS COURT MUST APPOINT A RECEIVER OVER PLAINTIFFS

It is well established under Nevada law that a court may appoint a receiver if there is an action pending in which the application for the appointment of a receiver is made, and where there exists statutory authority to appoint a receiver. State ex rel. Nenzel v. Second Jud. Dist. Ct., 49 Nev. 145, 155, 241 P. 317 (1925); see Bowler v. Leonard, 70 Nev. 370, 383, 269 P.2d 833, 839 (1954) (stating that the appointment of a receiver is a discretionary measure to be governed by a consideration of the entire circumstances of the case). Whether to appoint a receiver lies within the court's discretion. Nishon's, Inc. v. Kendigian, 91 Nev. 504, 505, 538 P.2d 580, 581 (1975).

### 1. The Corporate Fictions Of Magma And Meta Should Be Disregarded

It is also well settled that "where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies . . . courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 501, 38 S. Ct. 553, 557 (1918). In other words, "the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." Trustees Sys. of Co. of Pennsylvania v. Payne, 65 F.2d 103, 107 (3d Cir. 1933) (citing Chicago, M. & St. P. Ry. Co., 247 U.S. at 501, 38 S. Ct. at 557; In re Rieger, Kapner & Altmark, 157 F. 609, 613 (S.D. Ohio 1907) (explaining that "[t]he doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud."); Pennsylvania Canal Co v. Brown, 235 F. 669, 680 (3d Cir. 1916) (explaining that where one company created a second company "for its own use, acquired complete control over [the

second company] by acquiring nearly all its stock, organized it by electing officers from its own directorate . . ." and permitted moneys to be improperly diverted from [the second company] for its own advantage, "the legal fiction of separate corporate responsibility based upon distinct corporate existence disappeared."); Brown v. Pennsylvania R Co, 250 F. 513, 518 (3d Cir. 1918); Indus. Research Corp. v. Gen. Motors Corp., 29 F.2d 623, 625 (N.D. Ohio 1928); Cent. Republic Bank & Tr. Co. v. Caldwell, 58 F.2d 721, 728 (8th Cir. 1932)).

This concept of disregarding the fiction of corporate entities where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation has specifically been held to apply in the context of an application for a receivership, especially "when the facts are substantial enough to justify, indeed to compel, a finding that [a number of] corporations were so identified with the parent corporation as to be a part of it." Payne, 65 F.2d at 107. In Payne, the court specifically held that "[b]eing of opinion that the law makes no exception of receiverships, we tear asunder the legal maze of corporate fiction in which the[] [six companies at issue] have enveloped themselves and, observing that the six corporations were not merely related by stock ownership but, like wheels in a machine, were so closely meshed that all functioned together, we find . . . that in legal effect they were . . . one company." Id.; see also Viega GmbH v. Eighth Jud. Dist. Ct., 130 Nev. 368, 383, 328 P.3d 1152, 1162 (2014) (explaining that "[u]nder the principle of corporate separateness, the actions of a subsidiary company are generally not attributable to its parent corporation" "but this principle may yield where a subsidiary is so dominated by its parent that the two corporations are, as a practical matter, the same entity or "alter egos," and recognizing their corporate separateness would sanction fraud or promote injustice.) (citing Dole Food Co. v. Patrickson, 538 U.S. 468, 474, 123 S.Ct. 1655 (2003); Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir. 1979); Polaris Indus. Corp. v. Kaplan, 103 Nev. 598, 601, 747 P.2d 884, 886 (1987)).

Here, Third-Party Defendant MOTI is purports to be a parent company which is controlled by Michael and Daniel.  MOTI allegedly owns one hundred percent (100%) of the issued and outstanding shares of Magma, which owns one hundred percent (100%) of the issued

and outstanding shares of Meta.  In other words, Meta is a wholly-owned subsidiary of Magma, and Magma is a wholly-owned subsidiary of MOTI.  The overwhelming weight of evidence in this case demonstrates that Magma and Meta are mere agents and instrumentalities of MOTI (Karter has alleged a claim for alter ego against all parties in this case), and especially because adhering to the legal fiction of corporate separateness in this case would sanction fraud and promote injustice as set forth in more detail herein, the Court should view these three entities for what they are for purposes of this Countermotion – one single entity.

### 2. A Receiver Is Warranted And Appropriate Pursuant To NRS 32.101(1)

NRS 32.010 describes "[c]ases in which receiver may be appointed", and NRS 32.010(1) provides in relevant part:

> In an action . . . by a creditor to subject any property or fund to the creditor's claim, or between partners or others jointly owning or interested in any property or fund, on application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed or materially injured.

Here, as set forth above, Karter is both a creditor (via his ownership interest in Eightcig and the Eightcig Asset Purchase Agreement) and a partner (via his ownership interest in MOTI[90]) of Magma and Meta (See Section IIIB(2), above).  By virtue of Karter's status as both a creditor and partner of Magma and Meta, Karter necessarily holds an interest in Magma and Meta and their respective funds and property.  Furthermore, as set forth in detail above, there is a very real and credible threat that without the appointment of a receiver, Magma and Meta's respective funds and property are in danger of being permanently lost or removed from this Court's jurisdiction.  Given the foregoing, the appointment of a receiver over Magma and Meta is necessary and appropriate pursuant to NRS 32.101(1).

