## **DECLARATION OF G. ELAINE WOOD**

I, G. Elaine Wood, do hereby declare as follows:

## **I. QUALIFICATIONS**

1. I am a Vice President in the Risk, Investigations and Analytics practice at Charles River Associates International ("CRA"), based in New York City. I recently joined CRA from Duff & Phelps, where I was a Managing Director in Disputes and Investigations from 2017 to 2020. From 2012 to 2017, I was a Managing Director in Investigations and Business Intelligence at Alvarez & Marsal. From 1996 to 2009, I was a Managing Director at Kroll, Inc., where I supervised global fraud and money laundering investigations and conducted investigative due diligence and international market intelligence research assignments.

2. I received a Bachelor's Degree from Cornell University in 1983 and I graduated from Columbia Law School in 1986. I started my legal career at Cravath, Swaine & Moore, working as a litigation associate from 1986 to 1990. From 1990 to 1996, I served as an Assistant United States Attorney for the Southern District of New York, prosecuting fraud and civil racketeering cases, successfully instituting a Court appointed Monitor for the Restaurant Workers Union in New York City in 1995.

3. I have over 20 years of experience investigating money laundering schemes and allegations of financial crime. I have advised on the development of anti-money laundering ("AML") and anti-bribery and anti-corruption ("ABC") compliance programs, as well as on OFAC, FCPA and UK Bribery Act issues. I have led several AML program reviews and risk assessments for financial institutions in emerging markets, helping to design risk-based due diligence protocols and controls.

4. I am a member of the Association of Certified Fraud Examiners, the Association of Certified Anti-Money Laundering Specialists, and the Health Care Compliance Association.

5. The members of my team that worked with me on this matter include Hong Qiao and Brad Dragoon.

6. Hong Qiao is a Principal in the Risk, Investigations and Analytics practice at CRA, based in New York City. Ms. Qiao is a Certified Public Accountant (CPA) and Chartered Financial

Analyst (CFA) and received a Bachelor's Degree from Renmin University of China and an M.B.A. from University of Chicago Booth School of Business. Ms. Qiao has more than 15 years of experience providing economic, financial, and accounting advisory services to companies, legal counsel, regulatory authorities and tribunals involved in transactions, investigations, and disputes. Ms. Qiao has extensive experience in advising clients on financial accounting and reporting, regulatory compliance, analyzing complex financial and accounting data, conducting financial investigations, and valuing assets and businesses. Prior to consulting, Hong Qiao has four years of experience as Bank Examiner at People's Bank of China (China's central bank). Ms. Qiao is a native Mandarin speaker.

7. Brad Dragoon is an Associate Principal in the Risk, Investigations and Analytics practice at CRA, based in New York City. Mr. Dragoon is a Certified Anti-Money Laundering Specialist ("CAMS") and Certified Fraud Examiner ("CFE"). During his career in risk management consulting and internal compliance, Mr. Dragoon has led anti-money laundering investigations for global financial institutions under supervision of federal and local financial regulators. Mr. Dragoon's experience includes tracing payment activity through correspondent accounts, conducting Know-Your-Customer ("KYC") account remediations, and identifying violations of sanctions issued the U.S. Office of Foreign Assets Control ("OFAC"). In addition to assisting clients and remaining compliant with pertinent regulations, Mr. Dragoon has conducted fraud investigations and asset traces to assist in litigation and he has extensive experience performing pre-investment due diligence on enterprises preparing to list on public markets.

8. My Curriculum Vitae and Curriculum Vitae of Hong Qiao and Brad Dragoon are attached to this declaration as **Exhibit A**.

