1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **DISTRICT OF NEVADA**

6 * * *

7 MAGMA HOLDING, INC., a Nevada     Case No. 2:20-cv-00406-RFB-BNW
Corporation, META LAB, INC., a Nevada
8 Corporation,     **ORDER**

9        Plaintiffs/Counter Defendant,

10        v.

11 KA TAT "KARTER" AU-YEUNG, an
individual,
12
       Defendant/Counter Claimant.
13

14 KA TAT "KARTER" AU-YEUNG, an
individual,
15
      Third Party Plaintiff/ Counter Claimant
16
       v.
17
YUXIANG GAO, an individual; QIAN XU;
18 an individual; MOTI TECHNOLOGY CO.
LTD, a Cayman Islands company; DOES I-X
19 inclusive; and ROE ENTITIES 1-10,
inclusive,
20
      Third Party-Defendants/Counter Defendants.
21

22 **I.      INTRODUCTION**

23

24       Before the Court is Defendant/Counter Claimant Ka Tat ("Karter") Au-Yeung's Motion to

25 Appoint Receiver and Plaintiffs/Counter Defendants Magma Holding, Inc and Meta Lab Inc,'s

26 ("Magma" and "Meta", collectively "Plaintiffs") Motion to Dismiss Karter's Countercomplaint.

27 ECF Nos. 36, 49. For the following reasons, the Court grants the motion to appoint a receiver and

28 grants the motion to dismiss in part.

## I. PROCEDURAL BACKGROUND

Plaintiffs filed their complaint against Defendant Ka Tat "Karter" Au Yeung ("Karter" or "Defendant") on February 26, 2020. ECF No. 1. Karter was served on February 27, 2020. ECF No.5. In their complaint, Plaintiffs bring conversion, embezzlement, claim and delivery, unjust enrichment, breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, violations of the Lanham Act (15 U.S.C. § 1125(a)(1)(a)); violations of the Computer and Fraud Abuse Act (18 U.S.C. § 1030(a)(2)), tortious interference with contractual relations, violations of the Defend Trade Secrets Act (18 U.S.C. § 1836), and misappropriation of trade secrets claims. ECF No.1. Plaintiffs also seek injunctive and declaratory relief. Plaintiffs filed an emergency ex parte motion for a  temporary restraining order on March 12, 2020. ECF No.8. The Court granted the ex parte motion on March 16, 2020. ECF No. 13.

Defendant Ka Tat "Karter" answered the complaint on March 20, 2020. ECF No. 16. The answer also included a counterclaim against Plaintiffs and third-party claims against Third Party Defendants Yuxian  Gao ("Michael") and Qian Xu ("Daniel"). Id. Karter filed an amended third-party complaint adding third-party defendant Moti Technologies, Inc. on March 24, 2020. Karter moved for appointment of a receiver on March 25, 2020. ECF No. 36. Karter also filed a response in opposition to Plaintiffs' ex parte motion for a temporary restraining order on that same date. ECF No. 35. The Court held a hearing on the motions on March 26, 2020. The Court extended the effect of the temporary restraining order for an additional two weeks and ordered the parties to respond to briefing. ECF No. 41. Plaintiffs filed their response to Karter's motion to appoint a receiver on April 2, 2020. ECF No. 51. Plaintiffs also filed their reply to Karter's opposition to the motion for a temporary restraining order. ECF No. 53. Plaintiff moved to dismiss Karter's counterclaims on April 2, 2020. ECF No. 49. The motion was fully briefed. ECF Nos. 64, 65. The Court dissolved the temporary restraining order on April 9, 2020. ECF No. 59. A hearing on the motions was held on April 22, 2020. This written order now follows.

## II. FACTUAL ALLEGATIONS

Karter alleges as follows in his countercomplaint: Karter first met Third-Party Defendant

Qian Xu, or "Daniel" in or around April 2015 when they were both working at OutletPC.com in Henderson, Nevada. ECF  No. 38, Amended Countercompl. at ¶ 5. Karter and Daniel eventually began discussing the possibility of starting an ecigarette business together. Id. As part of their proposed business plan, Karter and Daniel agreed that they would share duties related to sales, marketing, and accounting for their new e-cigarette venture. Id. ¶ 7. Karter and Daniel further agreed that Daniel would focus on leveraging his supply chain connections in China, whereas Karter would focus on e-commerce, operations, warehousing, purchasing and accounts payable. Id. ¶ 8. Karter would later come to learn that Daniel's "supply chain connections in China" primarily referred to Third-Party Defendant Yuxian Gao, or "Michael" – Daniel's long-time friend from college. Id. ¶ 9. On or about May 23, 2015, Karter purchased the eightvape.com domain from GoDaddy.com. Id. ¶ 11.