### 3. A Receiver Is Also Warranted And Appropriate Pursuant To NRS 32.101(5)

NRS 32.010(5) provides in relevant part that a receiver may be appointed

---

[90] Karter's alleged ownership interest MOTI, Magma and Meta is being presented for purposes of maintaining a receivership argument pursuant to this Application; it is not an admission or waiver of Karter's claim for fraud related to the Eightcig roll-up or his demand for a rescission of the Eightcig roll-up.

"[i]n the cases when a corporation . . . has forfeited its corporate rights."

As set forth in detail above, Michael and Daniel have both personally broken a number laws (defrauding Karter, working without proper visas, dodging mandatory screening protocols and travel bans, etc.). In addition, Michael and Daniel have also directed Magma and Meta to violate a number of laws (funneling large sums of money between Chinese and Cayman entities for improper purposes and without proper documentation and tax disclosures, etc.). Moreover, Magma and Meta are currently operating without any officers, directors or executive level management on site. Given that Magma and Meta are being utilized as instrumentalities to achieve and further Michael and Daniel's illegal activities, Magma and Meta have forfeited their corporate rights. Accordingly, the appointment of a receiver over Magma and Meta is necessary and appropriate pursuant to NRS 32.101(5).

### 4.     A Receiver Is Also Warranted And Appropriate Pursuant To NRS 32.101(6)

NRS 32.010(6) provides in relevant part that a receiver may be appointed "[i]n all other cases where receivers have heretofore been appointed by the usages of the courts of equity." The Court's statutory authority to appoint a receiver is broadened extensively by this catchall provision. For example, the Supreme Court of Nevada has explained that "[t]he district court may appoint a temporary receiver in a number of instances, including, but not limited to, situations where corporate directors are guilty of fraud or gross mismanagement or where the assets of the corporation are in danger of waste." Medical Device Alliance, Inc. v. Ahr, 116 Nev. 851, 862, 8 P.3d 135, 142 (2000), *abrogated on other grounds by* Costello v. Casler, 127 Nev., 436, n. 4, 254 P.3d 631 (2011). The Supreme Court of Nevada has also explained that "[a] receiver is generally appointed to take possession of property and preserve its value where it appears to the court that neither party should hold it." Lynn v. Ingalls, 100 Nev. 115, 120, 676 P.2d 797, 800–01 (1984) (*citing* Bowler v. Leonard, 70 Nev. 370, 269 P.2d 833 (1954)). The Supreme Court of Nevada has also explained that the use of a receiver to maintain assets in conjunction with a contractual default is consistent with the use of a receiver in Nevada. See Gratitude Group, LLC v Hospitality Intern. Group, No. 15A720090, 2016 WL 8648852, at *3 (2016) (*citing* Lynn, 100 Nev. at 119, 676 P.2d at 800-01). Further, in examining Nevada state

law, the Nevada District Court affirmed the Bankruptcy Court's decision to appoint a receiver over a business pursuant to NRS 32.010(1) and (6) where evidence was presented that the business at issue was engaged in "[business] practices which could allow the diversion of cash." In re Ledstrom, No. 2:15-CV-01145-APG, 2017 WL 1239144, at *11 (D. Nev. Jan. 27, 2017); see also Liu v. Sun City Spas, Inc., No. A-478621, 2006 WL 4075784 (D. Nev. Dec. 27, 2006) (appointing a receiver where evidence demonstrated a likelihood of misappropriation).

Here, as set forth in detail above, Michael and Daniel have grossly mismanaged and misappropriated millions of dollars from Magma and Meta.  Indeed, without the appointment of a receiver, they will continue to fleece Magma and funnel money through Magma and Meta in violation of the laws of the United States.  This is precisely the type of situation where courts have appointed receivers in the past.  Accordingly, the appointment of a receiver over Magma and Meta is necessary and appropriate pursuant to NRS 32.101(6).

### 5.    A Receiver Is Also Warranted And Appropriate Pursuant To NRS 78.650

NRS 78.650 provides for a stockholders' application for injunction and appointment of receiver when a corporation mismanaged, and provides in relevant part:

> 1.   Any holder or holders of one-tenth of the issued and outstanding stock may apply to the district court . . . for an order appointing a receiver, and by injunction restrain the corporation from exercising any of its powers or doing business whatsoever, except by and through a receiver appointed by the court, whenever irreparable injury to the corporation is threatened or being suffered and:
>
> (a)  The corporation has willfully violated its charter;
>
> (b)  Its trustees or directors have been guilty of fraud or collusion or gross mismanagement in the conduct or control of its affairs and any presumption established by subsection 3 has been rebutted with respect to such conduct or control;
>
> (c)  The assets of the corporation are in danger of waste, sacrifice or loss through attachment, foreclosure, litigation or otherwise; or
>
> (d)  The corporation has dissolved, but has not proceeded diligently to wind up its affairs, or to distribute its assets in a reasonable time.
>
> . . .