II. **SCOPE OF ASSIGNMENT AND INFORMATION RELIED UPON**

9. This current action is brought by Magma Holding, Inc. ("Magma") and Meta Lab, Inc. ("Meta") (collectively, "Plaintiffs") against Ka Tat "Karter" Au-Yeung ("Karter"). On March 24, 2020, Craig L. Greene submitted an expert declaration in support of Karter's Opposition to Application for Preliminary Injunction and Countermotion for Appointment of a Receiver ("Countermotion") (the "Greene Declaration") outlining a series of transactions

from 2019, which Mr. Greene states constitute purported suspicious transactions that "do not seemingly have a business purpose."[1]

10. Sheppard Mullin Richter & Hampton LLP ("Counsel"), Counsel on behalf of Plaintiffs, retained CRA and me to review the Greene Declaration and provide expert analyses and opinions on the allegations relating to the transactions listed in the Greene Declaration and Karter's Countermotion.

11. CRA bills for my time and that of the members of my team working with me on this matter on an "as-incurred" basis. CRA's compensation is unrelated to and unaffected by the outcome of this litigation. My current hourly billing rate for this engagement is $700.

12. In performing my review, I relied on various pleadings, documents produced by the parties, publicly available data and research conducted by CRA analysts, and my experience conducting global fraud and money laundering investigations. A complete list of the materials I considered and relied upon is set forth in **Exhibit B** to this declaration.

13. I understand that additional documents and evidence may be produced in this action and that additional information may become available to me. To the extent that any such information is relevant to my analysis, I reserve the right to supplement this declaration and my opinions, as appropriate. I further reserve the right to supplement this declaration and my opinions, as appropriate, in response to any matters raised by the parties, opinions provided by additional experts, or any other testimony or other materials generated in discovery proceeds or presented at trial.

## III. THE PARTIES

14. Upon information and belief, in 2015, Karter and Yuxiang Gao ("Michael") and Qian Xu ("Daniel") founded a business together to buy, sell and distribute e-cigarettes and e-vape products in the United States. The original company was called EightCig LLC ("EightCig"). The company was restructured at the end of 2018 and became part of a larger enterprise that now distributes products globally. The new entity is Magma Holding, Inc. or "Magma." The new parent company is MOTI Technology Co. Ltd. or "MOTI."

---

[1] Greene Declaration, ¶ 15.

## IV. SUMMARY OF OPINIONS

15. It is my opinion, upon investigation and review, that the transactions and wire transfers identified in the Greene Declaration represent legitimate business transactions and do not provide proof of money laundering.

16. The transactions include two series of money transfers: the first, a series of payments for the purchase of goods and services; and the second, a series of bridge loans and large money transfers that relate to the restructuring of the company and investments made during last year by two prominent investment funds operating out of China.

17. The first series of round dollar amounts cited in the Greene Declaration as potentially suspicious transaction payments constitutes estimated payments on accounts due that match approximately to invoices for goods and services procured. While this practice may be informal, it does not constitute money laundering or fraud.

18. The second series of larger round dollar payments occurs when the company is successful in attracting investment capital. Documents evidence that the investors made a series of strategic bridge loans that went directly to pay operational costs and to invest in new distribution partners and to invest in the enterprise. This does not constitute evidence of fraud.

## V. ANALYSIS OF THE FACTS AND OPINIONS THAT I OFFER

19. Karter's Countermotion includes 27 transactions listed below, and the Greene Declaration submitted on March 24, 2020 examines 24 wire transfers included in the 27 transactions:

    a. January 16, 2019 - $1,000,000.00 wire from Magma to Troogle Technology, LTD ("Troogle");
    b. January 31, 2019 - $500,000.00 wire from Magma to Troogle;
    c. February 1, 2019 - $1,000,000.00 wire from Zhen Fund Coii, LLC ("Zhen Fund") to Magma;
    d. February 12, 2019 - $1,000,000.00 wire from Zhen Fund to Magma;
    e. February 12, 2019 - $1,000,000.00 wire from Magma to Zhen Advisors, LTD;

f. February 14, 2019 - $1,000,000.00 wire in three separate transactions ($700,000.00, $150,000.00 and $150,000.00) from Magma to Shenzhen Thunderstone Technology, LTD;