On or about October 8, 2015, an Operating Agreement for Eightcig was drafted utilizing the Nevada Secretary of State Website (the "Eightcig Operating Agreement"). Id. ¶ 13 -15. The Eightcig Operating Agreement listed the original members of Eightcig–Karter, Daniel and Mr. Chan, in addition to two new members – Michael and his friend and business associate from China, Xiangwei Wang. Id. Michael and Mr. Wang provided supply chain and logistics support for Eightcig products from Shenzhen, China through a company they owned together–Troogle Technology LTD ("Troogle"). Id.

The Eightcig Operating Agreement listed the Membership Interest percentages in Eightcig as: Daniel – 21.67%;  Karter – 21.66%; Mr. Chan – 21.66%; Michael – 17.5; Mr. Wang – 17.5%. Id. ¶ 16. The operating agreement required unanimous approve by all disinterested members for any transactions between members of the LLC and full disclosure of all material facts. Id. ¶ 17. The agreement also required unanimous approval to withdraw or transfer membership interests. Id. ¶ 18-20. In early 2016, Mr. Chan's visa expired, so he returned to China and voluntarily withdrew from Eightcig. Id. ¶ 21. As part of his voluntary withdrawal from Eightcig, Mr. Chan's sold his Membership Interests back to the company, and Michael insisted the Members redistribute equally, rather than in proportion to their respective ownership percentages. Id. ¶ 22.

At some point thereafter, although the circumstances and timing remain unclear, Michael claims to have acquired his friend and business partner–Mr. Wang's Membership Interests in Eightcig. Id. ¶ 23. Karter disputes Michael's claims that he validly acquired Mr. Wang's Membership Interests in Eightcig. Id. ¶ 23.

### i.  The Success of EightCig

Almost immediately after its formation in 2015, Eightcig became extremely successful. Id. ¶ 26. In 2018 alone, Eightcig reported gross revenue of $44,946,905.00, and gross profit of $4,731,632.00. Id. ¶ 27. Karter and the sales and marketing team he ran were responsible for virtually all of these sales. Id. ¶ 27. Karter was in charge of sales and virtually all of the day-to-day operations at Eightcig. Id. ¶ 20.

### ii.  The Rollup of Eightcig

In or around mid-2018, Karter alleges that Daniel and Michael worked together to devise a scheme to defraud Karter and fleece Eightcig by rolling it into a network of shadow companies which were secretly owned and controlled primarily by Michael and Daniel. Id. ¶ 30.

In order to accomplish their fraudulent scheme, Daniel and Michael decided to deceive Karter into believing that Eightcig was on the verge of financial failure so that Karter would agree to roll Eightcig into a new network of companies which would purportedly be utilized to attract new investors. Id. ¶ 31.

On or about July 16, 2018 at the Eightcig, Michael made the following alleged misrepresentations to Karter: a) the e-cigarette industry was facing imminent collapse because of purported new e-cigarette regulations working their way through the Food and Drug Administration of the United States Government; b) Eightcig was no longer viable as it was currently capitalized and positioned in the e-cigarette market; c) unless Eightcig obtained a quick

infusion of capital and was rolled into a new network of companies as Michael was demanding Eightcig would not make it another year; d) Michael already had investors from China lined up who were ready, willing and able to invest tens of millions of dollars into this new multi-company structure; e) if Karter agreed to roll Eightcig into this new network of companies, the new companies would immediately be worth approximately $100,000,000.00; f) if Karter agreed to roll Eightcig into this new network of companies, Karter's effective membership interest in the new companies would be somewhere between 15% - 20%, but not less than 15%; and g) if Karter did not agree to roll Eightcig into this new network of companies, Karter would have to immediately buy-out Michael and Daniel from Eightcig. Id. ¶ 34.

Karter alleges that Michael knew his representations to Karter were false. Id. ¶ 37 -39. Daniel also echoed the same misleading representations. Id. ¶ 40. Karter reasonably trusted and believed the misrepresentations. Id. ¶ 39, 45. Given that a buy-out of Michael and Daniel was not possible, and because together Michael and Daniel represented the majority ownership of Eightcig, and because Michael and Daniel told Karter in no uncertain terms that Karter did not have a choice but to agree to roll Eightcig into a new network of companies, Karter felt he had no option but to comply with Michael and Daniel's demands. Id. ¶ 49.