When Michael and Daniel fraudulently induced Karter to roll Eightcig into their network of shadow companies and when one of those companies – Magma purportedly

acquired all of Eightcig's assets pursuant to the Eightcig Asset Purchase Agreement in December 2018 – Karter owned at least 1/3 of Eightcig. Karter never received any monetary consideration for his at least 1/3 interest in Eightcig. Accordingly, no matter how you look at the situation, it is apparent that Karter holds *at least* ten percent (10%) of Magma and Meta (through his ownership in their parent company, MOTI), and is therefore entitled to maintain this receivership action pursuant to NRS 78.650.

Karter fully expects that in opposition to this Countermotion, Plaintiffs will attempt to convince this Court that Karter somehow holds less than the ten percent (10%) ownership interests in Magma and Meta required to bring a receivership action under NRS 78.650. In fact, Third-Party Defendants have recently asserted that they divested Karter of all his interests in Magma and Meta.[91] These arguments should be met by this Court with extreme skepticism given that many, if not all of the documents related to Magma, Meta and the fraudulent roll-up were executed by Karter under duress, under circumstances where these documents are invalid, and/or may have been altogether forged, as set forth in more detail herein. These arguments will also serve as a quintessential example the rank fraud perpetrated upon Karter by Michael and Daniel in this case – the notion that Karter somehow gave up his 1/3 interest in Eightcig which was worth tens of millions of dollars for, at best, something much different and much less than he was promised, or at worst, for absolutely nothing.

Here, as set forth in detail above, Michael and Daniel have grossly mismanaged and misappropriated millions of dollars from Magma and Meta. They have also utilized Magma and Meta to illegally funnel over ten million dollars to shady off-shore entities, outside the jurdisiction of this Court. Without the appointment of a receiver, they will continue to fleece Magma and Meta in violation of Karter's rights and the laws of the United States. This is precisely the type of situation that NRS 78.650 addresses and provides as a basis for the appointment of a receiver. Accordingly, the appointment of a receiver over Magma and Meta is necessary and appropriate pursuant to NRS 78.650.

---

[91] See **Exhibit GG**.

### 6.     The Power And Duties Of The Receiver

With respect to the powers and duties of a receiver, the Supreme Court of Nevada has explained:

> A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation *pendente lite*, when it does not seem reasonable to the court that either party should hold it. He is not the agent or representative of either party to the action, but is uniformly regarded as an officer of the court, exercising his functions in the interest of neither plaintiff nor defendant, but for the common benefit of all parties in interest. He should be a person wholly impartial and indifferent to all parties in interest. Being an officer of the court, the fund or property entrusted to his care is regarded as being *in custodia legis* for the benefit of whoever may finally establish title thereto, the court itself having the care of the property by its receiver, who is merely its creature or officer, having no powers other than those conferred upon him by the order of his appointment, or such as are derived from the established practice of courts of equity.'

Bowler v. Leonard, 70 Nev. 370, 382–83, 269 P.2d 833, 839 (1954).  NRS 635 *et seq.* generally sets forth the powers of receivers in Nevada.

Here, in order to for the receiver to effectively operate, manage, control, make secure, and preserve the assets of both Magma and Meta, it will be necessary for the receiver to have sufficient and appropriate powers.  Accordingly, Karter has attached hereto, a proposed Order setting forth a list of powers which are consistent with the powers associated with the traditional role of a receiver, and which are consistent with NRS 635 *et seq.*[92]

### IV.     CONCLUSION

There is absolutely no basis for a Preliminary Injunction against Karter.  Instead, this Court should either abstain from this action and allow the earlier State Court Action to go forward where Karter's Application for Appointment of a Receiver has already been heard and is under advisement, or immediately appoint a Receiver to safeguard the assets of Magma and Meta and ensure that Daniel and Michael's illicit and illegal schemes come to an immediate stop.

Dated this 24th day of March, 2020.

---

[92] See Proposed Order Granting Receiver **Exhibit NN**.

CV3 LEGAL

REID RUBINSTEIN & BOGATZ

By: _____ /s/ Charles Vlasic, Esq. _____
    Charles Vlasic III, Esq.
    Nevada Bar No. 11308
    197 E. California Ave., Ste. 302
    Las Vegas, Nevada 89104
    *Attorneys for Defendant/*
    *Counterclaimant/Third-Party Plaintiff,*
    *Ka Tat Au-Yeung*

By: _____ /s/ I. Scott Bogatz, Esq. _____
    I. Scott Bogatz, Esq.
    Nevada Bar No. 3367
    Brad Lipman, Esq.
    Nevada Bar No. 14567
    300 South Fourth St., Ste. 830
    Las Vegas, Nevada 89101
    *Attorneys for Defendant/*
    *Counterclaimant/Third-Party Plaintiff,*
    *Ka Tat Au-Yeung*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of March, 2020, our office served a copy of the foregoing **OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTION AND COUNTERMOTION FOR APPOINTMENT OF A RECEIVER** via the Court's CM/ECF system, which will accomplish service on all parties of record through their counsel.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

_____/s/ Charles Vlasic _____
An employee of CV3 Legal