g. February 20, 2019 - $1,000,000.00 wire in two separate transactions ($700,000.00 and $300,000.00) from Magma to Troogle;

h. March 4, 2019 - $4,000,000.00 wire from MSA China Fund II, LP to Magma;

i. March 25, 2019 - $1,000,000.00 wire from Magma to Troogle;

j. March 25, 2019 - $1,000,000.00 wire from Magma to Flamingo Technology, LTD ("Flamingo");

k. March 29, 2019 - $4,000,000.00 wire from Magma to Flamingo;

l. May 8, 2019 - $500,000.00 wire from Magma to Troogle;

m. May 14, 2019 - $600,000.00 wire from Magma to Troogle;

n. May 17, 2019 - $300,000.00 wire from Magma to Troogle;

o. May 21, 2019 - $500,000.00 wire from Magma to Troogle;

p. May 28, 2019 - $400,000.00 wire from Magma to Troogle;

q. May 30, 2019 - $300,000.00 wire from Magma to Troogle;

r. June 6, 2019 - $300,000.00 wire from Magma to Troogle;

s. June 12, 2019 - $400,000.00 wire from Magma to Troogle;

t. June 28, 2019 - $250,000.00 wire from Meta to Troogle;

u. August 16, 2019 - $900,000.00 wire from Magma to Troogle;

v. August 28, 2019 - $600,000.00 wire from Magma to Flamingo;

w. September 3, 2019 - $64,000.00 a check issued from Magma to Daniel for "Consulting fees;"

x. December 12, 2019 – $1,000,000.00 wire from Magma to Meta;

y. December 23, 2019 – $1,099,364.86 wire from Meta to Troogle.

z. December 31, 2019 – a check in the amount of $54,000.00 was issued from Magma to Daniel for "Consulting fees;" and

aa. December 31, 2019 – $15,000.00 a check issued from Magma to Michael for "Consulting fees."

12. Reviewing certain of these transactions, Mr. Greene opines that these transactions provide "significant indicia" of potential money laundering or fraud,[2] and further, that the transactions do not appear to have a business purpose.[3]

14. Money laundering, under 18 U.S. Code § 1956, Laundering of Monetary Instruments, is defined as conducting financial transactions with knowledge that the proceeds are derived from unlawful activity.[4] The purpose of laundering money is to conceal illicit activity and convert assets into a form in which their original, criminal nature, cannot be detected.[5] In addition to disguising the source of illicit funds, money laundering is also used to conceal the ultimate ownership of assets and to evade taxes and transaction reporting requirements required under State and Federal laws in the United States.[6]

20. I discuss in detail below evidence of the economic purpose of the transactions cited by Mr. Greene and the practice of making round dollar estimated payments against accounts due to suppliers. These payments do not constitute evidence of money laundering or fraud.

21. The Greene Declaration also observes that the large million-dollar international transactions he cites could have been structured to conceal illicit activity.[7] I discuss in detail below the bridge loans and equity investments made by two Chinese investment funds. These investments and bridge loans do not constitute evidence of money laundering or fraud.

### A. Money Transfers to Procure Products from Suppliers in China

22. Upon examination, the majority of the allegedly suspicious transactions cited in the Greene Declaration relate to payments made to procure goods and services.

23. As outlined below, an examination of the relevant invoices and shipping records demonstrates that this series of money transfers represent estimated round dollar payments and one payment with precise amount to business partners supplying e-cigarette and vape products that are sold and distributed by Magma.