### iii.  The Incorporation of Magma and Dissolution of EightCig

Karter later learned that Daniel had secretly incorporated Magma—the entity the Third-Party Defendants intended to roll Eightcig into—several weeks prior on July 2, 2018 and secretly made himself the president of Plaintiff/Counter-Defendant Magma. Id. ¶ 51.

Over the next several months of 2018, Michael and Daniel began bombarding Karter with stacks of documents. Id. ¶ 52 - 60. Michael and Daniel falsely represented to Karter that the documents they were bombarding him with were necessary to accomplish the roll-up of Eightcig

5

in accordance with the representations and promises they made to Karter previously. Id. Michael and Daniel expected Karter to sign every single document he was provided immediately, without question or negotiation. Id. Often, the documents Karter was expected to sign were written in traditional Chinese, a language in which Karter is not fluent. Id. Other documents only contained a signature page. Id.

When Karter began to express concern regarding his lack of inclusion in the Eightcig roll-up process and the sudden authoritarian tone Michael and Daniel began to take with Karter regarding the roll-up process, Michael and Daniel began questioning Karter's loyalty. Id.  Karter would later learn that Michael and Daniel eventually began having Daniel and other individuals, for example, Eva Wei, sign documents on Karter's behalf without his knowledge or approval. Id.

One document Karter contends contains a forged signature is a  Confirmation Letter from April 2019. Id. ¶ 63. The confirmation letter allegedly establishes that the purchase of the domain name eightvape by Karter for was the exclusive use of Meta, Labs, Inc, a wholly owned subsidiary of Magma. The second documents Karter contends is forged is a Confidential Information and Invention Assignment, which forbids Karter from disclosing confidential information about the company with other individuals. Id. ¶ 63.

### iv.  Alleged Fraudulent Transactions on the Part of Third-Party Defendants and Counter Defendants

Karter later learned that Michael and Daniel had essentially plugged Eightcig into a network of shadow offshore Cayman and Chinese entities owned and controlled primarily by Michael and Daniel, so they could improperly and illegally funnel money to and from these entities. Id. ¶ 65.

Karter would also learn that Michael and Daniel were representing that Eightcig essentially became Magma – a Nevada entity which purportedly was wholly owned by a Cayman entity – Third-Party Defendant MOTI Technology Co., LTD ("MOTI"). Id. ¶ 66.

Karter would also learn that MOTI, in turn, was wholly owned by several Cayman entities, one of which was set up for Karter, one of which was set up for Michael, one of which was set up for Daniel, and several other entities which were set up for so-called "investors." Id. ¶ 67.

As Karter continued to try and put all the pieces of the alleged fraud together, he also continued to run the day-to-day operations, and was responsible for virtually all of the administrative functions for Counter Defendants Magma, and its wholly owned subsidiary, Meta, as he had done for Eightcig. Id. ¶ 69

As part of his functions, Karter was a signatory on both the Magma and Meta bank accounts, and he was responsible for overseeing Magma and Meta payroll and accounts payable. Id. ¶ 72. Karter began noticing suspicious transfers of large sums of money being wired between Magma, Meta and the various network of Cayman and Chinese entities owned and controlled by Michael and Daniel. Id. ¶ 74. In or around October 2019 when Karter began requesting information from Michael about the suspicious transactions to and from Magma and Meta's bank account(s), Michael and Daniel sent Qin Gong, a financial controller from Leiyan Technology, LTD (a company owned in part and fully controlled by Michael) to oversee Magma and Meta's accounting department. Id. ¶ 74. Many of the wire transactions were to a Chinese-based company called Troogle and to the Zhen Fund and its affiliates. Id. ¶ 75. The transactions also included payments to Michael and Daniel for "consulting fees" despite there being no arrangement for consulting fees in place for Magma and Meta. Id. ¶ 75.

By the beginning of 2020, Karter had seen enough suspicious activity with respect to the Magma and Meta finances that he started to become worried Michael and Daniel were violating US tax laws and consulted with an accountant. Id. ¶ 86, 81. Karter also decided to move $6 million in funds from Magma to Meta's bank account for safekeeping with a memo titled Fraud Mitigation. Id. ¶ 89. The accountant explained that the lack of sufficient documentation for the wire transfers served as indicia for violations of tax and criminal laws. Id. ¶ 92. Karter forwarded the accountant's conclusions to Michael and Daniel but they ignored the information and instead demanded that Karter return a $150,000 bonus he had given himself after 2019's record sales. Id. ¶ 97, 83-85.