---

[2] Greene Declaration, ¶¶ 10-11.
[3] Greene Declaration, ¶ 15.
[4] Laundering of Monetary Instruments, 18 U.S.C. § 1956(a)(1).
[5] https://gfintegrity.org/issue/money-laundering/
[6] Laundering of Monetary Instruments, 18 U.S.C. § 1956(a)(1)(B)(ii).
[7] Greene Declaration, ¶ 12.

      i.   **Payments to Troogle Technologies Limited**

24. Troogle Technologies Limited ("Troogle") is a Hong Kong-based distributor of e-cigarette and vape products, that is owned and managed by Michael Gao and a colleague, Xiangwei Wang. From 2015 through June 2019, Troogle functioned as a distributor supplying e-cigarette and e-vape products to Magma and its predecessor company, EightCig, for sale in the United States. [8, 9]

25. The Greene Declaration lists a series of allegedly suspicious wire transfers that Magma and Meta[10] paid Troogle that total $6,849,364.86 for the calendar year 2019 (transactions a, b, g, l-t, and y). [11, 12, 13]

26. In a video interview, Daniel stated that the wire transfers to Troogle constitute payments that were applied to cover bills owed to the supplier.

27. Review of Troogle invoices and shipping documents for 2019 establishes that Troogle provided over $9 million dollars of goods and services to Magma during this time period. See **Schedule 1**. The invoices requesting payment from Magma, supported by corresponding shipment documents, provide detailed lists of e-cigarette and e-vape products that have been shipped to be sold in the United States.[14]

---

[8] Troogle is listed on the webpages of China-based vaporizer manufacturers Shenzhen Smoant Technology Co., Ltd and Shenzhen VapeMons Technology Co. and continues to be actively registered with the Hong Kong Special Administrative Region Corporate Registry. Troogle has not filed any forms to wind down its operation in Hong Kong. This contrasts with the statement in the Greene Declaration that Troogle "is suddenly in the process of liquidation/dissolution." See Greene Declaration, ¶ 11.c. The Troogle website currently includes product listings for the "MOTI Kit," an e-cigarette sold by Magma in the United States. See https://www.smoant.com/partners#; https://www.vapemons.com/art/global-partner-a0041.html; Troogle screenshots.

[9] Video conference interview with Daniel Xu, March 30, 2020.

[10] Meta Lab Inc. ("Meta") is a U.S. based subsidiary wholly owned by Magma and incorporated on January 11, 2019. See Organization Chart; Articles of Incorporation for Meta Lab Inc.

[11] Mr. Greene also cites the March 25, 2019 - $1,000,000 wire from Magma to Troogle (transaction i), but Magma's statement does not include this alleged transfer.

[12] Mr. Greene also cites the August 16, 2019 - $900,000.00 wire from Magma to Troogle (transaction u), but Magma's bank statement shows that the August 16, 2019 wire was from Magma to Flamingo. I, therefore, include that wire in my discussion of wire transfers from Magma to Flamingo. See Section V.A.ii.

[13] Mr. Greene cites a February 20, 2019 $1,000,000.00 wire in two separate transactions ($700,000.00 and $300,000.00) from Magma to Troogle (transaction g), but Magma's bank statement only shows a $700,000 wire transfer.

[14] Invoices and packing lists from Troogle to Magma, January 2019 – June 2019.

28. In my opinion, the invoice receipts and payments, while not timely or precise, establish evidence of an on-going business relationship between a Hong Kong-based distributor sourcing product from mainland China and an importer and retailer based in the United States. The wire transfers to Troogle do not constitute evidence of money laundering or fraud.

29. One wire transaction dated December 23, 2019, from Meta, a wholly owned subsidiary of Magma, totals precisely $1,099,364.86 (transaction y). This is the only money transfer made in 2019 that is not a round dollar amount. In my experience, a detailed payment made in December to a long-standing vendor typically represents a decision to pay an outstanding account balance at year end. In my opinion, this payment does not constitute evidence of money laundering or fraud.[15]

       ii. **Wire transfers from Magma to Flamingo**

30. In July 2019, Magma transitioned from Troogle to Flamingo Technology Limited ("Flamingo") as its distribution partner. Flamingo, a Hong Kong registered entity, is a wholly owned subsidiary of MOTI and operates under the same corporate umbrella as Magma. Flamingo performs a similar distribution function to that of Troogle.[16]

31. The Greene Declaration lists two round dollar wire transfers to Flamingo that total $1,500,000:

   u. August 16, 2019 - $900,000.00 wire from Magma to Flamingo;[17] and

   v. August 28, 2019 - $600,000.00 wire from Magma to Flamingo.