### v. Alleged Backdated Asset Purchase Agreement and Karter's Termination and Transfer of $6 million to Personal Account

On or about January 21, 2020, Karter learned that Daniel had secretly executed an Asset Purchase Agreement sometime in 2019, but which was back-dated to December 28, 2018 and which purported to sell certain of Eightcig's assets to Magma (the "Eightcig Asset Purchase Agreement"). Id. ¶ 98. Karter was surprised because when Karter had previously asked Daniel about the potential sale of Eightcig's assets to Magma, Daniel had provided Karter only with an incomplete draft of a purchase agreement, which contained no details regarding timing, amounts, or assets to be bought/sold. Id. ¶ 99. The Eightcig Asset Purchase Agreement was secretly executed by Daniel on behalf of both Eightcig and Magma. Id. ¶ 98. Karter neither knew of, or approved the Eightcig Asset Purchase Agreement or its terms. Id. ¶ 103. In late January 2020 as Karter continued to work with an accountant to sort out Magma and Meta's finances and accounting, Karter learned that Daniel instructed the employees not to cooperate or provide any financial information to Karter. Id. ¶ 113. On or about February 4, 2020, Karter attempted to terminate a Magma employee named Le Xiao, whom Daniel had installed at Magma, and whom Karter

8

strongly suspected was falsifying accounting records for Magma at Michael and Daniel's direction. Id. ¶ 114. As Karter was in the process of terminating Mr. Xiao, Mr. Xiao called Daniel, who told Karter and other Magma employees that Mr. Xiao reported "directly to China" and could not be terminated. Id. ¶ 115.

Several days later on or about February 5, 2020, Karter learned that he had secretly been replaced as the President, Treasurer, Secretary, Officer and Director on the Nevada Secretary of State website for Magma and Meta. Id. ¶ 117. No notice was provided to Karter, nor was a Directors or Shareholders meeting held where the Officers, Directors or Shareholders could vote on the actions taken by Third-Party Defendants to purportedly remove Karter as the President, Treasurer, Secretary, Officer and Director for Magma and/or Meta. Id. ¶ 118. Given Karter's sudden and secret removal as an officer and director on the Nevada Secretary of State website for Magma and Meta, Karter was reasonably concerned that the $6,000,000.00 in the Meta bank account may no longer be safe. Id. ¶ 119. As a result of these concerns, on or about February 6, 2020, Karter wired approximately $6,000,000.00 from the Meta bank account to his personal savings account. Id. ¶ 120.

### i.  The State Court Action

On or about February 12, 2020, Karter filed a lawsuit in the Eighth Judicial District of Nevada State Court, Case No. A-20-810395-B ("State Court Action") against the Counterdefendants and Third Party Defendants alleging the claims he asserts in his countercomplaint, including fraudulent/intentional misrepresentation, negligent misrepresentation, breach of contract, breach of implied covenant of good faith and fair dealing both tort and contract, breach of fiduciary duty, constructive fraud, civil conspiracy, unjust enrichment, and declaratory relief.

The state court complaint sought that the $6 million be interpled or that the court issue an order  restricting anyone from accessing the $6 million until this dispute is resolved.

After Plaintiffs filed their ex parte temporary restraining order in this federal action, the $6 million in funds has now been deposited with this Court.

### III.   LEGAL STANDARD
#### a.   Motion to Dismiss

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Services, Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

### b. Motion to Appoint Receiver

"Appointing a receiver is an "extraordinary equitable remedy which should applied with caution." <u>Canada Life Assur. Co. v. LaPeter</u>, 563 F.3d 837, 844 (9th Cir. 2009) (internal citations omitted). There is no precise formula for determining when a receiver may be appointed. <u>Id</u>. Federal courts should consider a variety of factors when determining whether an appointment is warranted, including (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct by the party not moving for appointment of the receiver; (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squander; (4) whether legal remedies are inadequate; (5) whether the harm to the party moving for appointment would outweigh injury to the party opposing the appointment; (6) the moving party's probable success in the action and the possibility of irreparable injury to the moving party's interest in the property, and (7) whether the moving party's interests sought to be protected will in fact be well-served by receivership. <u>Id</u>. The Court has broad discretion in deciding to appoint a receiver, however, and no one factor is dispositive. <u>Id</u>. While state law may provide the vehicle for the appointment of a receiver, federal law always governs the issues of whether to appoint a receiver. <u>Id.</u>

## IV.    DISCUSSION

The Court first addresses Plaintiffs/Counter Defendants' Motion to Dismiss and then turns to the Motion to Appoint a Receiver.