25. In a video interview, Daniel stated that these payments were made to match recurring invoices for e-cigarette and e-vapor products that Flamingo was selling to Magma.

---

[15] See screenshot of Meta's accounting system showing Meta's A/P Aging Summary as of December 22, 2019; see also an email from Ada Wang, a Troogle employee, dated December 18, 2019, requesting that Meta pay this balance. Karter was aware that this balance was due and owing. See WeChat records dated November 21, 2019 and November 23, 2019.

[16] A review of corporate records confirms Flamingo's status as a subsidiary of MOTI. Flamingo was incorporated in Hong Kong in June 2018 with MGAO Technology Co. Ltd. (since renamed MOTI), as its founding member and Michael serving as the company's director.

[17] Mr. Greene labels this transaction as a wire transfer from Magma to Troogle, but Magma's bank statement shows that this wire transfer was from Magma to Flamingo.

32. Flamingo invoices and shipping records provide detail of the shipment of e-cigarette and e-vapor products and total $1,119,535.33 for the month of July 2019. See **Schedule 2**.

33. The invoice flow and detail and the wire transfer payments detailed above provide evidence of an ongoing business relationship between a Hong Kong-based distributor sourcing product from mainland China and an importer and retailer based in the United States.

      iii.    **Wire transfers from Magma to Thunderstone**

34. Shenzhen Thunderstone Technology Limited ("Thunderstone") is a China-based distributor of e-cigarette and e-vapor products.

35. The Greene Declaration lists the following allegedly suspicious wire transfer from Magma to Thunderstone:

> f. February 14, 2019 - $1,000,000.00 wire in three separate transactions ($700,000.00, $150,000.00 and $150,000.00) from Magma to Thunderstone.

36. CRA analysts reviewed eight invoices and related shipment documents issued by Thunderstone to Meta, a wholly owned subsidiary of Magma,[18] between July 4, 2019 and September 6, 2019. The invoices total of $997,470 in payments. See **Schedule 3**.

37. CRA analysts also reviewed PRC Customs Export Declaration Forms and a summary of those forms from January to July 2019.[19] The forms demonstrate that Thunderstone exported close to $2 million products during this period.

38. The $1,000,000 wire on February 14, 2019 from Magma to Thunderstone (transaction f) appears to directly correlate to the amounts Meta owed to Thunderstone for goods and services provided.

      iv.    **Wire transfer from Magma to Meta**

39. The Greene Declaration lists the following allegedly suspicious transaction from Magma to Meta:

> x. December 12, 2019 - $1,000,000.00 wire from Magma to Meta

---

[18] Organization Chart.
[19] "Spreadsheet - Supply of Goods by Thunderstone to Troogle.xlsx"

9

40. CRA analysts reviewed a screenshot of Magma's accounting system showing Magma's Accounts Payable Aging Detail, which lists accounts payable to Meta that totaled $1,149,425.34 as of December 7, 2019.[20] The $1,000,000 wire dated December 12, 2019 correlates directly to the amounts that Magma owed to Meta.