### a. Motion to Dismiss

Plaintiffs/Counter Defendants seek to dismiss Karter's civil conspiracy, unjust enrichment, declaratory relief, constructive trust, alter ego, and accounting claims.[1] For the following reasons, the Court grants Counter Defendants' Motion to Dismiss in Part and Denies it in part.

### i. Civil Conspiracy

---

[1] Karter also has a claim for appointment of a receiver, however that claim is addressed separately in the portion of this order addressing the motion to appoint a receiver.

An actionable civil conspiracy "consists of a combination of two or more persons who by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results." Guilfoyle v. Olde Montmouth Stock Transfer Co., Inc., 335 P.3d 190, 198 (Nev. 2014) (citing Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc., 971 P.2d 1251, 1256 (Nev. 1998)).

Counter Defendants argue that a party is required to allege an underlying tort in order to have an actionable claim for conspiracy, but the Nevada Supreme Court has never held that this is a requirement.  See Cadle Co. v. Woods & Erickson, LLP, 345 P.3d 1049, 1052 (Nev. 2015) (noting that civil conspiracy may lie where "two or more persons undertake some concerted action with the intent to commit an unlawful objective, not necessarily a tort.").

Nevada law further recognizes that "agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on the behalf of the corporation and not as individuals for their individual advantage." Collins v. Union Fed. Sav. & Loan Ass'n, 662 P.2d 610, 622 (Nev. 1983).

Under the facts as alleged, the Court finds that Counter Claimant Karter has pled an adequate claim for civil conspiracy. The facts Karter pled established that Daniel and Michael conspired to use Magma and Meta funds to unlawfully divest Defendant Karter of his interest in Magma, formerly Eightcig, and that they did so for their individual advantage, rather than that of the corporations. To the extent that this claim is inconsistent with Counter Claimant's claim for alter ego, parties may plead alternative theories of liability. Fed. R. Civ. P. 8(d)(2). The Court will allow the claim to proceed.

**ii.  Unjust Enrichment**

"Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefits, and there is "acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." Certified Fire Prot. Inc. v. Precision Constr., 283 P.3d 250, 257 (Nev. 2012).

The Court finds that Karter has adequately pled a claim for unjust enrichment. Defendant Karter alleges in his complaint that his interest in Eightcig was unjustly conferred onto Magma, Meta, and the third-party defendants, and that it would be unjust for Magma and Meta to retain those interests.

The Court rejects Counter Defendants' arguments that the unjust enrichment claim cannot lie because there is an express written agreement. Karter alleges in his complaint that the written agreement at issue (the Eightcig Asset Purchase Agreement) is void and unenforceable. See Leasepartners Corp. v. Robert L. Brooks Tr., 942 P.2d 182, 187 (noting that unjust enrichment applies to situations where there is "no *legal* contract") (emphasis added). The Court will therefore allow the claim to proceed.

### iii.  Declarative Relief

The Court notes that Defendant Karter's counterclaims for declaratory relief are actually claims are for injunctive relief. See Olagues v. Russionello, 770 F.2d 791, 803 (9th Cir. 1985) (noting that "[t]here is a considerable difference between *ordering* a government official to conduct his activities in a certain manner, and simply *pronouncing* that his conduct is unlawful and *should* be corrected.").

However, failure to plead the correct legal theory is not grounds for dismissal of a claim. Johnson v. City of Shelby, Miss. 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

The Court shall decide the appropriateness of any permanent injunctive relief after all of the parties' claims have been decided on the merits. Edmo v. Corizon, Inc., 935 F.3d 757, 801 (9th Cir. 2019) (upholding lower court's issuance of permanent injunctive relief after holding trial on merits of the claims). These claims shall therefore be considered in the context of relief for the related substantive claims alleged.

### iv. Constructive Trust

"A constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it." Locken v. Locken, 650 P.2d 803, 804 – 05 (Nev. 1985). Under Nevada law, "imposition of a constructive trust requires: (1) that a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." Waldman v. Maini, 195 P.3d 850, 857 (Nev. 2008).