## B. The Zhen Advisors and Zhen Fund and the MSA and MSA China Fund II Investments

41. In 2018 and 2019, the market for e-cigarettes and e-vape products began to shift. In the U.S., the vaping industry began to encounter public and government pressure relating to new science on the health concerns, and the manufacturer of the popular "Juul" brand e-cigarette began removing its flavored products from store shelves. In China, by contrast, health concerns relating to traditional cigarette smoke were helping to fuel a rise in the online sale of vaping products.[21]

42. During this time, Michael, one of the founders of EightCig, attracted the attention of two premier venture capital funds focused on investment in China: Zhen Advisors Limited ("Zhen Advisors"), and MSA Capital. Both investment firms were interested in the growing market in China for online e-cigarette products.[22]

### i. The Zhen Advisors and Zhen Fund Investment

43. Zhen Advisors is a Beijing, China-based venture capital firm formed in 2011 in partnership with Sequoia Capital China Fund, the China-based branch of U.S. private equity firm Sequoia Capital.[23,24] The firm is global in reach but is focused on investments in China. Zhen Advisors is registered with the SEC and is also licensed as a securities advisor with the Cayman Islands

---

[20] An email from Qin Gong, dated December 10, 2019 shows a request for payment of this balance to Meta.

[21] https://www.globenewswire.com/news-release/2018/12/04/1661907/0/en/China-Electronic-Cigarette-Industry-2018-2022-Focus-on-the-World-s-Largest-Producer-of-Electronic-Cigarettes.html

[22] Video conference interview with Daniel Xu, March 30, 2020.

[23] "Sequoia Capital China Invested USD15mn in Zhen Fund," *SinoCast Investment & Securities Beat*, December 5, 2011.

[24] Since its formation, Zhen Advisors has closed numerous, well-publicized investments including the $88.3 million Series B funding round of Beijing Shihui Technology Co., Ltd (aka Nice Tuan)'s in January 2020. "Beijing Shihui Technology (Nice Tuan) Secures USD88.3 Million in Venture Funding," *Financial Deals Tracker*, January 14, 2020.

Monetary Authority.[25] *Reuters* describes Zhen Advisors as "China's largest angel investment fund."[26]

44. On September 11, 2018, Zhen Advisors entered into a strategic plan to invest $10 million dollars in the enterprise created by the founders of EightCig in exchange for equity. The strategic plan called for the restructuring of the company, resulting in the creation of Magma, headquartered in Nevada, and a new umbrella parent company, MOTI Technology Co. Ltd.,[27] established as an offshore entity registered in the Cayman Islands.

45. When the investment was finalized in May 2019, ZhenFund COII LLC, an investment fund established by Zhenfund, was issued a 13.07% interest in MOTI, the new parent company.[28]

46. As part of its investment strategy, Zhen Advisors set up bridge loans to assist the enterprise through the transition period and to provide immediate funds to pay critical business expenses.[29] In October 2018, Zhen Advisors set up a bridge loan agreement for $2,000,000 with Troogle, the company's most critical supply vendor.[30] In November 2018, Zhen Advisors sent Troogle a wire for $1,000,000 under the loan agreement.[31]

47. The Guarantors on the bridge loan agreement included Karter and Michael and Daniel, and Magma, the newly formed successor to EightCig.[32]

48. On January 31, 2019, when the new company was fully constituted, Magma entered into a second loan agreement for $2,000,000. This loan was funded by Zhen Fund, the investment arm of Zhen Advisors.[33]

---

[25] https://adviserinfo.sec.gov/firm/summary/283311

[26] Elzio Barreto, "China's Biggest Angel Fund Bets on Boom Led by Young Consumers," *Reuters,* June 1, 2016.

[27] The new umbrella company replaces the former parent entity, MGAO Technology Co. Ltd.

[28] Organization chart.

[29] Summary of Terms, September 11, 2018, § E.

[30] Loan Agreement between Troogle and Zhen Advisors, October 12, 2018.

[31] Video conference interview with Daniel Xu, March 30, 2020.

[32] Loan Agreement between Troogle and Zhen Advisors, October 12, 2018, Schedule A.

[33] Zhen Fund is private fund managed by Zhen Advisors with $25,020,340 in assets listed in filings with the SEC. See https://reports.adviserinfo.sec.gov/reports/ADV/283311/PDF/283311.pdf.  At some point in the formation of the new entities, Zhen Advisors decided to use Zhen Fund as its investment vehicle. The parties agreed that Magma would use part of the new bridge loan provided by Zhen Fund to repay the $1 million loan to Troogle. See Emails from Nanxi Chen to Joey Xie and others, January 16, 2019 and January 17, 2019.