The Court finds that Defendant Karter has not adequately pled the elements for a constructive trust to be imposed on his interest in Eightcig. Counter Defendants argue that the claim is not valid because Karter does not plead that he has a confidential relationship with Magma and Meta. Karter argues in response that Magma and Meta were the alter egos of Michael and Daniel, with whom he undisputedly had a fiduciary relationship. However, Karter cites to no binding Nevada law, nor could the Court locate any such law, that establishes that alter ego liability allows a court to impute a fiduciary duty and confidential relationship from the alter ego to the corporation for the purposes of satisfying the elements of a constructive trust claim. Accordingly,

14

the Court shall dismiss the constructive trust counterclaim, with leave to amend, if Karter can plead facts demonstrating that he did in fact have a confidential relationship with Magma and Meta.

### v. Alter Ego

To establish alter ego liability, a party must plead that: 1) a corporation is influenced and governed by a person; 2) there is such unity of interest and ownership that the corporation and the person are inseparable from each other; and 3) adherence to the notion of the corporation being an entity separate from the person would sanction fraud or promote manifest injustice." Nev. Rev. Stat. § 78. 747.

Factors the court may look at when examining whether a person is the alter ego of a corporation include commingling of funds, undercapitalization, unauthorized diversion of funds; treatment of corporate assets as the individual's own; and failure to observe corporate formalities. LFC Marketing Grp, Inc. v. Loomis, 8 P.3d 841, 847 (Nev. 2000).

The Court finds that Counter Claimant Karter has adequately pled that Counter Defendants Magma and Meta are the alter egos of Third-Party Defendants Michael and Daniel. Karter pleads in his complaint that Michael and Daniel had control of Magma and Meta and used this control to improperly wire money to offshore accounts that they controlled personally. He also alleged that they influenced and governed both corporations in terms of their operations but contrary to their established corporate governance.

Counter Defendants argue that because Karter also alleged that he was the CEO of Magma and Meta, and was the sole founder, shareholder, corporate officer and director of both organizations, he cannot adequately plead that the Third-Party Defendants are the alter egos of Magma and Meta.

15

The Court disagrees. In the Countercomplaint, Karter pleads that as a minority shareholder he was unable to stop Michael and Daniel's actions and that his signature on various documents that justified or authorized the rollup of EightCig into Magma were forged. The Court does not find, based on the facts alleged by Karter, that the mere fact that Karter was an officer in name precludes a possible conclusion that Magma and Meta were in fact alter egos for Michael and Daniel.

The Court also disregards Counter Defendants' arguments regarding whether Karter adequately plead that Magma and Meta are undercapitalized, as the Nevada Supreme Court has never indicated that undercapitalization is a necessary prerequisite for determining that a person is the alter ego of a company. Loomis, 8 P.3d at 847 (noting that the factors the court may consider are "not conclusive," and that "there is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case.") (internal citations omitted). The other factors militate toward a finding that Daniel and Michael are the alter egos of Magma and Meta. Karter pleads facts sufficient to support a finding that there were unauthorized diversions of funds, that corporate assets were treated as the individual's own, and that there was a failure to observe corporate formalities. The Court shall allow this claim to proceed.

### vi.   Claim for an Accounting.

Both parties cite to the case Alexander v. Timberlake to allege the elements for a claim of accounting. No. 2:07-cv-00590-RLH-GWF, 2008 WL 11452529 at * 1 (D. Nev. Jan. 3, 2008). But that case articulates the elements for a claim of accounting under New York law rather than Nevada law. Id. at *3 (applying Nevada choice of law rules and applying New York law to the state law claims). The Nevada Supreme Court  does not appear to have yet recognized a common law claim for accounting nor is there a Nevada statute articulating the elements.

16

However federal common law recognizes accounting as an available equitable remedy. An accounting remedy is similar to a damage remedy. Wright & Miller, <u>Fed. Practice & Procedure</u>, § 2310. The courts of equity had jurisdiction to require an accounting under three circumstances. <u>Id</u>. First, a court sitting in equity could require an accounting when the relationship of the parties created an equitable duty of account. <u>Id</u>. citing <u>Andersen, Meyer & Co. v. Fur & Wool Trading Co.</u>, 14 F.2d 586 (9th Cir. 1926). Second, an equity court could act if "the complicated nature of the accounts" would make it difficult, if not impossible, for a jury to unravel the numerous transactions." <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469, 478 (1966). Third, the court could order an accounting on an otherwise legal claim if the request for an accounting was incidental to a demand for an injunction or any other equitable form of relief. Wright & Miller, <u>Fed. Practice & Procedure</u>, § 2310 (citing <u>Root v. Lake Shore & M.S. Ry. Co.</u>, 105 U.S. 189).