49. The Guarantors on the loan included Karter and Michael and Daniel.[34]

50. Zhen Fund transferred $2,000,000 to Magma in two separate $1,000,000 wires dated February 1, 2019 and February 12, 2019.

51. Magma used these funds to repay the $1,000,000 loan issued to Troogle,[35] and to provide funding to Flamingo Technologies, Ltd., a new distribution partner formed as a separate subsidiary under MOTI, the new parent company. [36, 37]

52. The Greene Declaration lists the following allegedly suspicious transactions relating to the Zhen Investment:

> c. February 1, 2019 - $1,000,000.00 wire from Zhen Fund to Magma;
> d. February 12, 2019 - $1,000,000.00 wire from Zhen Fund to Magma;
> e. February 12, 2019 - $1,000,000.00 wire from Magma to Zhen Advisors, Ltd.; and
> j. March 25, 2019 - $1,000,000.00 wire from Magma to Flamingo.

53. Upon examination, the transactions listed above do not constitute suspicious transactions and do not provide evidence of money laundering or fraud.

54. Karter remained as a founding partner and head of the U.S. based operations for Magma during these events and through to the end of 2019. He was the signatory on Magma's bank account at Wells Fargo Bank, he is a guarantor on the bridge loans and he is copied on the emails detailing the funding of these deals. Karter signed the October 12, 2018 Troogle – Zhen Advisors Loan Agreement and the January 31, 2019 Magma – Zhen Fund Loan Agreement. He also authorized the wire transfer from Magma to Flamingo on March 25,

---

[34] Loan Agreement between Magma and Zhen Fund, January 31, 2019, Schedule A.

[35] Troogle assigned liability for the bridge loan to Magma as soon as the new company was fully constituted. See Debt Assumption Agreement between Troogle and Magma.

[36] Emails from Nanxi Chen to Joey Xie and others, January 16, 2019 and January 17, 2019.

[37] The loan agreement between Magma and Zhen Fund sets forth that "[e]xcept for the repayment of the Prior Loan [i.e., the loan from Zhen Advisors to Troogle under the October 12, 2018 Loan Agreement], the proceeds of the Loans shall be used only for the business as the Group Companies currently conducts or any other purpose approved by the Lender." Group Companies is defined to include "the Cayman Company, the HK Company, Magma, Mojo, Shenzhen Leiyan and Beijing Yanyan, and direct and indirect Subsidiaries of the foregoing and each Person (except individuals) Controlled by the Guarantors and their respective Subsidiaries from time to time." See Loan Agreement between Magma and Zhen Fund, §§ 1, 2.2.

2019.[38]  These facts demonstrate that he was well-positioned to be aware of the circumstances--discussed throughout this declaration--that explain the business purpose of the transactions he now claims are suspicious.

### ii. The MSA Investment

55. MSA, formerly Magic Stone Alternative Investments, is a Beijing, China-based venture capital firm with over $1 billion in assets under management.[39]  MSA China Fund II, L.P. (the "MSA China Fund II") is a pooled investment fund domiciled in the Cayman Islands and managed by MSA.[40]  MSA is a well-known firm that has made several successful investments in China, including a well-publicized $65 million investment in the short-term apartment rental platform Xiaozhu.com.[41]

56. In March 2019, MSA entered into a strategic plan with MOTI[42] and Karter, Daniel and Michael, to invest $10 million in the umbrella parent entity and its affiliated companies.  As part of this plan, the investment fund agreed to provide a bridge loan of $4 million to be used as "working capital" for the group companies.[43]  Under the terms of the loan agreement, MSA wired $4 million to Magma on March 4, 2019.