Federal courts are courts of equity. <u>Owner Operator Indep. Drivers Ass'n Inc. v. Swfit Transp. Co., Inc.</u>, 367 F.3d 1108, 1111 (9th Cir. 2004) (noting that federal courts have equity jurisdiction which gives them the power "to do equity and to mould each decree to the necessities of the particular case.")(internal citations omitted).

The Court finds that both parties have serious disputes as to the nature of several transactions made between the Counter Defendants and other entities. Accordingly, the Court finds that it lies within its equitable jurisdiction to order an accounting, and the Court will allow Counter Claimant Karter to proceed with a claim for accounting in this case.

### b. Motion to Appoint Receiver

The Court finds that the non-exclusive factors under <u>Canada River</u> warrant the appointment of a temporary receiver in this case.

The first factor supports the appointment of a temporary receiver. In the previous section of this order, the Court determined that Defendant Karter has pled legally plausible claims for civil conspiracy, unjust enrichment, alter ego, and injunctive relief for an accounting of the property at issue.

The second factor—whether there is fraudulent conduct or the probability of fraudulent conduct on the part of the party not moving for appointment—also supports the appointment of a receiver.

Defendant Karter has submitted credible allegations of possible fraud on the part of Plaintiffs. To support his motion, Karter submitted two declarations from a CPA. ECF No. 35-38, Greene Dec.; ECF No. 57-2; Suppl. Greene Dec. The CPA identified possible indicia of fraud including the lack of substantive documentation supporting alleged inventory purchases from third party vendors by Magma—including shipping documents or customs forms—and the payment by Magma of invoices that had been sent to Meta. The CPA also identified signatures and formatting on some agreements that suggested possible forgery.

In response, Plaintiffs submitted a declaration from their own expert and documentation purporting to substantiate several of the allegedly fraudulent transactions, including a supplemental declaration from Daniel. Having reviewed Plaintiffs' documents, however, the Court does not find that they necessarily vindicate Plaintiffs. Some of the documents are in untranslated Chinese. Others are lists with no explanations of their terms. Plaintiffs also attach 722 pages of packing lists and pro forma invoices that purport to establish and explain payments made from Magma to Troogle. But the pro forma invoices are not final invoices requesting payment, which would establish what goods were *actually* provided for in exchange for payment. They also do not include customs forms.

Plaintiffs also provide other "clarifying" documentation that does not actually clarify the purpose of some of the wire transfers. For example, Plaintiffs attach a text exchange between Karter and Daniel that supposedly establishes that the reasons for a March 25, 2019 wire transfer from Magma to Flamingo Technology, Limited was for "prepayment   for Flamingo's later provision of goods." ECF No. Decl. of Qian Xu, 25 – 26. But in the text message exchange, Daniel instructs Karter to "plz wire 1 million usd to this account tmr morning." When Karter asks why, Daniel responds, "They need 1m right now for branding." Nothing about this text exchange establishes that the $1 million is being sent as prepayment for goods.

In another example, Plaintiffs explain in a declaration that a $4 million payment to Flamingo was pursuant to a Tri-Partite Agreement that converted the payment into an investment by MOTI. But Plaintiffs do not actually attach the agreement.

Finally, Daniel states in his declaration that there was no record found for a March 25, 2019 of a $1 million wire payment from Magma to Troogle. But while there does not appear to be a record of a $1 million payment on that day, there does appear to be a record of a payment from Magma to Troogle for $520,779.37. ECF No. 57-2, Suppl. Decl of Greene, 26.  Daniel offers no explanation as to the purpose of that payment.

There are also no invoices produced from Troogle to Meta, despite Meta's wiring of $1,449,364.89 to Troogle in 2019. Plaintiffs attach an email showing that Karter approved a payment of consulting fees to Daniel. ECF No. 53-24. But the emails do not establish that there was ever any arrangement that Magma would issue consulting fees to Daniel, and that Karter approved the request is not inconsistent with his allegation that this is one of many transactions he was asked to effectuate for which he sought explanation but did not receive any. The Court finds

these allegations and Plaintiffs' incomplete documentation in response to be sufficient to suggest possible fraud which again supports the appointment of a receiver.

The third factor—whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered, also weighs in favor of appointing a receiver. Defendant Karter alleges the third-party defendants are transferring funds from Magma and Meta to off-shore companies for their own personal use. He further alleges that when the Court issued its temporary restraining order, that an addition $2.5 million in funds that became unfrozen may have been taken by plaintiffs for unauthorized use, and that plaintiff's counsel did not comply with defendant's request to not transfer $2.5 million until after the Court's hearing on the since-expired TRO. Def.'s Opp. TRO 7 n.1 . Defendant Karter has also alleged efforts on the part of the third-party defendants to eschew personal service but remain engaged in the everyday operations of Plaintiffs Magma and Meta. These allegations are sufficient to support a finding that if Plaintiffs were to have access to the funds, there is a possibility that the funds could be concealed or lost by transfer to a foreign account in response to the litigation in this case.