57. On March 29, 2019, Magma wired $4 million to Flamingo.

58. On December 30, 2019, MOTI, Magma and Flamingo signed a Tri-Partite Agreement, which converted the $4 million payment to Flamingo into an investment by MOTI.[44]

59. The Greene Declaration lists the following two allegedly suspicious transactions relating to the MSA investment:

---

[38] Karter wrote "Plz wire 2 million used to this account [of Flamingo] tmr morning." See Wechat record dated March 25, 2019.

[39] http://www.msacap.com/

[40] MSA China Fund II, LP, FORM D, March 6, 2019.

[41] https://www.prnewswire.com/news-releases/chinas-airbnb-equivalent-xiaozhucom-raises-65-million-in-new-funding-300356850.html

[42] During the time period of this transaction the former parent company – MGAO Technology Co. Ltd. – is reorganized as MOTI, as part of the Zhen Advisors investment deal.

[43] Loan Agreement between MSA and MGAO, March 2, 2019, Recitals, § 1.1 and § 1.4.

[44] Tri-Partite Agreement, December 30, 2019.

  h. March 4, 2019 - $4,000,000.00 wire from MSA China Fund II to Magma; and

  k. March 29, 2019 - $4,000,000.00 wire from Magma to Flamingo.

60. In my opinion, the wire payments above indicate steps to pursue an investment in Magma. The transactions do not constitute evidence of money laundering or fraud.

61. Karter remained as a founding partner and head of the U.S.-based operations for Magma during these events and through to the end of 2019. He was the signatory on Magma's bank account at Wells Fargo Bank, he is listed as one of the founders in the March 2, 2019 MSA-MGAO Convertible Loan Agreement and he signed that loan agreement.[45] Again, these facts demonstrate that he was well-positioned to be aware of the circumstances--discussed throughout this declaration--that explain the business purpose of the transactions he now claims are suspicious.

  C. **Transactions Related to Consulting Fees and Bonus to Individuals**

62. In addition to the 24 wire transfers listed in the Greene Declaration, Karter's Countermotion also lists three checks that allegedly represent unauthorized consulting fees and bonus payments:

  w. September 3, 2019 – a $64,000.00 check issued Daniel for "Consulting fees;"
  z. December 31, 2019 – a $54,000 check issued to Daniel for "Consulting fees;" and
  aa. December 31, 2019 – a $15,000.00 a check to Michael for "Consulting fees."

63. In a video interview, Daniel explained that Magma paid an estimated $8,000 per month in consulting fees to compensate key management personnel, including him and Karter. Daniel also stated that at the end of December 2019, the company paid a $15,000 year-end bonus to key management personnel.

64. Notes on the September 3, 2019 $64,000 to Daniel state: "Consulting Fees for February 2019 to September 2019; $8,000 p/mo x 8Months."[46]

---

[45] Karter was asked "Why don't they wire money direct to Flamingo and has to go to Magma then loan to Flamingo," and he wrote "History Issue. Flamingo just go their hk bank account." See Wechat record dated March 30, 2019.

[46] Screenshot of electronic check #1173.

65. Notes on the December 31, 2019 check to Daniel state: "Consulting Fees for October 2019 to December 2019; $8,000 p/mo x 3Months. $30,000 for other consulting service."[47]

66. Daniel confirmed in his video interview that the $30,000 fee represented a total of his $15,000 bonus and the bonus for a second management partner.

67. The $15,000 check issued in December 2019 to Michael is consistent with Daniel's description of the payment of yearend bonus.

68. The $15,000 year-end bonus was paid to five key management personnel, including Karter.[48]

## CONCLUSION

In my review and analysis above, I did not find evidence of money laundering or fraud.

Respectively submitted

By: _____/s/ G. Elaine Wood_____

G. Elaine Wood
April 2, 2020

---

[47] Screenshot of electronic check #1229.
[48] WeChat screenshot on January 1, 2020.