The fourth factor—whether legal remedies are inadequate, also weighs in favor of appointing of a receiver. Plaintiff argues that a legal remedy is adequate because Defendant Karter is seeking money damages, but Defendant Karter is also clearly seeking injunctive relief. Defendant Karter seeks to ensure that the value he allegedly retains in these companies is not mismanaged or squandered by Plaintiffs through improper financial transactions. This factor thus militates in favor of appointing a receiver.

The fifth factor—whether the harm to the party moving for appointment of appointment outweighs the harm to the party opposing appointment is neutral. Under either party's version of events, significant harm occurs. If the receiver is not appointed and the funds are returned to

Plaintiffs, then, according to Karter, his disputed interest in these companies would be severely harmed by the alleged fraudulent dissipation of resources which should be used to support the operation of the companies. Under Plaintiff's version of events, however, they could lose control over access to funds needed for their continued daily operating expenses.

The sixth factor, whether the party moving for appointment has a likelihood of success on the merits—weighs slightly in favor of receiver appointment. The Court acknowledges that this is a case in which both parties vociferously refute the other side's factual allegations.  This is also a case that will require significant credibility determinations on the part of the ultimate factfinder. However, based upon the documentation thus far and the Plaintiffs' incomplete responses to some of Karter's most serious allegations, the Court finds Karter has a likelihood of success on the merits on some of his substantive claims.

The Court finally finds that the seventh factor—whether the moving party's interest will be well-served by receivership—also weighs in favor of appointment. Appointing a receiver will allow an independent entity to manage the funds while the claims are adjudicated, which is in Karter's interest.

The Court acknowledges that the decision to appoint a receiver must not be taken lightly. But the Ninth Circuit has recognized that appointment of a receiver may be necessary in cases of possible fraud. See S.E.C. v. Wencke, 622 F.2d 1363, 1366 (9th Cir. 1980) (noting that a temporary receiver may be appointed to "take custody of and conserve whatever assets might remain for defrauded public investigations until he could fully investigate the complex corporate relationships [in the case]"). The Court also notes that the "appointment of a receiver . . . is [an] ancillary remedy that does not affect the action's ultimate outcome." Canada Life, 563 F.3d at 843. The Court thus concludes that the temporary appointment of a receiver is necessary.

The Court has reviewed the parties' list of receivers and objections to those receivers. The Court appoints Kevin Singer as the receiver, as the parties have stipulated.

## V.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Ka Tat "Karter" Au-Yeung's Motion to Appointer Receiver (ECF No. 36) is GRANTED. Kevin Singer of Receivership Specialists located at 7251 W. Lake Mead Blvd., Suite 300, Las Vegas, Nevada 89128, Phone: (702) 562-4230. This appointment is effective as of April 24, 2020.  The Receiver may begin the process of reviewing the disputed claims of the parties in this case and formulating a plan for addressing them to present to the Court.

**IT IS FURTHER ORDERED** that Defendant Ka Tat "Karter" Au-Yeung's Motion for Leave to File Excess Pages (ECF No. 34) is GRANTED nunc pro tunc.

**IT IS FURTHER ORDERED** that Counter Defendants/Plaintiffs Magma Holding, Inc and Meta Lab's Motion to Dismiss the Amended Countercomplaint (ECF No. 49) is granted in part. The Court dismisses Counter Claimant/Defendant Ka Tat "Karter" Au-Yeung's claim for a constructive trust without prejudice.

**IT IS FURTHER ORDERED** that Plaintiff Magma Holding, Inc's Motion to Extend Temporary Restraining Order (ECF No. 58) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Supplement to Motion for TRO and Order to Show Cause re Preliminary Injunction (ECF No. 66) is denied.

/ / /

/ / /

/ / /

22

**IT IS FURTHER ORDERED** that a videoconference hearing addressing the parameters of the temporary receivership and the complete assets that will fall under the control of the Receiver is scheduled for **Wednesday, April 29 at 10:30 AM** in LV Courtroom 7C before Judge Richard F. Boulware, II.

**DATED**: **April 24, 2020**.

_____

**RICHARD F.  BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

23